**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

MARSH USA LLC,

                                            Plaintiff,

            v.

ALFRED GRONOVIUS, ANDREA
AMODEO, CARLOS SERIO, GIOVANNI
PEREZ, JANETTE WILCOX, NATHAN
COLLINS, AND RICHARD LENNERTH

                                Defendants.

**Civil Action No**. 1:25-cv-9130

**JURY TRIAL DEMANDED**

---

## COMPLAINT

1.      Plaintiff Marsh USA LLC ("Marsh" or "the Company"), brings this case to stop

and remedy an organized effort by seven former employees—Defendants Alfred Gronovius, An-

drea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Len-

nerth—to misappropriate Marsh's confidential information and damage its business.  Marsh al-

leges, based on its own knowledge and on information and belief, as follows:

### INTRODUCTION

2.      This action arises from a coordinated and concealed scheme to misappropriate

Marsh's employees, clients, confidential information, and trade secrets—in direct violation of De-

fendants' clear and enforceable contractual and fiduciary obligations—and to deliver those assets

to Howden US Services, LLC ("Howden"), a direct competitor that previously had no U.S. insur-

ance business until Defendants helped provide one.  Acting together, Defendants enabled Howden

1

to enter the U.S. market overnight with a fully staffed workforce and book of business built on decades of Marsh's investment and work.

3.      The scheme began at the top, led by four senior executives in Marsh's "Florida Zone": Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton (the "Florida Zone Leaders").  Over many months, those leaders covertly recruited Marsh's employees to resign, using Marsh's confidential information to facilitate the departures.  The Florida Zone Leaders' plan culminated on July 21, 2025, when nearly the entire Florida Zone—more than 90 Marsh employees, including Defendants—resigned from Marsh in a single, coordinated departure.  The conduct of the Florida Zone Leaders is already the subject of a related action in this District, *see Marsh USA LLC v. Michael Parrish, et al*., No. 1:25-cv-06208 (S.D.N.Y. July 29, 2025), ECF No. 1 (Daniels, J.) (the *"Parrish"* action), in which the Court granted Marsh a preliminary injunction to halt the ongoing unlawful solicitation of its workforce and clients and the misuse of its confidential information, *see Marsh USA LLC v. Michael Parrish, et al*., 2025 WL 2676389 (S.D.N.Y. Sept. 18, 2025) (decision granting preliminary injunction).

4.      That preliminary injunction followed a five-hour hearing before Judge George B. Daniels, who held that Marsh was likely to succeed on the merits of its claims that the Florida Zone Leaders breached their non-solicitation and confidentiality covenants.  Judge Daniels rejected as "disingenuous" the assertion that nearly 100 coordinated resignations were coincidental, credited sworn testimony that the leaders had promised promotions and pay raises and directed employees to download confidential client files.  And Judge Daniels concluded that Marsh faced irreparable harm from the loss of client relationships and the threatened use of its confidential strategies.

5.       While the Florida Zone Leaders conceived and directed the plan, they did not act alone.  Marsh's ongoing investigation has now revealed that the scheme's success depended on a second tier of senior personnel that included seven additional former Marsh employees who executed the plan on the ground: Defendants Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth.  Each held a leadership or senior client-facing role within the Florida Zone and reported directly or indirectly to Parrish and the other Florida Zone Leaders.  Each Defendant had regular conduct with Marsh's clients (or managed or reported to individuals who did).  They not only sold insurance to these clients, but maintained relationships with them on Marsh's behalf, harnessing and developing the goodwill and trust that forms the basis of Marsh's business and allows it to be a leader in its field.  Marsh provided Defendants the resources they needed to facilitate and maintain these strong client relationships, which included access to skills-based trainings, strategy playbooks, data analytics and research, and other trade secrets that Marsh invested significant time and money to develop.

6.       In the days and weeks before the raid, Defendants engaged in turncoat conduct designed to benefit Howden (Marsh's direct competitor) at Marsh's expense.  Several Defendants solicited other Marsh employees—including subordinates within their reporting lines—to join Howden, while still employed by Marsh.  Others accessed, printed, and electronically transmitted Marsh's trade secrets and confidential information—in violation of Marsh policy and their contractual agreements—to equip themselves with the tools needed to unlawfully solicit clients to move their business to Howden and continue servicing them there.  Several Defendants also deleted a significant volume of Marsh's documents on their way out the door, an attempt to conceal from Marsh their disloyal service, deprive Marsh of its property, and sabotage Marsh's business by obstructing its ability to compete fairly in the market.  The documents Defendants accessed,

stole, and in some cases, deleted, included compilations of client relationship data, pricing and revenue structures, and internal trainings and strategic documents—information that confers a substantial competitive advantage by remaining secret.  The misappropriation of these trade secrets was integral to the raid.

7.      Defendants' misconduct did not end with their resignations.  For example, in the time since the mass resignations, at least one Defendant prepared documents for clients to transfer their accounts to Howden, confirming their integral involvement in the unlawful solicitation of those clients to follow Defendants from Marsh to Howden.  Several others have continued using Marsh's confidential information and trade secrets to solicit Marsh's clients—causing significant economic loss and further erosion of Marsh's goodwill.  And at least one continues to service a client at Howden that he previously serviced at Marsh, despite a contractual obligation to refrain from doing so.

8.      Through these actions, Defendants have violated their binding contractual commitments not to solicit Marsh employees or clients, not to disclose or misuse Marsh's confidential information and trade secrets, and their fiduciary duty to maintain loyalty to Marsh.  Their ongoing breaches threaten to compound the harm already inflicted by the initial mass defection.

9.      What's more, Defendants' continuing conduct demonstrates their ongoing efforts to obstruct Marsh's investigation into the raid and ability to stop the resulting harm.  Now that discovery has commenced in the *Parrish* action, Marsh has served non-party subpoenas to Defendants Amodeo, Serio, Perez, Collins, and Lennerth, requesting documents and information concerning their roles in the raid.  In response to these subpoenas, Defendants have refused to produce a single document. They have provided no legitimate basis for this stonewalling (indeed, none

exists). Defendants' obstruction of Marsh's efforts to investigate their misconduct confirms they have more to hide.

10.     Marsh invested years and millions of dollars to build its specialized retail brokerage business in Florida. But Defendants' continuing efforts to divert Marsh's employees and clients, as well as their brazen theft of Marsh's confidential information and trade secrets, have caused— and continue to cause—substantial and irreparable harm to that business. Marsh has brought two actions to remedy that severe damage—one against the former Marsh leaders who pilfered it and another against Howden for tortiously unleashing Marsh's former employees against it. Now with evidence of further misconduct by the Defendants in this case (and with Marsh's investigation of the now more than 100 employees who have departed still ongoing), Marsh brings this new action to enjoin Defendants' ongoing unfair competition, to recover the damages they have caused, and to vindicate Marsh's statutory and bargained-for contractual rights.

## PARTIES

11.     **Marsh**. Plaintiff Marsh USA LLC is a single-member limited liability company whose sole member is incorporated in Delaware with its principal place of business in New York. Marsh USA LLC and its sole member are both, therefore, citizens of Delaware and New York. Marsh's headquarters is located at 1166 Avenue of the Americas, New York, New York 10036.

12.     **Gronovius**. Defendant Alfred Gronovius was employed by Marsh as a Corporate Segment Team Leader in the Florida Zone responsible for acting as a strategic account manager in Marsh's healthcare practice, specializing in professional medical liability and general property and casualty placements for large healthcare systems and physician groups. He was based out of Marsh's Tampa, Florida office. Gronovius is domiciled in and a citizen of Florida.

13.     Gronovius was highly compensated through his: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

14.    As a Corporate Segment Team Leader, Gronovius had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets. This included: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for his team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

15.    Gronovius executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants. On June 15, 2021, Gronovius executed five agreements containing binding covenants: (1) an offer letter ("Gronovius Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Gronovius NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Gronovius CA"); (4) the "Supplemental Terms and Conditions of Employment" ("Gronovius STE"); and (5) the "Sign-On Bonus Agreement" ("Gronovius SBA").

16.    **Amodeo**. Defendant Andrea Amodeo was employed by Marsh as a Senior Associate, Client Executive in the Florida Zone, responsible for client accounts, including managing the renewal process, acting as a point of contact for clients, and participating in business development. She was based out of Marsh's Miami, Florida office. Amodeo is domiciled in and a citizen of Florida.

17.    Amodeo was highly compensated through her: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

18.    As a Senior Associate, Client Executive, Amodeo had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets. This included: strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

19.    Amodeo executed binding agreements in connection with and in exchange for her continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants. On June 9, 2021, Amodeo executed five agreements containing binding covenants: (1) an offer letter ("Amodeo Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Amodeo NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Amodeo CA"); (4) the "Supplemental Terms and Conditions of Employment" ("Amodeo STE"); and (5) the "Sign-On Bonus Agreement" ("Amodeo SBA").

20.    **Serio**. Defendant Carlos Serio was employed by Marsh as a Corporate Segment Team Leader in the Florida Zone. He was responsible for managing a team handling complex client accounts, drafting project analyses and presentations, and conducting market research to identify business development opportunities. He was based out of Marsh's Miami, Florida office. Serio is domiciled in and a citizen of Florida.

21.    Serio was highly compensated through his: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

22.    As a Corporate Segment Team Leader, Serio had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets. This included financial and

business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for his team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

23.    Serio executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  On June 10, 2021, Serio executed five agreements containing binding covenants: (1) an offer letter ("Serio Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Serio NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Serio CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Serio STE"); and (5) the "Sign-On Bonus Agreement" ("Serio SBA").

24.    **Perez**.  Defendant Giovanni Perez was employed by Marsh as a Senior Associate, Client Executive in the Florida Zone, responsible for overseeing and cultivating Marsh's client portfolio, providing guidance and ensuring delivery of high-quality products and solutions.  He was based out of Marsh's Miami, Florida office.  Perez is domiciled in and a citizen of Florida.

25.    Perez was highly compensated through his: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

26.    As a Senior Associate, Client Executive, Perez had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets.  This included: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and

commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

27.     Perez executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, non-competition covenants, client and employee non-solicitation covenants, and confidentiality covenants. In 2023, Perez executed five agreements containing binding covenants: (1) an offer letter ("Perez Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Perez NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Perez CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Perez STE");  and (5) the "Sign-On Bonus Agreement" ("Perez SBA").

28.     **Wilcox**.  Defendant Janette Wilcox was employed by Marsh as a Corporate Segment Leader in the Florida Zone, serving as a strategic relationship officer for key accounts and leading Marsh's Corporate Account Management team.  She was based out of Marsh's Jacksonville-Baypine, Florida office.  Wilcox is domiciled in and a citizen of Florida.

29.     Wilcox was highly compensated through her: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

30.     As a Corporate Segment Leader, Wilcox had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets.  This included: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and historic client

information; information regarding the cost and revenue structure of client accounts and place-ments; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for her team, including their salaries, bo-nuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

31.     Wilcox executed binding agreements in connection with and in exchange for her continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  On June 10, 2021, Wilcox executed five agreements containing binding covenants: (1) an offer letter ("Wilcox Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Wilcox NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Wilcox CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Wilcox STE"); and (5) the "Sign-On Bonus Agreement" ("Wilcox SBA").

32.     **Collins**.  Defendant Nathan Collins was employed by Marsh as a Corporate Seg-ment Team Leader in the Florida Zone, responsible for managing a team handling complex client accounts, drafting project analyses and presentations, and conducting market research to identify business development opportunities.  He was based out of Marsh's Tampa, Florida office.  Collins is domiciled in and a citizen of Florida.

33.     Collins was highly compensated through his: (1) base salary; (2) incentive compen-sation; (3) equity awards and other incentives.

34.     As a Corporate Segment Team Leader, Collins had access to Marsh's highly con-fidential and proprietary information, including Marsh's trade secrets.  This included: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and

historic client information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

35.    Collins executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  In early 2014, Collins executed four agreements containing binding covenants: (1) an offer letter ("Collins Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Collins NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Collins CA"); and (4) the "Sign-On Bonus Agreement" ("Collins SBA").

36.    **Lennerth**.  Defendant Richard Lennerth was employed by Marsh as a Senior Sales Executive in the Florida Zone responsible for maintaining and growing a large client portfolio, developing sales proposals and presentations, conducting outreach to potential clients, leading complex account processes, and interfacing and maintaining relationships with client representatives.  He was based out of Marsh's Tampa, Florida office.  Lennerth is domiciled in and a citizen of Florida.

37.    Lennerth was highly compensated through his: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

38.    As a Senior Sales Executive, Lennerth had access to Marsh's highly confidential and proprietary information, including Marsh's trade secrets.  This included: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh over time and at considerable expense, including valuable non-public and historic client

information; information regarding the cost and revenue structure of client accounts and place-ments; and information regarding client account renewal schedules and non-public client needs and preferences.

39.    Lennerth executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  In 2014, Lennerth executed three agreements containing binding covenants: (1) an offer letter ("Lennerth Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agree-ment" ("Lennerth NSA"); and (3) the "Marsh USA Inc. Confidentiality Agreement" ("Lennerth CA").

## JURISDICTION AND VENUE

40.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.  Marsh is a citizen of Delaware and New York.  Each Defendant is domiciled in, and therefore a citizen of, Florida.

41.    This Court also has federal question jurisdiction under 28 U.S.C. §§ 1333 and 1367 because Marsh asserts a claim under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1832 *et seq.*  The Court has supplemental jurisdiction over Marsh's related state-law claims un-der 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

42.    This Court has personal jurisdiction over each Defendant.  By signing and accept-ing the benefits of binding employment agreements containing forum-selection clauses, each De-fendant expressly consented to this Court's jurisdiction.  Those agreements include the Non-So-licitation Agreements ("NSAs") signed by Gronovius, Amodeo, Serio, Perez, and Wilcox, each of which provides that any action "shall be brought exclusively . . . in the United States District Court

for the Southern District of New York . . . and the parties agree to the personal jurisdiction thereof," and the NSAs signed by Collins and Lennerth, which contain materially identical provisions. This also includes the Supplemental Terms and Conditions of Employment ("STEs") that Gronovius, Amodeo, Serio, Perez, and Wilcox executed, which provide for New York governing law and exclusive jurisdiction and venue in New York state or federal courts.

43. There is a strong and reasonable basis for the parties' choice of this forum. Marsh's principal place of business and corporate headquarters are located at 1166 Avenue of the Americas, New York, New York 10036. Marsh maintains substantial operations in this District, and many employees in the Florida Zone—including Defendants—worked closely with Marsh personnel in New York and served New York-based clients.

44. In addition to their contractual consent to this forum, this Court has specific personal jurisdiction over each Defendant because they each regularly transacted business in New York, including with Marsh, which is headquartered here. Each Defendant interacted with Marsh clients and colleagues in this District and traveled to New York for business meetings with Marsh leadership, clients, or prospects. At a minimum, Gronovius and Collins attended internal Marsh meetings and client sessions in New York.

45. Venue is proper in this District because each Defendant expressly agreed, by executing their respective covenants, that any action arising from those agreements or their employment must be brought in this Court and that they waive any objection to venue.

46. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District: (1) Defendants owed duties to their New York-based employer; (2) Marsh discovered the breaches in New York;

and (3) Marsh maintains in this District the confidential information and trade secrets central to its claims.

## FACTUAL BACKGROUND

I. **Marsh built an industry-leading platform through decades of investment in people, confidential information, trade secrets, and proprietary know-how.**

47.    Founded in 1871, Marsh is a leading insurance brokerage and risk management firm. Marsh provides insurance broking, consulting, and claims advocacy services through a comprehensive platform that serves every segment of the market, including complex specialty accounts in healthcare, energy, construction, marine, and real estate. Serving these accounts requires expertise and relationships developed over years. Marsh has made those investments, building and training teams to serve critical and highly profitable clients.

48.    Marsh organizes its business by geographic "Zones." Defendants worked in the Florida Zone. As in other Zones, Florida personnel provide risk analysis, insurance program design and placement, insurance program support and administration, claims support and advocacy, alternative risk strategies, and a wide array of risk analysis and risk management consulting services.

49.    Florida Zone clients benefit from Marsh's advanced analytics, technical expertise, and industry knowledge, along with collaboration across Marsh's global network. The Florida Zone services clients of all sizes, including large multinational companies, high growth middle-market businesses, small commercial enterprises and high net-worth private clients, and affinity groups. These segments are designed to tailor value propositions and operating models to client needs.

50.    In recent years, Marsh invested significant time, millions of dollars, and goodwill to make the Florida Zone into a market leader and to develop and train its employees. Marsh

expanded production and client-service capacity, opened and improved offices, and built the Zone's brand presence. Florida Zone employees received extensive training, client development resources, and cross-selling opportunities.

51.    Florida Zone employees—including Defendants during their employment—leveraged Marsh's domestic and international talent and unique market relationships with insurance carriers to deliver customized solutions. They used Marsh's technology to enhance client servicing capabilities and efficiencies.

52.    Before July 2025, more than 100 Marsh employees worked in the Florida Zone, comprising the majority of Marsh's Florida workforce.

53.    Florida Zone employees—including Defendants—managed substantial client revenue for Marsh.

## II.    Marsh trained Defendants and granted them access to Marsh's confidential information and trade secrets.

54.    Marsh provided Florida Zone employees, including Defendants, with broad access to sensitive confidential information and trade secrets that Marsh developed, refined, and protected at substantial expense.

55.    Marsh trusted Defendants with access to Marsh's confidential information, including the identities of Marsh's clients and prospects, contracts terms and conditions, and information concerning Marsh's workforce and organizational structure.

56.    By virtue of their senior positions in the Florida Zone, Marsh also trusted Defendants with highly valuable and safeguarded trade secrets, including:

      a.  ***Client Folders***: Compilations of documents containing binders, policies, claim histories, renewal terms, premiums, commission structures, risk analyses, and coverage details across a client's business. These documents reflect years of relationship capital and effort. Because they provide everything a competitor would need to solicit and transition an account, they are extremely valuable and safeguarded. Indeed, a single client file in the hands

of a competitor could jeopardize Marsh's relationship with that client, a relationship Marsh spent significant time and effort developing as its broker of record. Marsh therefore derives economic value from their secrecy. They reside on password-protected systems and are shared only with third parties on a need-to-know basis (for example, when soliciting bids for insurance quotes).

    b.   ***Compilations of Client Relationship Data and Account Intelligence***: Lists of clients with associated revenue, renewal periods and status, fee and commission structures, and detailed contact information and notes developed over time at significant cost. These non-public compilations of data and intelligence are extremely valuable to Marsh and safeguarded. Disclosure would significantly harm Marsh by enabling targeted diversion of accounts. Maintaining the secrecy of these compilations is thus independently valuable to Marsh.

    c.   ***Client and Partnership Objectives and Profitability "Playbooks"***: Presentations and models reflecting Marsh's client, carrier, and partner-specific strategies, placement approaches, and coordinated growth plans by industry. These safeguarded playbooks map strategic relationships and growth priorities. They provide highly confidential information about Marsh's existing business and strategy to grow its business moving forward, including by identifying geographical areas and industries or sectors where Marsh has had success, growth, or room for improvement. Maintaining their secrecy provides economic value to Marsh, as access to this information would allow a competitor to intercept and replicate Marsh's strategy to Marsh's detriment.

    d.   ***Internal Training Documents***: Trainings that provide detailed information about how Marsh operates its business, including detailed processes for onboarding clients, preparing and managing renewals, and delivering Marsh's service model. These documents also identify unique aspects of Marsh's business model. These non-public and safeguarded materials confer a substantial competitive advantage to Marsh, and would be particularly valuable to a new market entrant seeking to compete with the Company. Maintaining the secrecy of these documents thus provides economic value to Marsh beyond the value of the information itself.

57.    Marsh's trade secrets and confidential information are Marsh's property.

58.    Marsh went through great lengths at enormous expense to develop, collect, and refine its confidential information and trade secrets to benefit its business, which are vital to

Marsh's ability to compete.  These documents provide significant competitive advantages.  Marsh heavily invested to collect, refine, and protect this information.

59.    Marsh employs robust protocols to protect its confidential information and trade secrets and to guard against unfair competition. Among other measures, employees sign non-solicitation and confidentiality agreements; receive regular reminders via the employee handbook ("Working Here"), the Code of Conduct, and trainings; are granted access only on a need-to-know basis; and encounter password protection and data-loss-prevention tools that encrypt or block sensitive transmissions and restrict use of personal email and unapproved cloud storage.  Marsh's computer system requires from employees two sets of passwords in order to gain access.  Marsh also requires multi-factor authentication to access certain parts of its systems.  And certain document folders, drives, Teams sites, and similar repositories of confidential information and/or trade secrets have electronic access restrictions in place that allow only certain employees to access them.

60.    Marsh's Code of Conduct prohibits coordinating with competitors on fees, commissions, or strategic plans; restricts use and disclosure of confidential information and trade secrets to legitimate business purposes; and requires sharing it only with authorized parties.  Marsh's data loss prevention ("DLP") system lags and encrypts sensitive outbound transmissions and protects internal networks from suspicious inbound traffic.  Personal webmail and unapproved cloud storage (e.g., DropBox), are prohibited on company devices with rare exceptions.

61.    Marsh also secures information at separation.  For all employees, Marsh disables accounts and blocks network access upon termination of employment.  In certain circumstances— for example, when an employee resigns to work for a competitor and will not be working during

their notice period—Marsh disables accounts and blocks network access upon notice of resignation. Departing employees must return their corporate devices; equipment is collected on-site or via prepaid shipping.

### III. Marsh protected its investments with reasonable restrictive covenants that Defendants freely accepted.

62.    To safeguard client and employee relationships and protect trade secrets and confidential information, Marsh requires industry-standard agreements, including Confidentiality Agreements and Non-Solicitation Agreements, governed by New York law.

63.    Each Defendant executed multiple binding agreements with Marsh, received substantial compensation and benefits, and accepted the associated covenants.

### Confidentiality Agreement.

64.    Defendants executed a Confidentiality Agreement ("CA") when they joined Marsh.

65.    Defendants' CAs apply to employees of Marsh USA, Inc. and its subsidiaries, including Marsh USA, LLC.

66.    Defendants' CAs acknowledge that Marsh is "engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense."

67.    Defendants' CAs acknowledge that "any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage."

68.    Defendants' CAs prohibit, in perpetuity, disclosure of Marsh's confidential information and trade secrets for any purpose except for as required to carry out employment for Marsh, or as expressly authorized by the Company.

69.    Defendants' CAs define confidential information and trade secrets as follows:

(a)    *"Confidential Information and Trade Secrets are items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its effort and expense. Confidential Information and Trade Secrets can be in any form, including but not limited to: verbal, written or machine readable, including electronic files. Trade secrets are items of Confidential Information that meet the requirements of applicable trade secret law. The absence of any marking or statement that any particular information is Confidential Information or trade secret shall not affect its status as Confidential Information or trade secret. Confidential Information and Trade Secrets include but are not limited to:*

(i)    *financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;*

(ii)    *product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects;*

(iii)    *client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;*

(iv)    *personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.*

(v)    *any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;*

*(vi)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; . . . ."*

70.    Defendants' CAs also require the return of all Marsh property immediately upon the termination of employment with Marsh.  The CAs defines Marsh property to include:

*i. any originals and all copies of all files, notes, documents, slides (including trans-parencies), computer disks or drives or other equipment, printouts, reports, lists in my possession or control which contain or pertain to Confidential Information and Trade Secrets; and*

*ii. all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment, including all passcodes or passwords associated with such equipment.*

71.    Defendants' CAs also require Defendants, upon the termination of their employment with Marsh, to "execute a statement declaring that [they] have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have [they] supplied the same to any person, except as required to carry out [their] duties as an employee of the Company."

72.    Defendants' CAs provide that Marsh would be entitled to equitable relief for breach of the CAs, including "specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond)" and "recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

**Non-Solicitation Agreement.**

73.    Defendants executed Non-Solicitation Agreements ("NSA") with Marsh.

74.    Defendants' NSAs apply to employees of Marsh USA, Inc. and its subsidiaries and affiliates, including Marsh USA, LLC.

75.    Defendants' NSAs acknowledge that the agreement's restrictions are reasonable and necessary to protect Marsh's legitimate business interests.

76.    Defendants' NSAs prohibit the solicitation and continued servicing of clients or employees according to the following terms:

*2.    Non-Solicitation Of Clients*

*(a)    Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of good will developed by Company with its clients.*

*(b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, . . . Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 2(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and*

*Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.*

*3. Non-Solicitation Of Employees*

*Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.*

77.     Under the terms of their respective NSAs, Defendants expressly agreed to refrain from *directly or indirectly* soliciting Marsh employees and customers, as defined in the agreement, while employed and for twelve months after the termination of their employment.

78.     Under the terms of their respective NSAs, Defendants expressly agreed, for twelve months after the termination of their employment, to refrain from *directly or indirectly* providing Marsh clients the services they provided while at Marsh if the Defendant had contact with the client or obtained confidential information and trade secrets about the client during the last two years of employment with Marsh.

79.     Under the terms of their respective NSAs, Defendants agreed that New York law governs this agreement and any disputes arising from it, including the present action, and that lawsuits related to the agreement must be filed in New York.

80.     Under the terms of their respective NSAs, Defendants agreed that Marsh would be entitled to equitable relief, including "specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond)" and "recovery of all seasonable

sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

81.     Under the terms of their respective NSAs, Gronovius, Amodeo, Serio, and Wilcox agreed that Marsh would be entitled to liquidated damages for their breaches of the NSA's client non-solicitation provisions.  Lennerth and Collins agreed that Marsh would be entitled to liquidated damages for their breaches of the NSA's client or employee non-solicitation provisions, as well as the conflict of interest provision.

## IV.     Defendants, alongside the Florida Zone Leaders, perpetrate a shocking raid on Marsh's business, culminating in the loss of numerous clients and the resignations of more than 90 employees within a single day.

82.     Beginning in spring 2025 and culminating in July 2025—and continuing thereafter—the Florida Zone Leaders Parrish, Lugones, Lynn, and Layton spearheaded a methodical raid that resulted in the near simultaneous departure of nearly all Florida Zone employees and a growing number of Marsh's clients to Defendants' new employer.

83.     Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth—senior Florida Zone personnel reporting directly or indirectly to Parrish and the other Florida Zone Leaders—executed the raid by leveraging confidential information and trade secrets about Marsh's workforce, business, and clients to drive a coordinated campaign to recruit employees and divert clients to Howden.

84.     On Thursday, July 18, 2025, news of the impending raid leaked to the press.  The Florida Zone Leaders and their lieutenants, including Defendants, accelerated their plan.  Gronovius, Amodeo, Serio, Wilcox, and Collins pressed the employees of the Florida Zone to resign *en masse*.  Gronovius, Serio, and Perez also solicited clients to leave Marsh for Howden with them, despite Howden having no existing U.S. business to absorb and service these new clients.  Each Defendant accessed, downloaded, and/or transmitted Marsh's confidential information and trade

secrets, including client folders, compilations of client relationship data and account intelligence, partnership objectives and profitability "playbooks," and internal training documents for onboarding clients. And in a glaring admission of guilt, Gronovius, Amodeo, Serio, and Perez deleted the confidential information and trade secrets they accessed off of Marsh's systems in an attempt to cover their tracks and conceal their disloyal service, deprive Marsh of its property, and sabotage Marsh's business by obstructing its ability to compete fairly in the market.

**V.    Defendants Gronovius, Amodeo, Serio, Wilcox, and Collins unlawfully solicited and serviced Marsh employees to join Marsh's competitor, Howden.**

85.    In the days following the press leak, Gronovius, Amodeo, Serio, Wilcox, and Collins contacted Marsh employees seeking personal contact information, urging departures, discussing compensation at Howden, and coordinating timing. They engaged in textbook solicitation.

86.    Between July 15 and July 17, 2025, Gronovius spoke repeatedly with several Marsh employees about leaving Marsh. He made five calls to a single colleague soliciting that person to leave Marsh for Howden. Those employees—and multiple others—that Gronovius contacted resigned shortly thereafter.

87.    On July 18, 2025, Serio held back-to-back calls with a key ringleader of the raid, Parrish, and a Marsh employee who later resigned. The following day, Serio told another Marsh employee that nearly everyone that employee worked with was leaving, described the higher compensation the employee could expect at Howden—in a position the employee had not applied for—and asked her to keep their conversation confidential. The employees Serio contacted resigned days later.

88.    On July 19, 2025, Amodeo reached out to a Marsh colleague outside her reporting line from Amodeo's personal phone. That employee resigned two days later. Between calls to

that employee, she spoke with Parrish, one of the masterminds behind the raid. Her calls to this employee were attempts to solicit him to leave Marsh for Howden.

89.    On July 18, 2025, Wilcox asked one employee for his personal email address so that employee could receive an offer from Howden, even though the employee had not applied for a job at Howden, submitted a resume to the company, or interviewed for any position. On July 20, 2025, she texted another employee to call her "as soon as she could." Both employees Wilcox contacted later resigned.

90.    By day's end on July 21, 2025, more than 90 Marsh employees—many reporting directly or indirectly to Defendants—had resigned or informed Marsh that they had offers from Howden. None interviewed with Howden or provided resumes or applications. All of these Marsh employees had jobs in the bag. That could not have happened without Defendants' disloyalty and brazen disregard for their contractual obligations.

91.    Defendants' solicitation continued after their departures from Marsh. For example, the day after leaving Marsh, Collins texted a group of Marsh employees, "Rick is with us!"— referring to Defendant Richard "Rick" Lennerth, whom Collins convinced to leave Marsh for Howden. Lennerth resigned from Marsh the next day.

92.    The raid continues. To date, more than 140 Marsh employees have defected to Howden since July 21, 2025.

93.    These solicitations breached Defendants' contractual obligations and harmed Marsh. While isolated departures are commonly managed, a coordinated lift-out of an entire business unit risks client coverage lapses and significant operational disruption—precisely the harm the narrowly tailored covenants are designed to prevent.

**VI.    Defendants Gronovius, Serio, and Perez solicited and serviced Marsh's clients in further breach of their duties.**

94.    Defendants' raid did not stop with employees.  Starting on the same day as the mass resignation—July 21, 2025—and continuing thereafter, Marsh clients began notifying Marsh that they would be moving their business to Howden.  They did so by submitting Broker of Record or "BOR" letters, the industry document that authorizes a new broker to act on a client's behalf and directs insurers to share client information with that broker.  A BOR transfers responsibility for managing a client's insurance program and reflects the client's decision to move its business.  Receipt of a BOR signifies that the account has moved to a new broker—known in the industry as having "BOR'd."  To date, Marsh has received at least 50 post-raid BORs, at least 20 of which confirmed a client's intention to move to Howden.  Nearly all of the clients who filed these BORs were serviced directly or indirectly by Defendants at Marsh.

95.    That these clients BOR'd from Marsh to Howden shortly following the raid is no coincidence.  Like the Florida Leaders, Defendants Gronovius, Serio, and Perez contacted the clients with whom they worked and solicited them to move from Marsh to Howden with them.  And move they did.

96.    For example, on July 22, 2025, Gronovius called a Marsh client he had serviced to solicit that account to move to Howden.   He also prepared BORs for several clients using his personal email account following his departure, assisting these clients in moving their business from Marsh to Howden.  Further, two clients whose files Gronovius accessed on July 20 and 21 BOR'd immediately after Gronovius resigned from Marsh on July 21, indicating that Gronovius had used the information he accessed on Marsh's system to solicit them to move to Howden.

97.    Serio engaged in similar solicitation efforts.  During the late afternoon of Friday, July 18—the same the day news of the raid leaked to the press—Serio held back-to-back calls with

Parrish, the ringleader of the raid, and two Marsh clients ("Client A" and "Client B"), all within the span of one hour. One of those clients has since BOR'd. Then, in the early morning of July 21 (the day Serio resigned), Serio communicated again with the clients he attempted to solicit on July 18 in coordination with Parrish. Serio sent a text message to Client A, writing: "Apologies for the early text, but please give me a call as soon as you're available." Approximately an hour later, Serio wrote Client A again: "I am sending you your files through a system Marsh uses called Kiteworks. It'll give you an email with a link and password to download." Using Kiteworks, Marsh's secured data-transfer site, Serio sent a compressed folder (.zip files) containing hundreds of files. Later that day, Serio also sent a compressed file containing more than 1,000 files through Kiteworks to Client B. These large, compressed folders contained trade secrets, including policy records, pricing and premium allocations, claims histories, renewal schedules, and risk-exposure data. There would be no legitimate explanation for Serio to send a client this large number of files in the ordinary course of Marsh business, especially not days before he resigned from the Company. By transferring the client files to the clients, Serio enabled them to seamlessly transfer their business from Marsh to Howden.

98.     Perez also used Kiteworks to send Marsh clients mass .zip files containing their insurance documents, including on July 17, 2025. By transferring the client files to the clients, Perez enabled them to seamlessly transfer their business from Marsh to Howden. Further, at least two clients whose files Perez accessed at Marsh shortly before the raid later BOR'd, indicating that Perez had used the Marsh information he accessed to solicit them to move to Howden.

99.     And at least one Defendant continues to violate his NSA to this day. On October 17, 2025, Gronovius contacted a former client of Marsh's that had BOR'd for Howden, asking the client to request from Marsh financial information from the 2020-2025 policy years (during which

time Marsh was the client's broker of record, and during which time Gronovius serviced the ac-

count). Gronovius discussed with the former client the information the former client will need to

insure certain of its programs, and noted that he has reviewed information the client provided to

him. This confirms that Gronovius continues to service the client's account at Howden. In so

doing, Gronovius is further violating his NSA, which as noted above, requires he refrain for twelve

months from "perform[ing] or supervis[ing] the provision" of the same services he provided at

Marsh to any clients with whom he had contact at Marsh during the last two years.

100.    Through these coordinated acts, Defendants Gronovius, Serio, and Perez, along

with others acting in concert with them, unlawfully lured Marsh's clients away from the Company

and into the hands of its direct competitor, causing Marsh substantial and ongoing economic harm.

## VII.    Defendants misuse Marsh's confidential information and trade secrets for the benefit of Marsh's competitor, Howden.

101.    Defendants solicited Marsh's clients to leave the Company for its direct competitor,

Howden, even though Howden had no U.S.-based insurance business at all, and no established

U.S. infrastructure to absorb and service these new clients. Defendants enabled Howden to get its

U.S. business off the ground in record speed, and service the clients Defendants had lured away

from Marsh, by unlawfully bringing to Howden trade secrets and confidential information belong-

ing to their former employer. These trade secrets and confidential information legally belonged to

Marsh. Defendants therefore violated both their contractual and common-law duties.

102.    Gronovius repeatedly accessed and transmitted Marsh's trade secrets in connection

with the raid. In the months leading up to his resignation, Gronovius emailed confidential client

documents directly from his work account to his personal address in direct violation of Marsh

policy and without any legitimate business justification. In the final days before his resignation,

he also accessed and printed Marsh client files—including the files for two clients that BOR'd

almost immediately after the raid.  And, a few days before his resignation, Gronovius accessed a compilation of client prospects detailing referral information, renewal dates, total premiums, and projected revenue.  Together, the documents Gronovius accessed, electronically transmitted, and printed detail Marsh's unique strategic approach for providing insurance solutions for its valuable clients—essentially a playbook of Marsh's strategies it has developed over years of industry experience and significant investment for assessing exposures, identifying suitable policies, and advising clients on risk tolerance in the client's industry.  These highlight confidential documents, which were valuable in part because they were non-public, constituted Marsh's trade secrets. Gronovius lacked authority or justification for accessing, electronically transmitting, and printing these trade secrets.

103.    As described above, in the days and weeks preceding his defection from Marsh, Serio repeatedly accessed and transmitted client files, including the client files he sent to two clients, without authorization or business justification, on July 21.  The compilations of client files Serio transmitted—which contained policy records, pricing and premium allocations, claims histories, renewal schedules, and risk-exposure data—constitute Marsh's trade secrets.

104.    Just days before Perez resigned, on Saturday, July 19, Perez spent approximately three hours in the early morning accessing Marsh's client files, including for at least two clients that have since submitted BORs.  The files Perez accessed were Marsh's trade secrets—they provided detailed summaries of each client's insurance coverage, costs, and policies for the 7/31/2025 through 7/31/2026 coverage term, including details on policy premiums, fees, expiration dates, and renewal timelines.  Perez did not need to access these client files containing trade secrets—on a weekend—to carry out his duties as a Marsh employee.

105.    On June 12, a few weeks before the raid began, Wilcox emailed her personal email, without any legitimate business purpose, confidential Marsh documents containing trade secrets. These documents described Marsh's strategic relationships with carriers, joint objectives for market growth, and market projections across a range of industries in the Florida Zone. Disclosure of these documents to a competitor—particularly a new market entrant—would provide valuable insight into Marsh's strategic partnerships. The mere disclosure of the relationship between Marsh and its partners, in addition to details like the revenue and market share derived therefrom, would cause Marsh significant competitive harm. Wilcox intended to use these documents describing Marsh's strategic relationships with third parties to bring value to her new employer and to unfairly compete with Marsh.

106.    On July 16, shortly before he resigned from Marsh, Collins accessed a document including a detailed list of all of Marsh's Florida Zone clients, their associated revenue, renewal periods, and renewal status, information that would be highly valuable to any competitor and would cause serious harm to Marsh's business if disclosed. Five days later, Collins again accessed documents containing Marsh's trade secrets at a time when a portable USB device was connected to his computer on information and belief, without any legitimate business reason. On July 21, 2025, his last day as a Marsh employee, Collins inserted a portable USB device into his laptop for approximately twenty minutes. During that brief window, Collins accessed Marsh's trade secrets, including internal training documents for sales and client representatives, which detail Marsh's unique process for onboarding new clients, preparing for renewals, and other touchpoints for delivering client service at the high standard Marsh's clients are accustomed to. The documents additionally offer guidance to new account representatives on managing the lifecycle of a client's renewal process. Such documents would be highly valuable to any competitor broker, especially

one looking to start a retail brokerage firm from scratch. Collins accessed these documents for the sole purpose of helping Howden operationalize its new business and capitalize on Marsh's valuable clients. Though forensic tools cannot reveal whether Collins copied the files onto his USB drive without first accessing and analyzing the drive, the circumstances imply that he did just that. He would have no other reason to plug in a portable USB drive, access critical documents, and remove the drive in such a short span of time other than to copy documents onto that drive, particularly not on his last day working at Marsh.

107.    Lennerth downloaded, printed, and emailed himself compilations of Marsh's trade secrets shortly before resigning from Marsh. On July 21, 2025, Lennerth printed 18 copies of a document containing a list of client names along with information about those clients' business with Marsh, such as the Company Number, the name of the Marsh "executive" who handled the account, and a final column titled "Total," which refers to revenue. Lennerth had no apparent legitimate business reason to print 18 copies of that document on the same day his colleagues resigned, and two days before he resigned to follow them. On July 23, 2025—Lennerth's last day at Marsh—he downloaded to his Marsh laptop, then sent to his personal email, a file titled "phone contacts.csv," which contains a list of Marsh's client names, contacts, their work phone numbers, personal phone numbers, work and personal email addresses, birthdays, and "Notes" with personal details, such as the names and details of the client's minor children or other relationships, and in some cases identifying the revenue associated with that particular client. He had no business justification or authorization to do so. Lennerth used these contacts to bring with him to his new employer and leverage the client relationships he built while employed by Marsh and using Marsh resources. This compilation of Marsh's client information constitutes Marsh's trade secrets; Marsh

obtained it over time and through great company expense and would be significantly harmed if the list fell into the hands of an unscrupulous competitor.

108.    And Amodeo, in the two weeks leading up to her resignation, accessed files, including confidential files, pertaining to several Marsh clients, which included policy documents, quotes, proposals, and a client's "strategy meeting" agenda.   Amodeo did not need to access these client files containing trade secrets to carry out her duties as a Marsh employee, and she was not expressly authorized to do so.

109.    Defendants had no legitimate business reason to access these confidential documents and trade secrets in the days preceding their resignations.

110.    Defendants were obligated to protect Marsh's confidential information and trade secrets, to which they had access by virtue of their employment with Marsh, and not to misappropriate the information for their own use.

111.    Defendants were contractually obligated to return all Marsh property immediately upon the termination of their employment with Marsh, and to "execute a statement declaring that [they] have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have [they] supplied the same to any person, except as required to carry out [their] duties as an employee of the Company."   Defendants have not completed either of these contractually obligated actions.  This supports the conclusion that they continue to possess Marsh's trade secrets and confidential information.  That some of these trade secrets and documents containing confidential information pertain to clients who moved their business from Marsh to Howden during the raid indicates that Defendants continue to use Marsh's trade secrets and confidential information for the benefit of their new employer, Howden.

112.    Defendants deliberately exploited Marsh's trade secrets and confidential infor-
mation to incentivize clients to leave Marsh's business—causing harm to Marsh's tangible inter-
ests—in violation of their contractual and common law obligations to Marsh.

**VIII.    In an effort to cover their tracks and harm Marsh's business, Defendants further vi-
olate their obligations to Marsh by deleting documents containing trade secrets, con-
fidential information, and Marsh's intellectual property.**

113.    Defendants Gronovius, Serio, Amodeo, and Perez did not just improperly access
and transmit Marsh's documents—they also deleted them from Marsh's computer systems on their
way out the door.  In so doing, they breached their contractual and fiduciary duties to the Company
by concealing their disloyal service from Marsh, depriving Marsh of its property (and the confi-
dential information, trade secrets, and information contained therein), and attempting to sabotage
Marsh by obstructing its ability to compete fairly in the market.

114.    For example, on the day of his resignation, Gronovius accessed and deleted Marsh
client files—including an insurance workbook for a Marsh client who BOR'd on July 21, 2025,
and several files for a Marsh client who BOR'd on July 22, 2025.  Gronovius deleted the docu-
ments to cover his tracks and interfere with Marsh's client relationships.

115.    Likewise, beginning on July 18 (the day that news of the impending raid leaked)
through July 21 (the day he resigned), Serio deleted from his Marsh laptop and Marsh's cloud
storage system entire client file directories, compilations of client insurance records (such as fi-
nancial reports, claims history, policy terms, and coverage details) as well as Marsh's work product
reflecting Marsh's risk assessments, insurance proposals, commission amounts, fee structures, car-
rier contacts, renewal timelines, and details involving revenue sharing with wholesalers.   Serio
also deleted client files pertaining to the clients he attempted to solicit on July 18.  One of those
clients whose files he deleted has BOR'd.  Serio deleted those files to divert clients from Marsh
and cover his tracks.

116.    Amodeo, in the two weeks leading up to her resignation, deleted numerous confidential files pertaining to several Marsh clients, including policy documents, quotes, and proposals.

117.    And on July 19, days before Perez resigned, Perez deleted numerous client files, including worksheets summarizing and comparing clients' various coverages for the upcoming term.  Perez's mass-deletion campaign was an attempt to cover his tracks and impede Marsh's relationships with those clients.

118.    Deleting these documents, in violation of their duties to their employer, served both to conceal the evidence of Defendants' misdeeds, deprive Marsh of its property, and to sabotage Marsh's business.

## IX.    Defendants stonewall Marsh's reasonable efforts to investigate their wrongdoing by refusing to comply with lawful subpoenas seeking information about their roles in the raid.

119.    In the *Parrish* action, discovery has commenced.  The parties in that action have served discovery requests on one another.  Among other items, Marsh's requests seek communications with Howden about potential employment, communications with Marsh employees regarding Howden, and communications transmitting Marsh documents.

120.    Marsh has also served non-party discovery in that case.  On September 26, 2025, Marsh issued non-party subpoenas in the *Parrish* action to Gronovius, Amodeo, Serio, Perez, Collins, and Lennerth (and others), seeking the production of documents on or before October 17, 2025.  The subpoenas included 16 requests for the production of documents on topics relating to the raid, including documents containing Marsh's information or property currently in the individual's possession; documents relating to any book of business that he or she intended to bring to Howden; and communications with Marsh employees regarding Howden.

121.    Amodeo, Serio, Perez, Collins, and Lennerth accepted service of the subpoenas;

Gronovius to date evades service.

122.    On October 30, 2025, Amodeo, Serio, Perez, Collins, and Lennerth responded to the subpoenas.  Each refused to comply with any document request, stating that they "will not produce documents or communications in response" to any of the requests in the subpoena.  Defendants did not provide any legitimate basis for their total refusal to comply with any aspect of the subpoenas (indeed, none exists).  Even for those requests for which responsive documents are undeniably relevant and should be easy to identify and produce (for example, offers of employment by Howden, or Marsh property currently in the Defendants' possession), Defendants utterly and completely refused to engage.

123.    Defendants' full-scale obstruction of these lawful subpoenas confirms their intent to stymie Marsh's efforts to investigate the raid. It also makes clear that Defendants have documents and information they want to hide from Marsh.  Defendants' refusal to comply with their obligations under the Federal Rules of Civil Procedure is consistent with their refusal to comply with their contracts. Defendants' misconduct also confirms their consciousness of guilt—because they are guilty.

## COUNT I
## BREACH OF CONTRACT - SOLICITATION OF EMPLOYEES
*(Gronovius, Amodeo, Serio, Wilcox, Collins)*

124.    Marsh incorporates the previous paragraphs as if fully restated here.

125.    Marsh has valid and enforceable employee non-solicitation provisions in its NSAs with Gronovius, Amodeo, Serio, Wilcox, and Collins as detailed above.

126.    Gronovius, Amodeo, Serio, Wilcox, and Collins expressly agreed that their NSAs with Marsh were reasonable and agreed to refrain from soliciting Marsh's employees with whom they worked or about whom they had Marsh's confidential and proprietary information and trade secrets during their employment and for a 12-month restricted period.

127.    Marsh performed its obligations under the employee non-solicitation provisions of Defendants' NSAs.

128.    As detailed above, Gronovius, Amodeo, Serio, Wilcox, and Collins each individually breached the employee non-solicitation provisions of their NSAs by soliciting other Marsh employees to terminate their employment with Marsh and work for Howden instead.

129.    By soliciting employees to join Howden, Gronovius, Amodeo, Serio, Wilcox, and Collins directly and proximately have caused or contributed to Marsh employees resigning.

130.    Defendants' conduct to date indicates that they do not intend to abide by their NSAs.

131.    Marsh has no adequate remedy at law.

132.    Gronovius, Amodeo, Serio, Wilcox, and Collins executed binding agreements with Marsh acknowledging that irreparable injury will result to Marsh if they breach the employee and client non-solicitation provisions in their respective NSAs, that there is no adequate remedy at law for such breaches, and that Marsh is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—"incurred by the Company in seeking to enforce the provisions of this Agreement."

133.    Injunctive relief enforcing the contractual obligations of Gronovius, Amodeo, Serio, Wilcox, and Collins to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of the employee non-solicitation provisions of Defendants' NSAs.

134.    Based on Defendants' breaches, Marsh is entitled to relief as provided for in § 6 of the NSAs of Gronovius, Amodeo, Serio, and Wilcox and § 5 of the NSA of Collins, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

135.    Based on Collins's breach, Marsh is entitled to liquidated damages as provided for in § 6 of his NSA, in an amount equal to the total fees and commissions received by the Company for such business during the two years prior to the breach.

136.    Marsh is also entitled to monetary damages for Gronovius's, Amodeo's, Serio's, Wilcox's, and Collins's breaches.

**COUNT II**
**BREACH OF CONTRACT - SOLICITATION OF CLIENTS**
*(Gronovius, Serio, Perez)*

137.    Marsh incorporates the previous paragraphs as if fully restated here.

138.    Marsh has a valid and enforceable NSA with Gronovius, Serio, and Perez, as detailed above.  This agreement prohibits both direct and indirect solicitation as well as the continued servicing of certain Marsh clients.

139.    Gronovius, Serio, and Perez expressly agreed that their NSA with Marsh was reasonable and agreed to refrain from soliciting or servicing Marsh's clients during their employment and for a 12-month restricted period.

140.    Marsh performed its obligations under the client non-solicitation provisions of its NSAs with Gronovius, Serio, and Perez.

141.    As detailed above, Gronovius, Serio, and Perez breached the client non-solicitation provisions of their NSAs by soliciting Marsh's clients to terminate business with Marsh and transfer their accounts to Howden.

142.    Gronovius further breached the client non-solicitation provision of his NSA by continuing at Howden to service a former client of Marsh's that he serviced while employed at Marsh.

143.    By these actions, Gronovius, Serio, and Perez directly and proximately caused and allowed clients to move their business to Howden.

144.    Gronovius's, Serio's, and Perez's conduct to date indicates that they do not intend to abide by the client non-solicitation provisions of their NSAs.

145.    Marsh has no adequate remedy at law.

146.    Gronovius, Serio, and Perez executed binding agreements with Marsh acknowledging that irreparable injury will result to Marsh if they breach the client non-solicitation provisions of their respective NSAs, that there is no adequate remedy at law for such breaches, and that Marsh is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—"incurred by the Company in seeking to enforce the provisions of this Agreement."

147.    Injunctive relief enforcing Defendants' contractual obligations to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of the client non-solicitation provisions of Gronovius's, Serio's, and Perez's NSAs.

148.    Based on Gronovius's, Serio's, and Perez's breaches, Marsh is entitled to relief as provided for in § 6 of their NSAs, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

149.    Based on Gronovius's, Serio's, and Perez's breaches, Marsh is also entitled to liquidated damages as provided for in § 7 their NSAs, in "an amount equal to the total fees and commissions received by the Company for such business during the two (2) years prior to the breach."

150.    Marsh is also entitled to monetary damages for Gronovius's, Serio's, and Perez's breaches.

## COUNT III
## BREACH OF CONTRACT – NON-DISCLOSURE
### *(all Defendants)*

151.    Marsh incorporates the previous paragraphs as if fully restated here.

152.    Marsh has valid and enforceable CAs with Defendants, as detailed above.

153.    The CAs are also expressly incorporated by reference into Marsh's valid and enforceable NSAs with Defendants.

154.    Defendants expressly agreed that their CAs with Marsh were reasonable and agreed to refrain from using or disclosing Marsh's confidential information, as defined in the CA, "except as required to carry out [their] duties as an employee of the Company."

155.    Defendants' valid and enforceable CAs define Marsh's confidential information as including:

> (iii)    *client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;*

> (iv)    *personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.*

156.    Marsh performed its obligations under the CAs.

157.    As detailed above, Defendants breached their CAs by improperly accessing and transmitting Marsh's confidential information, including client files, personnel information, strategy documents, financial information, policy documents, quotes, proposals, and strategy meeting

agenda. They did so to continue to access and use the information contained in those documents after they left Marsh for Howden.

158.    By these actions, Defendants individually breached their respective CAs.

159.    By these actions, Defendants individually directly and proximately have caused harm to Marsh through the loss of exclusive control of their confidential and proprietary property.

160.    Defendants' conduct to date indicates that they do not intend to abide by their CAs.

161.    Marsh has no adequate remedy at law.

162.    Defendants executed binding agreements in their CAs "that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore[.]"  Accordingly, Defendants "acknowledge[d], consent[ed] and agree[d] that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (i) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by [them] and persons acting for or in connection with [them], and (ii) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

163.    Injunctive relief enforcing Defendants' contractual obligations to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of Defendants' CAs.

164.    Based on these breaches, Marsh is entitled to additional monetary relief as provided for in Defendants' CAs, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

165.     Marsh is also entitled to monetary damages for Defendants' breaches.

## COUNT IV
## BREACH OF FAITHLESS SERVANT DOCTRINE
### *(All Defendants)*

166.     Marsh incorporates the previous paragraphs as if fully restated here.

167.     As high-ranking Florida Zone employees, Defendants owed fiduciary duties and a duty of loyalty to their employer Marsh.

168.     Each Defendant was employed in a position of trust and confidence and in the course of their employment acquired confidential and trade secrets relating to Marsh's business.

169.     Marsh employed each Defendant to perform economically valuable and operationally essential services for and on behalf of Marsh and the Florida Zone.

170.     Defendants acted contrary to their duties of loyalty and good faith by participating in a scheme to lift out the entire Florida Zone operations, including its employees and clients, and move them *en masse* to Marsh's direct competitor.  Specifically, Defendants attempted to recruit employees and clients to leave Marsh for Howden, improperly accessed and transmitted Marsh's confidential documents, and deleted documents to cover their tracks.  Defendants further breached their duties of loyalty and good faith by, while employed by Marsh, actively working with one of Marsh's direct competitors (Howden) to create for the U.K.-based Howden a U.S. insurance brokerage business where none previously existed to directly compete with Marsh.  While Marsh employees, and at times while using Marsh devices, Defendants pilfered Marsh's confidential and proprietary property to use at Howden.  In doing so, Defendants co-opted the investments Marsh had made in the Florida Zone and transferred an entire business from their employer to a competitor. That service is definitionally disloyal.

171.     Starting no later than March 2025, each Defendant acted as a faithless servant.

172.    Marsh is entitled to disgorge and recover any and all compensation it paid to each Defendant during that period of disloyalty.

## COUNT V
## UNFAIR COMPETITION
### *(All Defendants)*

173.    Marsh incorporates the previous paragraphs as if fully restated here.

174.    As detailed above, the Defendants' misconduct was not isolated.  The Defendants acted as part of an unlawful and unfair scheme to lift-out a fully formed retail insurance business and transfer that business to a direct competitor in the same market—indeed, the same state—while sabotaging their employer's ability to fairly compete in that market.

175.    Within a period of days, Defendants solicited numerous Florida Zone employees to defect to Howden.  They solicited clients to do the same, in some cases even preparing the BOR letters required to make the switch.

176.    They also took Marsh documents with them upon their departure, by means of emailing documents to themselves or to clients, or printing documents from the Marsh system. These documents contained trade secrets and confidential information.  Defendants retain this property of Marsh's despite a contractual obligation to return it upon their termination.   That some of these trade secrets and documents containing confidential information relate to clients who moved their business from Marsh to Howden during the raid indicates that Defendants continue to use Marsh's trade secrets and confidential information for the benefit of their new employer, Howden.

177.    By deleting countless of Marsh's documents ahead of their departure, Defendants further attempted to sabotage Marsh's business by obstructing its ability to compete fairly in the market.

178.    And by refusing to comply with lawful subpoenas seeking documents and information about their participation in the raid, Defendants continue their efforts to sabotage Marsh's business and stymie its investigation into the harm Defendants have caused it.

179.    Defendants' effort to gut Marsh's Florida Zone and port it over to Howden was textbook unfair competition: taking Marsh's staff, clients, and countless documents, the raid was designed and intended to hobble Marsh's business entirely by leaving it without the means to fairly compete in the market.

180.    Defendants' actions directly and proximately caused harm to Marsh's business interests, including by risking Marsh's ability to provide its clients continuity of coverage.

## COUNT VI
## CONVERSION
*(All Defendants)*

181.    Marsh incorporates the previous paragraphs as if fully restated here.

182.    Marsh's documents, including client files, strategy playbooks, insurance workbooks, client lists, training documents, quotes, proposals, and meeting agenda, are Marsh's property.  Some of these documents are trade secrets; some may not be.  Trade secret or not, they legally belonged to Marsh.

183.    By printing these documents, emailing them outside of Marsh (including to personal email accounts), and loading them onto external USB drives, Defendants exercised control and dominion over this property of Marsh's, and in effect deprived Marsh the ability to exercise control and dominion over its property.  Defendants were contractually obligated to return all Marsh property to Marsh upon the termination of employment, and to "execute a statement declaring that [they] have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have [they] supplied the same to any person, except as required

to carry out [their] duties as an employee of the Company." They have done neither. Marsh thus has a good faith reason to believe that Defendants continue to exercise control and dominion over the property of Marsh's that Defendants printed or emailed to themselves.

184.    By deleting these documents, Defendants exercised exclusive control and dominion over this property of Marsh's and excluded Marsh from exercising any control and dominion over its property.

185.    Defendants' conduct in printing, emailing, downloading, and deleting Marsh's property was wrongful.

186.    This conduct was to Marsh's detriment. Without the information that Defendants took and/or deleted, Marsh is hampered in its ability to serve its clients. Loss of exclusive control over its property will cause serious financial and competitive harm to Marsh as well.

## COUNT VII
## TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
*(Gronovius, Serio, Perez, Wilcox, Collins, Lennerth)*

187.    Marsh incorporates the previous paragraphs as if fully restated here.

188.    Marsh has developed and acquired trade secrets of great value to its business, as described in paragraphs 55 and 100–105 above.

189.    Marsh's trade secrets are used in, or intended to be used in, conducting business throughout the United States.

190.    Marsh invested substantial time and resources to develop its trade secrets.

191.    Marsh's trade secrets are not generally known or available to the public.

192.    Marsh's trade secrets derive independent economic value by virtue of not being known or available to the public.

193.    Marsh takes reasonable, affirmative steps to protect its trade secrets and prevent others from acquiring or using its trade secrets by, for example, requiring those who have access to them, including Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth, to sign agreements restricting the use of Marsh's confidential information and limiting access to Marsh's systems, including employee computers, phones, and other devices, through network approvals and password protection.

194.    Marsh's trade secrets provide Marsh a competitive advantage over its competitors.

195.    Marsh provided Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth with Marsh's trade secrets in confidence and for use only in connection with their employment with Marsh and for the benefit of Marsh.

196.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth had a duty to maintain the secrecy of Marsh's trade secrets or limit the use of Marsh's trade secrets for the benefit of Marsh.

197.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth signed multiple agreements—including Confidentiality, Non-Solicitation, and/or Supplemental Terms and Conditions of Employment Agreements—in which they promised to keep Marsh's trade secrets confidential, to use Marsh's trade secrets only on behalf of Marsh, and to return and discontinue use of Marsh's trade secrets when their employment with Marsh ended.

198.    As detailed above, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth improperly used and disclosed Marsh's trade secrets—including compilations of client relationship data, pricing and revenue structures, and internal trainings and strategic documents—for the benefit of a competitor without Marsh's consent.

199.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth knew or had reason to know that they were not to disclose or misuse Marsh's trade secrets.

200.    As a direct and proximate result of Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unlawful conduct, Marsh has been irreparably damaged, and Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth have been unjustly enriched. For example, Marsh has lost clients as a result of Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's misappropriation of its trade secrets. Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unjust enrichment include, for example, value attributable to the misappropriated information; amounts that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth and their new employer saved in costs and development by using the misappropriated information; increased productivity resulting from the use of the misappropriated information; and increased market share. The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

201.    The acts described above constituted willful and malicious misappropriation in that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth accessed Marsh's trade secrets with the deliberate intent to injure Marsh's business and improve their own and that of Marsh's competitor.

## COUNT VIII
## TRADE SECRET MISAPPROPRIATION UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT, FLA. STAT. § 688.001, ET SEQ.
*(Gronovius, Serio, Perez, Wilcox, Collins, Lennerth)*

202.    Marsh incorporates the previous paragraphs as if fully restated here.

203.    Marsh has developed and acquired trade secrets of great value to its business, as described in paragraphs 55 and 100–105 above.

204.    Defendants used Marsh's trade secrets in conducting business in Florida.

205.    Marsh invested substantial time and resources to develop its trade secrets.

206.    Marsh's trade secrets are not generally known or available to the public.

207.    Marsh's trade secrets derive independent economic value by virtue of not being known or available to the public.

208.    Marsh takes reasonable, affirmative steps to protect its trade secrets and prevent others from acquiring or using its trade secrets by, for example, requiring those who have access to them, including Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth, to sign agreements restricting the use of Marsh's confidential information and limiting access to Marsh's systems, including employee computers, phones, and other devices, through network approvals and password protection.

209.    Marsh's trade secrets provide Marsh a competitive advantage over its competitors.

210.    Marsh provided Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth with Marsh's trade secrets in confidence and for use only in connection with their employment with Marsh and for the benefit of Marsh.

211.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth had a duty to maintain the secrecy of Marsh's trade secrets or limit the use of Marsh's trade secrets for the benefit of Marsh.

212.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth signed multiple agreements—including their Confidentiality, Non-Solicitation, and/or and Supplemental Terms and Conditions of Employment Agreements—in which they promised to keep Marsh's trade secrets confidential, to use Marsh's trade secrets only on behalf of Marsh, and to return and discontinue use of Marsh's trade secrets when their employment with Marsh ended.

213.    As detailed above, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth improperly used and disclosed Marsh's trade secrets—including compilations of client relationship data, pricing and revenue structures, and internal trainings and strategic documents—for the benefit of a competitor without Marsh's consent.

214.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth knew or had reason to know that they were not to disclose or misuse Marsh's trade secrets.

215.    As a direct and proximate result of Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unlawful conduct, Marsh has been irreparably damaged, and Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth have been unjustly enriched. For example, Marsh has lost clients as a result of Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's misappropriation of its trade secrets. Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unjust enrichment include, for example, value attributable to the misappropriated information; amounts that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth and their new employer saved in costs and development by using the misappropriated information; increased productivity resulting from the use of the misappropriated information; and increased market share. The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

216.    The acts described above constituted willful and malicious misappropriation in that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth accessed Marsh's trade secrets with the deliberate intent to injure Marsh's business and improve their own and that of Marsh's competitor.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Marsh respectfully requests the Court grant the following relief:

    a.    Entry of judgment in Marsh's favor as specified in this Complaint;

    b.    Entry of preliminary and permanent injunctive relief;

    c.    Equitable tolling of each Defendant's Non-Solicitation Agreement;

    d.    Actual damages;

    e.    Punitive damages;

f.    Exemplary damages;

g.    Disgorgement of the compensation Marsh paid to each Defendant during the time they acted as faithless servants;

h.    Prejudgment and post judgment interest and court costs;

I.    Damages for any unjust enrichment pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq*.;

j.    Attorneys' fees, as provided for by the NSAs, CAs, and other binding agreements;

k.    Liquidated damages for Gronovius's, Amodeo's, Serio's, Wilcox's. and Collins's breaches of the employee non-solicitation provision of their NSAs, as provided for in Gronovius's, Amodeo's Serio's, and Wilcox's NSAs at § 7 and Collins's NSA at § 6;

l.    Liquidated damages for Gronovius's Serio's, Perez's, and Collins's, breaches of the client non-solicitation provision of their NSAs, as provided for in Gronovius's, Serio's, and Perez's NSAs at § 7 and Collins's NSA at § 6;

m.    Award of all damages and relief as agreed to by the parties in the Agreements; and

n.    All other relief at law or in equity to which Marsh is entitled.

## JURY TRIAL DEMANDED

217.    Marsh demands a jury trial on all claims triable by jury.

Dated: November 3, 2025                  Respectfully submitted,

By:  /s/ *Harris M. Mufson*

     Harris M. Mufson
     Lee R. Crain
     Kelly Herbert
     200 Park Avenue
     New York, NY 10166
     Tel.:  212.351.3805
     Fax:  212.817.9505
     hmufson@gibsondunn.com
     lcrain@gibsondunn.com
     kherbert@gibsondunn.com

     Jason C. Schwartz (*pro hac vice forthcoming*)
     Ryan C. Stewart (*pro hac vice forthcoming*)
     Amanda C. Machin (*pro hac vice forthcoming*)
     Catherine McCaffrey
     Nicole Santora
     1700 M Street, NW
     Washington, D.C. 20036
     jschwartz@gibsondunn.com
     rstewart@gibsondunn.com
     amachin@gibsondunn.com
     cmccaffrey@gibsondunn.com
     nsantora@gibsondunn.com

     Karl G. Nelson (*pro hac vice forthcoming*)
     Rachel W. Robertson (*pro hac vice forthcoming*)
     Brian Richman
     2001 Ross Avenue, Suite 2100
     Dallas, TX 75201
     knelson@gibsondunn.com
     rrobertson@gibsondunn.com

     *Attorneys for Plaintiff Marsh USA, LLC*