**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

MARSH & MCLENNAN COMPANIES INC.,
MARSH USA LLC, MERCER (US) LLC, and
MARSH & MCLENNAN AGENCY LLC,

               Plaintiffs,

    v.

HOWDEN US SERVICES, LLC, HOWDEN
US SPECIALTY, LLC, ALFRED
GRONOVIUS, ANDREA AMODEO,
CARLOS SERIO, GIOVANNI PEREZ,
JANETTE WILCOX, NATHAN COLLINS,
AND RICHARD LENNERTH,

               Defendants.

**Civil Action No.** 1:25-cv-9130-JLR

**JURY TRIAL DEMANDED**

---

## FIRST AMENDED COMPLAINT

1.    This case arises from Howden's parasitic efforts to enter the US insurance broker-age business overnight through theft, deception, and unfair competition. To accomplish its scheme, Howden needed insiders at Marsh McLennan to shift their loyalties and solicit colleagues and clients using confidential information and trade secrets. Howden knew full well that these Marsh McLennan employees had contracts and legal duties that prohibited solicitation and use of confidential information. These are industry standard provisions—ones that Howden itself re-quires for new employees (including those hired from Marsh McLennan). Howden also knew full well that it was committing unlawful acts and would face legal action but it decided the juice was worth the squeeze, brazenly encouraging and inducing Marsh McLennan's employees to run

roughshod over their contractual commitments and obligations of loyalty and face the consequences later. Several of the former Marsh McLennan employees involved in the scheme have already been enjoined by this Court from continuing their misconduct—although evidence indicates they have lied to the Court and failed to comply with that injunction. Marsh McLennan now brings this action to hold Howden US Services, LLC and Howden US Specialty, LLC, along with former employees Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth (the "Individual Defendants"), accountable for their roles in that scheme. The plaintiffs are Marsh & McLennan Companies, Inc. ("MMC"), Marsh USA LLC ("Marsh"), Mercer (US) LLC ("Mercer"), and Marsh & McLennan Agency LLC ("MMA") (collectively, "Marsh McLennan" or "the Company"). Marsh McLennan alleges, based on its own knowledge and on information and belief, as follows:

## INTRODUCTION

2. After it failed to acquire another rival US insurance business, Howden—an insurance broker with no US retail presence—turned its sights on Marsh McLennan. Working with key senior insiders, Howden leveraged those fiduciaries and the confidential information they had to recruit more than 140 employees, take Marsh McLennan's clients, and replicate entire business units overnight. This interference was not limited to the individuals named here or in related actions—Howden targeted entire teams across multiple divisions, inducing scores of Marsh McLennan employees to breach their contracts and fiduciary duties. The scheme was not a coincidence; it was a calculated plan to steal from a competitor to create a ready-made US operation from Marsh McLennan's talent, clients, information, trade secrets, and goodwill.

3. Howden's first step in its unlawful plot began by recruiting four top senior executives from Marsh's Florida Zone—Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton (the "Florida Zone Leaders"), who it convinced to execute its theft from within, all while on

Marsh's payroll.  Acting at Howden's direction, these leaders built a covert network of subordinate turncoats, including the Individual Defendants, to solicit employees, court clients, and collect confidential files for Howden's benefit.  Among the information stolen and shared with Howden was which employees to target based on their client relationships and how much to pay them.  Acting as Howden's agent, Lugones laid out part of the plan in a detailed spreadsheet replete with confidential employment information.  Lugones's spreadsheet is a roadmap of unlawful employee solicitation: identifying which Marsh employees to target, providing information about their salary and title, making notes on how to reach them and when to contact them, and analyzing the terms of their employment offers.  Howden then used that confidential information to craft targeted employment offers to capitalize on its plan to lure Marsh McLennan's employees away.

4.      On July 21, 2025, Howden's plan went into motion with over 100 Marsh McLennan employees resigning *en masse*.  None had interviewed with Howden or submitted an employment application or resume.  That morning, Howden had no US retail offices, no employees, and no clients.  By nightfall, it had transformed itself into a full-service national brokerage—constructed entirely from what it stole from Marsh McLennan after it spent months carefully planning its raid of Marsh McLennan's employees, clients, trade secrets, and confidential information.

5.      The fallout was immediate and severe.  The coordinated resignations gutted Marsh's Florida Zone and aimed to cripple Marsh McLennan's specialty practices in Marine, Energy, and Construction.  Howden celebrated its overnight "launch" and made clear that additional departures would follow.  Faced with an unprecedented mass defection that threatened to jeopardize client service and market stability, Marsh McLennan immediately sought judicial relief to protect its business, its people, and its clients.

6.      Marsh McLennan moved swiftly in this Court to stop the theft in progress.  Within

days of the raid, Marsh sought a temporary restraining order and preliminary injunction to prevent the Florida Zone Leaders from violating their contractual non-competition and non-solicitation agreements any further, and from misappropriating Marsh's confidential information. *See Marsh USA LLC v. Michael Parrish, et al.*, No. 1:25-cv-06208 (S.D.N.Y. July 29, 2025), ECF Nos. 1, 15 (Daniels, J.) (the *"Parrish* action"). The Court granted that relief, issuing a preliminary injunction forbidding the Florida Zone Leaders from soliciting Marsh employees and clients and from mis-appropriating Marsh McLennan's confidential information—as well as requiring the Florida Zone Leaders to return all of Marsh's property in their possession. *See Marsh USA LLC v. Michael Parrish, et al.*, 2025 WL 2676389 (S.D.N.Y. Sept. 18, 2025).

7.    That preliminary injunction followed a five-hour hearing before Judge George B. Daniels, who held that Marsh was likely to succeed on the merits of its claims that the Florida Zone Leaders breached their non-solicitation and confidentiality covenants.  Judge Daniels rejected as "disingenuous" the assertion that the nearly 100 coordinated resignations were coincidental.  The Florida Zone Leaders argued the Court should abstain in favor of a New York state court lawsuit that Howden, Parrish, Lugones, and another Florida Zone executive, Michael Landa had filed seeking a declaratory judgment that their restrictive covenants were invalid. *See Parrish, et al. v. Marsh & McLennan Cos., Inc., et al.*, Index No. 654430/2025 (N.Y. Sup. Ct. July 27, 2025), Dkt. 1 (Bannon, J.).  But Judge Daniels moved forward and issued an injunction, holding that Marsh was likely to succeed on the merits of its claims, faced irreparable harm from the loss of client relationships and the threatened use of its confidential strategies, and that the balance of equities favored Marsh.  The Florida Zone Leaders (now employed by Howden) have already violated the injunction by failing to timely return all Marsh property, including documents containing confidential information like client proposals, strategic business plans, and compendia of

documentation regarding client services.

8.    In addition to the *Parrish* action, Marsh McLennan immediately brought a suit in the Delaware Chancery Court to prevent Howden, which had recently incorporated at least two new LLCs under Delaware law, from continuing to tortiously interfere with Marsh McLennan's business and contractual relationships.  *See Marsh & McLennan Cos. Inc., et. al. v. Howden US Services, LLC, et al.*, C.A. No. 2025-0877-MTZ (Del. Ch. Aug. 1, 2025), Dkt. No. 1 (Zurn, V.C.). Marsh McLennan moved for a temporary restraining order and expedition.  Initially, the Delaware court held the action in abeyance, pending a ruling in the *Parrish* action, *id.* (Del. Ch. Aug. 19, 2025), Dkt. 44, then it granted Howden's motion to stay pending the resolution of the New York state court declaratory judgment action, *id.* (Del. Ch. Nov. 6, 2025), Dkt. 61.  With the Delaware court declining to rule in deference to this Court, Marsh McLennan withdrew its Complaint in Delaware and now hereby seeks redress against Howden in New York, as Howden continues to unfairly compete.

9.    As these cases have proceeded, Marsh McLennan has continued to investigate the circumstances that led to Howden's unlawful raid on Marsh McLennan's business.  That investigation has revealed that, although Howden undoubtedly worked with the Florida Zone Leaders to conceive and direct the plan—building a full-service US brokerage firm out of thin air—Howden and those leaders did not act alone.  The scheme's success depended on a second tier of senior personnel that included seven additional former Marsh employees who executed the plan on the ground: Individual Defendants Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth.  Each held a leadership or senior client-facing role within the Florida Zone and reported directly or indirectly to Parrish and the other Florida Zone Leaders.  Each had regular contact with Marsh McLennan's clients (or managed or

reported to individuals who did). They not only sold insurance to these clients but also maintained relationships with them on Marsh McLennan's behalf, harnessing and developing the goodwill and trust that forms the basis of Marsh McLennan's business and allows it to be a leader in its field. Marsh McLennan provided the Individual Defendants the resources they needed to facilitate and maintain these strong client relationships, which included access to skills-based trainings, strategy playbooks, data analytics and research, and other trade secrets that Marsh McLennan invested significant time and money to develop. In return, the Individual Defendants while receiving Marsh paychecks engaged in deception and disloyalty—recruiting clients and employees to leave for Howden and misappropriating trade secrets and confidential information for Howden's benefit.

10. In the days and weeks before the raid, the Individual Defendants engaged in turn-coat conduct in coordination with Howden and designed to benefit Howden at Marsh McLennan's expense. Several Individual Defendants solicited other Marsh McLennan employees, including subordinates within their reporting lines, to join Howden while they were all still employed by Marsh McLennan. They also provided Howden with confidential personnel information—compensation and client relationship information—that Howden used to issue tailored, unsolicited job offers to employees who had not applied, interviewed, or otherwise expressed interest in leaving.

11. The complete picture of how many former Marsh McLennan employees misappropriated confidential information and solicited clients and employees is still unclear because the Florida Zone Leaders and others have resisted and attempted to delay discovery in the related *Parrish* action. But based on information from Marsh McLennan's systems and testimony from Marsh McLennan employees who resisted Howden's overtures, it is clear that the Florida Zone Leaders and the Individual Defendants breached their agreements with Marsh McLennan—and Howden facilitated those breaches, eagerly embracing the fruits of the forbidden tree to create a

US insurance business overnight.

12.      In coordination with the Individual Defendants, Howden also orchestrated the pilfering of Marsh McLennan's trade secrets and confidential information.  Working as agents for Howden, several Individual Defendants accessed, printed, and transmitted Marsh McLennan's trade secrets and confidential information—including client databases and pricing models—to equip Howden with the tools to solicit both employees and clients.  Howden also received a detailed map of Marsh McLennan's workforce—who to target, what to offer, and how to undercut existing teams—turning stolen information into the blueprint for its US expansion.  Several Individual Defendants also deleted a significant volume of Marsh McLennan's documents on their way out the door, an attempt to conceal from Marsh McLennan their disloyal service, deprive Marsh McLennan of its property, and sabotage Marsh McLennan's business by obstructing its ability to compete fairly against Howden in the market.  The documents the Individual Defendants accessed, stole, and in some cases, deleted, included compilations of client relationship data and employment information, pricing and revenue structures, and internal trainings and strategic documents—information that confers a substantial competitive advantage by remaining secret.  The misappropriation of these trade secrets was integral to the raid and for Howden's benefit.  The solicitation of employees and clients, plus the misappropriation of trade secrets and confidential information, was necessary for Howden to build out a full-service brokerage firm overnight, which it did through at least two new US-based LLCs: Howden US Services, LLC and Howden US Specialty, LLC.

13.      The misconduct did not end when the Individual Defendants jumped ship for Howden.  For example, in the time since the mass resignations, at least one Individual Defendant

prepared documents for clients to transfer their accounts to Howden, confirming his integral involvement in the unlawful solicitation of those clients to follow Individual Defendants from Marsh McLennan to Howden.  Several others have continued using Marsh McLennan's confidential information and trade secrets to solicit Marsh McLennan's clients to move to Howden—causing significant economic loss and further erosion of Marsh McLennan's goodwill.  And at least one continues to service a client at Howden that he previously serviced at Marsh McLennan, despite a contractual obligation to refrain from doing so.

14.    Marsh McLennan's ongoing investigation into Howden's malfeasance also revealed that Baxter Southern, a trusted MMA leader  (previously employed by McGriff—a company that MMA acquired in November 2024 at great expense) violated his contractual agreements with Marsh McLennan regarding non-solicitation of employees and clients, non-servicing of clients, and confidentiality, and also breached his duty of loyalty to Marsh McLennan and engaged in unfair competition.  As a result of this investigation, Marsh McLennan has also filed suit against Southern.  *See Marsh & McLennan Agency, LLC v. Charles Baxter Southern III*, 1:25-cv-09080 (S.D.N.Y. Oct. 31, 2025), ECF No. 1 (Rochon, J).

15.    Defendants' continuing conduct demonstrates their ongoing efforts to obstruct Marsh McLennan's investigation into the raid and ability to stop the resulting harm.  Now that discovery has commenced in the *Parrish* action, Marsh has served non-party subpoenas to Individual Defendants Amodeo, Serio, Perez, Collins, and Lennerth, requesting documents and information concerning their roles in the raid.  In response to these subpoenas, Individual Defendants have refused to produce a single document. They have provided no legitimate basis for this stonewalling (indeed, none exists).  The Individual Defendants' obstruction of Marsh McLennan's efforts to investigate their misconduct—no doubt at Howden's behest—confirms they have more to

hide.  Howden also continues to inflict harm, as it continues to poach growing numbers of employees and clients to leave Marsh McLennan for Howden.  Rather than express contrition for its theft, deception and unfair competition, Howden has made clear that it is doubling down and will continue to build its U.S. business through the same unlawful means.  During a recent interview of Howden's vice chair Danielle Lombardo by Insurance Insider US, Ms. Lombardo bragged about the large number of employees Howden has recruited in the United States with "established" books of business (approximately half of whom were solicited from Marsh McLennan) and stated that Howden believes its scheme is "changing the game entirely."  And Howden—through Parrish, the Chief Executive Officer of Howden's new US business, as well as the other Florida Zone Leaders—continues to retain Marsh's trade secrets and confidential information despite those individuals' contractual, fiduciary, and court-ordered obligations to return Marsh McLennan's property.

16.    Marsh McLennan invested years and millions of dollars to build its specialized retail brokerage business in Florida and its specialty practice areas in Marine, Energy and Construction.  But Defendants' continuing efforts to divert Marsh McLennan's employees and clients, as well as their shameless theft of Marsh McLennan's confidential information and trade secrets, have caused—and continue to cause—substantial and irreparable harm to the business.  Upon learning of the raid, Marsh McLennan took swift action to remedy the severe damage it suffered, seeking and obtaining injunctive relief against the Florida Zone Leaders who orchestrated the raid with Howden.  It also attempted to hold Howden to account in Delaware, where each of the corporate parties are incorporated, but the court there delayed the case and directed Marsh McLennan to seek relief against Howden along with the others in New York.  Now with evidence of further misconduct by the Individual Defendants (and with Marsh McLennan's investigation of the now more than 140 employees who have departed still ongoing), Marsh McLennan brings this new

action to enjoin Defendants' ongoing misconduct, to recover the damages they have caused, and to vindicate Marsh McLennan's statutory and bargained-for contractual rights.

## PARTIES

**Plaintiffs**

17.  **MMC** is a publicly traded corporation organized under the laws of Delaware. MMC is a global professional services firm offering clients advice and solutions in risk, strategy and people.  It is the parent company of several leading risk advisors and specialty businesses, including Marsh, Mercer, and MMA.

18.  **Marsh** is a single-member limited liability company whose sole member is incorporated in Delaware with its principal place of business in New York.  Marsh and its sole member are both, therefore, citizens of Delaware and New York.  Marsh's headquarters is located at 1166 Avenue of the Americas, New York, New York 10036.

19.  **Mercer** is a consulting leader in health, retirement, investments and talent. Among other services, Mercer's employees assist public and private sector employers in the design and management of employee health care programs; manage the administration of health benefits and flexible benefits programs; provide a wide range of strategic and compliance-related retirement services and solutions to corporate, governmental, and institutional clients; assist clients worldwide in the design, governance, and risk management of defined benefit, defined contribution, and hybrid retirement plans; and provide investment advice and related services to the sponsors of pension funds, foundations, endowments, insurance companies, wealth management firms, and other investors.

20.  **MMA** serves middle market and corporate clients with a broad range of commercial property and casualty products and services, as well as solutions for employee health and benefits, retirement and administration needs, and a growing personal lines business in the United

States and Canada. MMA also provides advice on insurance program structure and market dynamics, along with industry expertise and transactional capability. Since its first acquisition in 2009, MMA has invested in the acquisition of over 125 agencies, including its November 2024 acquisition of McGriff Insurance Services, LLC ("McGriff" or "McGriff Specialty"). As of November 15, 2024, MMA became the employer of McGriff employees, and the McGriff Specialty employees targeted by Howden to date comprise its Marine, Energy, and Construction practices responsible for complex large client accounts in those specialty areas.

**Howden Defendants**

21.    **Howden US Services, LLC** is a Delaware limited liability company established in March 2025. Howden US Services, LLC does not currently have any headquarters or principal place of business. Howden US Services, LLC is an affiliate of Howden Group Holdings Limited, which is headquartered in London and is Marsh McLennan's direct competitor in the global risk management and broking services industry.

22.    **Howden US Specialty, LLC** is a Delaware limited liability company established in March 2025. Howden US Specialty, LLC does not currently have any headquarters or principal place of business. Howden US Specialty, LLC is an affiliate of Howden Group Holdings Limited, which is headquartered in London and is Marsh McLennan's direct competitor in the global risk management and broking services industry.

**Individual Defendants**

23.    **Gronovius**. Defendant Alfred Gronovius was employed by Marsh as a Corporate Segment Team Leader in the Florida Zone responsible for acting as a strategic account manager in Marsh's healthcare practice, specializing in professional medical liability and general property

and casualty placements for large healthcare systems and physician groups. He was based out of Marsh's Tampa, Florida office. Gronovius is domiciled in and a citizen of Florida.

24.    Gronovius was highly compensated through his: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

25.    As a Corporate Segment Team Leader, Gronovius had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets. This included: financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for his team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

26.    Gronovius executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants. On June 15, 2021, Gronovius executed five agreements containing binding covenants: (1) an offer letter ("Gronovius Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Gronovius NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Gronovius CA"); (4) the "Supplemental Terms and Conditions of Employment" ("Gronovius STE"); and (5) the "Sign-On Bonus Agreement" ("Gronovius SBA").

27.    **Amodeo**. Defendant Andrea Amodeo was employed by Marsh as a Senior Associate, Client Executive in the Florida Zone, responsible for client accounts, including managing

the renewal process, acting as a point of contact for clients, and participating in business development.  She was based out of Marsh's Miami, Florida office.  Amodeo is domiciled in and a citizen of Florida.

28.     Amodeo was highly compensated through her: (1) base salary; (2) incentive compensation; (3) other incentives.

29.     As a Senior Associate, Client Executive, Amodeo had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets.  This included: strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

30.     Amodeo executed binding agreements in connection with and in exchange for her continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  On June 9, 2021, Amodeo executed five agreements containing binding covenants: (1) an offer letter ("Amodeo Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Amodeo NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Amodeo CA"); (4) the "Supplemental Terms and Conditions of Employment" ("Amodeo STE"); and (5) the "Sign-On Bonus Agreement" ("Amodeo SBA").

31.     **Serio**.  Defendant Carlos Serio was employed by Marsh as a Corporate Segment Team Leader in the Florida Zone.  He was responsible for managing a team handling complex client accounts, drafting project analyses and presentations, and conducting market research to

identify business development opportunities. He was based out of Marsh's Miami, Florida office. Serio is domiciled in and a citizen of Florida.

32. Serio was highly compensated through his: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

33. As a Corporate Segment Team Leader, Serio had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets. This included financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for his team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

34. Serio executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants. On June 10, 2021, Serio executed five agreements containing binding covenants: (1) an offer letter ("Serio Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Serio NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Serio CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Serio STE"); and (5) the "Sign-On Bonus Agreement" ("Serio SBA").

35. **Perez**. Defendant Giovanni Perez was employed by Marsh as a Senior Associate, Client Executive in the Florida Zone, responsible for overseeing and cultivating Marsh's client

portfolio, providing guidance and ensuring delivery of high-quality products and solutions. He was based out of Marsh's Miami, Florida office. Perez is domiciled in and a citizen of Florida.

36.    Perez was highly compensated through his: (1) base salary; (2) incentive compensation; (3) other incentives.

37.    As a Senior Associate, Client Executive, Perez had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets. This included: financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

38.    Perez executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, non-competition covenants, client and employee non-solicitation covenants, and confidentiality covenants. In 2023, Perez executed five agreements containing binding covenants: (1) an offer letter ("Perez Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Perez NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Perez CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Perez STE"); and (5) the "Sign-On Bonus Agreement" ("Perez SBA").

39.    **Wilcox**. Defendant Janette Wilcox was employed by Marsh as a Corporate Segment Leader in the Florida Zone, serving as a strategic relationship officer for key accounts and leading Marsh's Corporate Account Management team. She was based out of Marsh's Jacksonville-Baypine, Florida office. Wilcox is domiciled in and a citizen of Florida.

40.     Wilcox was highly compensated through her: (1) base salary; (2) incentive compensation; (3) equity awards and other incentives.

41.     As a Corporate Segment Leader, Wilcox had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets. This included: financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for her team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

42.     Wilcox executed binding agreements in connection with and in exchange for her continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants. On June 10, 2021, Wilcox executed five agreements containing binding covenants: (1) an offer letter ("Wilcox Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Wilcox NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Wilcox CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Wilcox STE"); and (5) the "Sign-On Bonus Agreement" ("Wilcox SBA").

43.     **Collins**. Defendant Nathan Collins was employed by Marsh as a Corporate Segment Team Leader in the Florida Zone, responsible for managing a team handling complex client accounts, drafting project analyses and presentations, and conducting market research to identify

business development opportunities.  He was based out of Marsh's Tampa, Florida office.  Collins is domiciled in and a citizen of Florida.

44.    Collins was highly compensated through his: (1) base salary; (2) incentive compensation; (3) other incentives.

45.    As a Corporate Segment Team Leader, Collins had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets.  This included: financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

46.    Collins executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  In early 2014, Collins executed four agreements containing binding covenants: (1) an offer letter ("Collins Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Collins NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Collins CA"); and (4) the "Sign-On Bonus Agreement" ("Collins SBA").

47.    **Lennerth**.  Defendant Richard Lennerth was employed by Marsh as a Senior Sales Executive in the Florida Zone responsible for maintaining and growing a large client portfolio, developing sales proposals and presentations, conducting outreach to potential clients, leading complex account processes, and interfacing and maintaining relationships with client representatives.  He was based out of Marsh's Tampa, Florida office.  Lennerth is domiciled in and a citizen

of Florida.

48.    Lennerth was highly compensated through his: (1) base salary, (2) incentive compensation; (3) other incentives.

49.    As a Senior Sales Executive, Lennerth had access to Marsh McLennan's highly confidential and proprietary information, including Marsh McLennan's trade secrets.  This included: financial and business information related to Marsh McLennan and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by Marsh McLennan over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; and information regarding client account renewal schedules and non-public client needs and preferences.

50.    Lennerth executed binding agreements in connection with and in exchange for his continued employment, which included, *inter alia*, client and employee non-solicitation covenants and confidentiality covenants.  In 2014, Lennerth executed three agreements containing binding covenants: (1) an offer letter ("Lennerth Offer"); (2) the "Marsh USA Inc. Non-Solicitation Agreement" ("Lennerth NSA"); and (3) the "Marsh USA Inc. Confidentiality Agreement" ("Lennerth CA").

## JURISDICTION AND VENUE

51.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1333 and 1367 because Marsh McLennan asserts a claim under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1832 *et seq.*  The Court has supplemental jurisdiction over Marsh McLennan's related state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

52.     This Court has personal jurisdiction over each Individual Defendant.  By signing and accepting the benefits of binding employment agreements containing forum-selection clauses, each Individual Defendant expressly consented to this Court's jurisdiction.  Those agreements include the Non-Solicitation Agreements ("NSAs") signed by Gronovius, Amodeo, Serio, Perez, and Wilcox, each of which provides that any action "shall be brought exclusively . . . in the United States District Court for the Southern District of New York . . . and the parties agree to the personal jurisdiction thereof," and the NSAs signed by Collins and Lennerth, which contain materially identical provisions.  This also includes the Supplemental Terms and Conditions of Employment ("STEs") that Gronovius, Amodeo, Serio, Perez, and Wilcox executed, which provide for New York governing law and exclusive jurisdiction and venue in New York state or federal courts. Although Howden is not a party to those forum-selection clauses, it should be estopped from disavowing them.  In the Delaware proceeding, Howden moved to dismiss or stay, arguing specifically that the Court of Chancery should dismiss or stay that action in part because of Marsh's forum-selection clauses with its employees.  The Court ultimately granted that stay.

53.     There is a strong and reasonable basis for the parties' choice of this forum.  Marsh McLennan's principal place of business and corporate headquarters are located at 1166 Avenue of the Americas, New York, New York 10036.  Marsh McLennan maintains substantial operations in this District, and many employees in the Florida Zone—including the Individual Defendants— worked closely with Marsh McLennan personnel in New York and served New York-based clients.

54.     In addition to their contractual consent to this forum, this Court has specific personal jurisdiction over each Individual Defendant because they each regularly transacted business in New York, including with Marsh McLennan, which is headquartered here.  Each Individual

Defendant interacted with Marsh McLennan clients and colleagues in this District and traveled to New York for business meetings with Marsh McLennan leadership, clients, or prospects. At a minimum, Gronovius and Collins attended internal Marsh McLennan meetings and client sessions in New York. And at least some Individual Defendants, including Gronovius, Serio, and Wilcox, received equity in Marsh, making them partial owners of the New York based business at issue in this case.

55.    This Court has personal jurisdiction over Howden US Services, LLC and Howden US Specialty, LLC because Howden has New York-based employees and intends to open a New York office. It has picked New York as the exclusive forum for employment contracts it enters with its new employees. Furthermore, Howden has availed itself of the courts of this jurisdiction by moving to intervene in the *Parrish* action and by filing a declaratory judgment suit against Marsh McLennan in New York Supreme Court. Howden also interfered with numerous contracts between Marsh McLennan and its former employees governed by New York law.

56.    Venue is proper in this District. Each Individual Defendant expressly agreed, by executing their respective covenants, that any action arising from those agreements or their employment must be brought in this Court and that they waive any objection to venue. Howden also consented to proceed in this venue when it moved to intervene in the *Parrish* action. Howden's reliance on Marsh's New York forum-selection clause in the Delaware action estops it from disavowing this forum now.

57.    Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District: (1) the Individual Defendants owed duties to their New York-based employer; (2) Marsh McLennan discovered the

breaches in New York; and (3) Marsh McLennan maintains in this District the confidential information and trade secrets central to its claims.

## FACTUAL BACKGROUND

I.    **Marsh McLennan built an industry-leading platform through decades of investment in people, confidential information, trade secrets, and proprietary know-how.**

58.    For over a century, Marsh McLennan has been a leading insurance brokerage and risk management firm.  Marsh McLennan provides insurance brokering, consulting, and claims advocacy services through a comprehensive platform that serves every segment of the market, including complex specialty accounts in healthcare, energy, construction, marine, and real estate. Serving these accounts requires expertise and relationships developed over years.  Marsh McLennan has made those investments, building and training teams to serve critical and highly profitable clients.

59.    As defined above, Marsh McLennan includes MMC, the parent organization, which has various subsidiaries and affiliates, including Marsh, Mercer, and MMA.  Marsh, Mercer, and MMA have different business structures and provide different products and services as part of Marsh McLennan's comprehensive platform but share a common commitment to superior client service through their talented employees.

60.    Marsh McLennan's businesses work together to provide comprehensive solutions to their clients.  Teams collaborate across businesses to provide products and services on risk, consulting, health, wealth, and career.  Colleagues share referral opportunities across businesses and will market together to showcase the broad range of services available to clients.

61.    Marsh organizes its business by geographic "Zones."  Individual Defendants worked in the Florida Zone.  As in other Zones, Florida personnel provide risk analysis, insurance program design and placement, insurance program support and administration, claims support and

advocacy, alternative risk strategies, and a wide array of risk analysis and risk management consulting services.

62.     Florida Zone clients benefit from Marsh McLennan's advanced analytics, technical expertise, and industry knowledge, along with collaboration across Marsh McLennan's global network.  The Florida Zone services clients of all sizes, including large multinational companies, high growth middle-market businesses, small commercial enterprises and high net-worth private clients and affinity groups.  These segments are designed to tailor value propositions and operating models to client needs.

63.     MMA serves middle market and large corporate clients with a broad range of commercial property and casualty products and services, as well as solutions for employee health and benefits, retirement and administration needs, and a growing personal lines business in the United States and Canada.  MMA employees have access to and rely upon Marsh McLennan's confidential and proprietary information and/or trade secrets to provide these services.

64.     Mercer employees provide consulting services, often working collaboratively with other Marsh McLennan employees.  For example, Mercer employees have provided extensive Health & Benefits consulting to Marsh's Florida Zone clients.  Mercer employees rely on Marsh McLennan's confidential and proprietary information and/or trade secrets to provide these services.

65.     In recent years, Marsh McLennan invested significant time, millions of dollars, and goodwill to make the Florida Zone into a market leader and to develop and train its employees. Marsh McLennan expanded production and client-service capacity, opened and improved offices, and built the Zone's brand presence.  Florida Zone employees received extensive training, client development resources, and cross-selling opportunities.

66.     Florida Zone employees, including Individual Defendants during their employment, leveraged Marsh McLennan's domestic and international talent and unique market relationships with insurance carriers to deliver customized solutions.  They used Marsh McLennan's technology to enhance client servicing capabilities and efficiencies.

67.     Before July 2025, more than 100 Marsh employees worked in the Florida Zone, comprising the majority of Marsh's Florida workforce.

68.     Florida Zone employees—including the Individual Defendants—managed substantial client revenue for Marsh.

## II.    Marsh McLennan trained the Individual Defendants and granted them access to Marsh McLennan's confidential information and trade secrets.

69.     Marsh McLennan provided employees, including the Individual Defendants, with broad access to sensitive confidential information and trade secrets that Marsh McLennan developed, refined, and protected at substantial expense.

70.     Marsh McLennan trusted its employees, including the Individual Defendants, with access to Marsh McLennan's confidential information and trade secrets, including the identities of Marsh McLennan's clients and prospects, terms and conditions of Marsh McLennan's contracts, and information concerning Marsh McLennan's workforce and organizational structure.

71.     By virtue of their senior positions in the Florida Zone, Marsh McLennan also trusted the Individual Defendants with highly valuable and safeguarded trade secrets, including:

> a.  ***Client Folders***: Compilations of documents containing binders, policies, claim histories, renewal terms, premiums, commission structures, risk analyses, and coverage details across a client's business.  These documents reflect years of relationship capital and effort.  Because they provide everything a competitor would need to solicit and transition an account, they are extremely valuable and safeguarded.  Indeed, a single client file in the hands of a competitor could jeopardize Marsh McLennan's relationship with that client, a relationship Marsh McLennan spent significant time and effort developing as its broker of record.  Marsh McLennan therefore derives eco-

nomic value from their secrecy. They reside on password-protected systems and are shared only with third parties on a need-to-know basis (for example, when soliciting bids for insurance quotes).

b. ***Compilations of Client Relationship Data and Account Intelligence***: Lists of clients with associated revenue, renewal periods and status, fee and commission structures, and detailed contact information and notes developed over time at significant cost. These non-public compilations of data and intelligence are extremely valuable to Marsh McLennan and safeguarded. Disclosure would significantly harm Marsh McLennan by enabling targeted diversion of accounts. Maintaining the secrecy of these compilations is thus independently valuable to Marsh.

c. ***Client and Partnership Objectives and Profitability "Playbooks"***: Presentations and models reflecting Marsh McLennan's client, carrier, and partner-specific strategies, placement approaches, and coordinated growth plans by industry. These safeguarded playbooks map strategic relationships and growth priorities. They provide highly confidential information about Marsh McLennan's existing business and strategy to grow its business moving forward, including by identifying geographical areas and industries or sectors where Marsh McLennan has had success, growth, or room for improvement. Maintaining their secrecy provides economic value to Marsh McLennan, as access to this information would allow a competitor to intercept and replicate Marsh McLennan's strategy to Marsh McLennan's detriment.

d. ***Internal Training Documents***: Trainings that provide detailed information about how Marsh McLennan operates its business, including detailed processes for onboarding clients, preparing and managing renewals, and delivering Marsh McLennan's service model. These documents also identify unique aspects of Marsh McLennan's business model. These non-public and safeguarded materials confer a substantial competitive advantage to Marsh, McLennan and would be particularly valuable to a new market entrant seeking to compete with the Company. Maintaining the secrecy of these documents thus provides economic value to Marsh McLennan beyond the value of the information itself.

e. ***Compendia of Employment Information***: Confidential and closely guarded compendia of employment-related information for Marsh McLennan's employees, including information on compensation, client relationships, and performance data. Maintaining the secrecy of these non-public and safeguarded compendia of materials provides economic value to Marsh McLennan, as access to this information would allow a competitor to intercept Marsh McLennan's business by targeting specific high performers with high-value client relationships for recruitment, and providing them tailored job offers they would be more likely to accept than if the competitor did not

have this closely guarded information. Allowing such a targeted and strategic pilfering of Marsh McLennan's work force would be to Marsh McLennan's detriment, and would allow a competitor replicate Marsh McLennan's business and undercut Marsh McLennan's success.

72.     Marsh McLennan's trade secrets and confidential information are Marsh McLennan's property.

73.     Marsh McLennan went through great lengths at enormous expense to develop, collect, and refine its confidential information and trade secrets to benefit its business, which are vital to Marsh McLennan's ability to compete. These documents provide significant competitive advantages. Marsh McLennan heavily invested to collect, refine, and protect this information.

74.     Marsh McLennan employs robust protocols to protect its confidential information and trade secrets and to guard against unfair competition. Among other measures, employees sign non-solicitation and confidentiality agreements; receive regular reminders via the employee handbook *Working Here*, its Code of Conduct *The Greater Good*, and trainings; are granted access only on a need-to-know basis; and encounter password protection and data-loss-prevention tools that encrypt or block sensitive transmissions and restrict use of personal webmail and unapproved cloud storage. Marsh McLennan's computer system requires that employees enter two sets of passwords in order to gain access. Marsh McLennan also requires multi-factor authentication to access certain parts of its systems. And certain document folders, drives, Teams sites, and similar repositories of confidential information and/or trade secrets have electronic access restrictions in place that allow only certain employees to access them.

75.     Marsh McLennan's Code of Conduct prohibits coordinating with competitors on fees, commissions, or strategic plans; restricts use and disclosure of confidential information and trade secrets to legitimate business purposes; and requires sharing them only with authorized par-

ties.  Marsh McLennan's data loss prevention system logs and encrypts sensitive outbound transmissions and protects internal networks from suspicious inbound traffic.  Personal webmail and unapproved cloud storage (e.g., DropBox), are prohibited on company devices with rare exceptions.

76.    Marsh McLennan also secures information at separation.  For all employees, Marsh McLennan disables accounts and blocks network access upon termination of employment.  Departing employees must return their corporate devices; equipment is collected on-site or via prepaid shipping.

## III.    Marsh McLennan protected its investments with reasonable restrictive covenants that Individual Defendants freely accepted.

77.    To safeguard client and employee relationships and protect trade secrets and confidential information, Marsh McLennan requires industry-standard agreements, including Confidentiality Agreements and Non-Solicitation Agreements, many governed by New York law.

78.    Each Individual Defendant executed multiple binding agreements with Marsh McLennan, received substantial compensation and benefits, and accepted the associated covenants.

**Confidentiality Agreements.**

79.    The Individual Defendants executed a Confidentiality Agreement ("CA") when they joined Marsh.

80.    The Individual Defendants' CAs apply to employees of Marsh USA, Inc. (now Marsh USA LLC) and its subsidiaries and affiliates.

81.    The Individual Defendants' CAs acknowledge that Marsh McLennan is "engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense."

82.    The Individual Defendants' CAs acknowledge that "any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage."

83.    The Individual Defendants' CAs prohibit, in perpetuity, disclosure of Marsh McLennan's confidential information and trade secrets for any purpose except for as required to carry out employment for Marsh, or as expressly authorized by the Company.

84.    The Individual Defendants' CAs define confidential information and trade secrets as follows:

> (a)    *"Confidential Information and Trade Secrets are items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its effort and expense. Confidential Information and Trade Secrets can be in any form, including but not limited to: verbal, written or machine readable, including electronic files. Trade secrets are items of Confidential Information that meet the requirements of applicable trade secret law. The absence of any marking or statement that any particular information is Confidential Information or trade secret shall not affect its status as Confidential Information or trade secret. Confidential Information and Trade Secrets include but are not limited to:*
>
> (i)    *financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;*
>
> (ii)    *product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects;*

*(iii)     client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;*

*(iv)     personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.*

*(v)     any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;*

*(vi)     any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; . . . ."*

85.     The Individual Defendants' CAs also require the return of all Marsh McLennan property immediately upon the termination of employment.  The CAs defines Marsh McLennan property to include:

*i. any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks or drives or other equipment, printouts, reports, lists in my possession or control which contain or pertain to Confidential Information and Trade Secrets; and*

*ii. all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment, including all passcodes or passwords associated with such equipment.*

86.     The Individual Defendants' CAs also require Individual Defendants, upon the termination of their employment with Marsh and upon request, to "execute a statement declaring that [they] have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have [they] supplied the same to any person, except as required to carry out [their] duties as an employee of the Company."

87.     The Individual Defendants' CAs provide that Marsh McLennan would be entitled to equitable relief for breach of the CAs, including "specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond)" and "recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

**Non-Solicitation Agreements.**

88.     The Individual Defendants executed Non-Solicitation Agreements ("NSA") with Marsh.

89.     The Individual Defendants' NSAs apply to employees of Marsh and its subsidiaries.

90.     The Individual Defendants' NSAs acknowledge that the agreements' restrictions are reasonable and necessary to protect Marsh McLennan's legitimate business interests.

91.     The Individual Defendants' NSAs prohibit the solicitation and continued servicing of clients or employees according to the following terms:

*2.      Non-Solicitation Of Clients*

*(a)      Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of good will developed by Company with its clients.*

*(b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, . . . Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on*

*behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 2(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a ""prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.*

*3. Non-Solicitation Of Employees*

*Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.*

92.    Under the terms of their respective NSAs, the Individual Defendants expressly agreed to refrain from *directly or indirectly* soliciting Marsh McLennan employees and customers, as defined in the Agreement, while employed and for twelve months after the termination of their employment.

93.     Under the terms of their respective NSAs, the Individual Defendants expressly agreed, for twelve months after the termination of their employment, to refrain from *directly or indirectly* providing Marsh McLennan clients the services they provided while at Marsh McLennan if the Individual Defendant had contact with the client or obtained confidential information and trade secrets about the client during the last two years of employment with Marsh McLennan.

94.     Under the terms of their respective NSAs, the Individual Defendants agreed that New York law governs this Agreement and any disputes arising from it, including the present action, and that lawsuits related to the Agreement must be filed in New York.

95.     Under the terms of their respective NSAs, the Individual Defendants agreed that Marsh McLennan would be entitled to equitable relief, including "specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond)" and "recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

96.     Under the terms of their respective NSAs, Gronovius, Amodeo, Serio, and Wilcox agreed that Marsh McLennan would be entitled to liquidated damages for their breaches of the NSA's client non-solicitation provisions.  Lennerth and Collins agreed that Marsh McLennan would be entitled to liquidated damages for their breaches of the NSA's client or employee non-solicitation provisions, as well as the conflict of interest provision.

97.     The Florida Zone Leaders, Baxter Southern, and other Marsh McLennan employees also agreed to restrictive covenants protecting Marsh McLennan's confidential information and prohibiting the solicitation of Marsh McLennan's employees and customers post-termination. Howden has tortiously interfered with those agreements too.

IV.    **Unable to create a US business through legitimate means, Howden and the Florida Zone Leaders plan to raid Marsh McLennan's business and pilfer its clients, employees, confidential information, and trade secrets.**

98.    Howden Group Holdings Limited is based in the United Kingdom and has historically had little presence in the United States—let alone a full-service insurance brokerage business. Recently, Howden decided to enter the US insurance brokerage market. By at least January 2025, Howden was in talks to acquire Risk Strategies, a large privately held US insurance broker, as a means to expand into the US retail insurance market. But by March 2025, the deal was not closed, and Howden abandoned its pursuit of Risk Strategies.

99.    With its plan for a US acquisition off the table, Howden turned to plan B. This time, rather than investing the time and resources to build a US presence, Howden hatched an unlawful scheme to poach Marsh McLennan's employees, clients, confidential information, and goodwill. Howden was going to build a full-scale business out of nothing overnight—not through hard work, relationship building, and proven success; rather, by stealing a fully developed business out from under the nose of its competitor and industry leader, Marsh McLennan.

100.    In March 2025, Howden formed at least two new US-based LLCs: Howden US Services, LLC and Howden US Specialty, LLC. Shortly thereafter, Howden enlisted Marsh's Florida Leader Michael Parrish to serve as the CEO of its newly minted US operations. With Howden's active encouragement, aid, and support, Parrish recruited the other Florida Zone Leaders—including Lugones, Lynn, and Layton—to assist in orchestrating this raid. They then recruited their henchmen—the Individual Defendants and others—to raid Marsh's employees and clients for Howden. Beginning in March 2025, Howden, the Florida Zone Leaders, and the Individual Defendants, and their accomplices quietly and surreptitiously laid the groundwork to lift out the entire Florida Zone in August 2025, a timeline which was ultimately accelerated to July when the press got wind of the plan.

101.    For example, in a phone call in the Spring of 2025, in furtherance of his scheme with Howden, Parrish told a Marsh employee who reported to him that Parrish would be leaving to start and run Howden's new United States operation, in direct competition with Marsh McLennan. Parrish told the employee that when this happened, he wanted the employee to leave Marsh and go work for Howden under him as the leader of one of Howden's US specialty groups.

102.    On information and belief, the Florida Zone Leaders and Individual Defendants told Howden which employees should be extended employment offers because of their performance and client relationships, and how much to pay them. None of Marsh's employees applied for jobs with Howden. None submitted applications or resumes. All of them had offers in the bag because Howden knew who to target and hire—and how to do it—based on the trade secret information it received from Marsh's turncoat employees.

103.    Howden and Parrish also directed departing employees to collect Marsh McLennan employees' personal contact information so that they could communicate with them discreetly and so Howden could send offer letters and follow-up recruitment efforts. In furtherance of Howden's scheme, Parrish directed his longtime executive assistant, Wilda Godinez, to collect personal email addresses from the employees in the Florida Zone. Godinez claimed she was collecting personal email addresses to stay in touch with them after her retirement, but she was in fact collecting personal email addresses to funnel to Parrish, who then funneled them to Howden, so that Parrish and Howden could discreetly solicit Marsh McLennan employees without the risks associated with using Marsh McLennan email addresses. Godinez went so far as to obtain the personal cell phone number of one Marsh McLennan employee's daughter, at an event in June 2025, in order for Howden to be able to contact the employee off Marsh McLennan's radar. After the raid became public, Godinez then called the daughter's personal cell phone and asked the

daughter to deliver a message to her mother from "Mr. Parrish" about calling in a "poker chip," or favor. The employee interpreted Parrish's message as encouraging her to follow him to Howden. Numerous members of Parrish's team, which included Individual Defendants Janette Wilcox and Giovanni Perez, as well as members of their teams, which included Individual Defendants Carlos Serio and Nathan Collins, followed Parrish to Howden.

104. At Howden's direction, Florida Zone Leader Julie Layton also began laying the groundwork to move her team, which included Individual Defendant Andrea Amodeo, and the clients they supported from Marsh McLennan to Howden. On June 26, 2025, approximately one month before the raid, Layton created a SharePoint and directed her team, which included Amodeo, to upload key client documents, including the "team chart" (showing the Marsh McLennan employees working on the account), the "account financial trackers" (showing the key financial information for the account), and the "schedules of insurance" (showing key events on the account, including renewals). These documents contained and comprised Marsh McLennan's valuable trade secrets. Layton had never made any similar request to her team in the past. Layton was collecting this confidential information to unfairly compete and solicit Marsh McLennan's clients on behalf of Howden.

105. Lugones did her part by holding an in-person meeting in Marsh McLennan's Miami office with multiple employees from her team, which included Individual Defendant Alfred Gronovius, only a few days before the raid. Every single one of those employees resigned from Marsh McLennan the next business day. Demonstrating the coordinated nature of their departures, they left as a group for lunch and simply never returned. Lugones also created a detailed roadmap for soliciting Marsh's employees: identifying which Marsh employees to target, providing information about their salary and title, making notes on how to reach them and when to contact them,

and analyzing the terms of their employment offers.  Her roadmap allowed Howden to craft targeted employment offers to capitalize on its plan to lure Marsh McLennan's employees away.  Lugones kept that roadmap during her employment with Howden and only recently "returned" it to Marsh.

106.     Lynn solicited Marsh McLennan employees to move to Howden using false and misleading information.  On July 18, 2025, Lynn called a Marsh McLennan colleague to convince her to move to Howden.  Lynn told his colleague a rumor that Marsh McLennan was going to fire Parrish and that if Marsh McLennan fired Parrish, Lynn also expected to be fired.  Lynn also told his colleague that planned changes at Marsh McLennan would increase her workload.  Lynn solicited the vast majority of his 19 direct reports on the sales team, including Individual Defendant Richard Lennerth, to move to Howden. Most of Lynn's team resigned soon after.

107.     The Florida Zone Leaders were acting as Howden's agents and for Howden's benefit at this time.  They knew in order to make their new venture a success—a venture that, until March 2025 did not exist—they needed to bring everything with them: clients and employees included.

108.     Similarly, on information and belief, senior leaders within MMA's McGriff Specialty group were enlisted by Howden to recruit teams of McGriff Specialty employees.  The goal was for those employees to resign *en masse* and at a moment's notice to set up the same Energy, Marine and Construction teams for Howden US.  Those employees were largely located in Alabama, Missouri, and Texas.

109.     Howden managed and coordinated this aspect of the scheme with key insiders of MMA's McGriff Specialty team including Baxter Southern, an employee for more than 20 years of McGriff Specialty Group and later MMA, who led McGriff St. Louis and the McGriff Marine

Team.  On the same day as the raid of the Florida Zone, July 21, 2025, Southern resigned and choreographed the mass exodus of 17 other employees, transferring a valuable chunk of McGriff Specialty's client base in the process.  Because Howden had no presence in St. Louis, Southern set up shop in Southern's own basement.  Southern attempted to cover his tracks by cancelling his MMA phone plan a week prior to departure and, upon information and belief, instructing others who were leaving to shred or steal documents containing MMA's confidential information.

110.    Upon information and belief, Howden continues to recruit MMA's McGriff Specialty employees and clients through former senior leaders of MMA.  Employees who were recruited by Howden but remain with MMA confirm that Howden's intention was to hit all of Marsh McLennan hard, intending to "unglue" its business operations, and to expect further resignations "in waves."  Thus far for MMA, over 40 employees have left, along with over 30 clients, all attributable to the clandestine efforts of Southern and other former senior leaders.

111.    On information and belief, these former leaders of MMA, at Howden's direction, provided personal emails and phone numbers of MMA employees to Howden's recruiters.

112.    On information and belief, at Howden's direction, these senior MMA leaders also funneled MMA's confidential compensation and performance information about their team's employees and other MMA colleagues to Howden so it could prepare employment offers for MMA employees in the McGriff Specialty groups to incentivize them to leave MMA for Howden.  Immediately following Southern's departure, Howden began extending offers to McGriff Specialty team members that, upon information and belief, reflect awareness of confidential information about those individuals.

113.    On information and belief, MMA leader Alastair Muir-Taylor brazenly negotiated at least one other MMA employee's offer from Howden while Mr. Muir-Taylor was still employed by MMA and receiving his MMA paycheck.

**V.    The Individual Defendants execute Howden's plan alongside the Florida Zone Leaders, culminating in the loss of numerous clients and the resignations of more than 90 employees within a single day.**

114.    The raid on Marsh McLennan may have been concocted by Howden and the Florida Zone Leaders, but when it came time to execute, they did not act alone.  Individual Defendants Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth—senior Florida Zone personnel reporting directly or indirectly to Parrish and the other Florida Zone Leaders—executed the raid together with Howden by leveraging confidential information and trade secrets about Marsh McLennan's workforce, business, and clients to drive a coordinated campaign to recruit employees and divert clients to Howden.

115.    On Thursday, July 18, 2025, news of the impending raid leaked to the press.  The Florida Zone Leaders and their collaborators, including the Individual Defendants, accelerated their plan.  Gronovius, Amodeo, Serio, Wilcox, and Collins pressed the employees of the Florida Zone to resign *en masse*.  Gronovius, Serio, and Perez also solicited clients to leave Marsh McLennan for Howden with them, despite Howden having no existing US business to absorb and service these new clients.  Each Individual Defendant accessed, downloaded, and/or transmitted Marsh McLennan's confidential information and trade secrets, including client folders, compendia of employment information, compilations of client relationship data and account intelligence, partnership objectives and profitability "playbooks," and internal training documents for onboarding clients.  And in a glaring admission of guilt, Gronovius, Amodeo, Serio, and Perez deleted the confidential information and trade secrets they accessed off of Marsh McLennan's systems in an at-

tempt to cover their tracks and conceal their disloyal service, deprive Marsh McLennan of its property, and sabotage Marsh McLennan's business by obstructing its ability to compete fairly in the market. On information and belief, the MMA colleagues who defected to Howden were also encouraged to begin their group resignations at the same time.

116.    Howden encouraged, facilitated, and benefitted from the raid every step of the way. It prepared and sent to Marsh McLennan employees unsolicited offers of employment. It accepted Marsh McLennan's clients' business, knowing the clients were improperly solicited to abandon Marsh McLennan. And to this day, it continues to accept and use (through the Individual Defendants and other former Marsh McLennan employees that now make up its US workforce) Marsh McLennan's trade secrets and confidential information—even with knowledge that doing so violates contractual obligations, fiduciary duties, and state and federal statutes.

117.    The Individual Defendants acted as Howden's agents and for Howden's benefit in executing this raid. As with the Florida Zone Leaders, they knew that their new venture could not succeed without the infrastructure, and they did not have time to build that infrastructure anew. Violating their contractual obligations and fiduciary duties to Marsh McLennan, and stealing its clients, employees, trade secrets, and confidential information, were necessary steps to ensuring Howden's success and their own.

118.    Outside of the Florida Zone, Howden followed a similar playbook. Howden targeted select MMA practice leaders, including Baxter Southern, leading MMA's McGriff Specialty Marine, Energy and Construction practices that Howden sought to pilfer, and had those leaders hand pick who from their respective teams to recruit to leave MMA and join them at Howden. Further, upon information and belief, now employed at Howden, Southern has been directing his reports to contact restricted clients and induce them to transfer their business from MMA to

Howden.  To date, Southern's actions, including acting on Howden's behalf, have harmed MMA by depriving it of over $4 million in annual recurring revenue—amounting to nearly half of the annually-recurring revenue of MMA's Marine Team. Southern appears to have targeted the Marine Team's largest clients.

119.    Defendants' raid has caused harm and will continue to cause incalculable harm to Marsh McLennan for so long as they are permitted to continue their tortious conduct.  Although isolated individual departures are natural and to be expected, Marsh McLennan has succession plans in place for when individual employees leave.  Succession plans are particularly critical for Marsh McLennan's business in order to avoid coverage lapses that can damage clients and impair Marsh McLennan's business relationships and goodwill.  Marsh McLennan can, and does, recruit to fill one-off departures without disrupting its business.  But soliciting the systematic and near simultaneous departure of teams comprising entire or significant portions of Marsh McLennan's business units not only damages Marsh McLennan but threatens to put clients at serious risk.  That is precisely why the departing employees' restrictive covenants are narrowly tailored and critical to protect Marsh McLennan's legitimate business interests.  And it is precisely why Howden must be held accountable for interfering with the departing employees' adherence to these contractual obligations, as well as their fiduciary duties owed to their employer.  The breadth of Howden's interference—with scores of employees across multiple states and business specialties—demonstrates Howden's deliberate corporate strategy to weaponize stolen employment information and dismantle Marsh McLennan's competitive workforce infrastructure.

VI.    **Working in partnership with Howden, Individual Defendants Gronovius, Amodeo, Serio, Wilcox, and Collins unlawfully solicited Marsh McLennan employees to leave Marsh McLennan for Howden.**

120.    In the days following the press leak, Gronovius, Amodeo, Serio, Wilcox, and Collins contacted Marsh McLennan employees seeking their personal contact information, urging departures, discussing compensation at Howden, and coordinating timing.  In some instances, Howden directly participated in this solicitation by sending unsolicited job offers to the Marsh McLennan employees the Individual Defendants solicited—without those employees having applied for, interviewed for, or otherwise expressed interest in these jobs to Howden.  These Individual Defendants engaged in textbook solicitation.

121.    Between July 15 and July 17, 2025, Gronovius spoke repeatedly with several Marsh McLennan employees about leaving Marsh McLennan.  He had at least four interactions with a single colleague soliciting that person to leave Marsh McLennan for Howden.  Those employees—and multiple others—that Gronovius contacted resigned shortly thereafter.

122.    On July 18, 2025, Serio held back-to-back calls with a key ringleader of the raid, Parrish, and a Marsh McLennan employee who later resigned.  The following day, Serio told another Marsh McLennan employee that nearly everyone that employee worked with was leaving, described the higher compensation the employee could expect at Howden—in a position the employee had not applied for—and asked her to keep their conversation confidential.

123.    On July 18, 2025, Amodeo had a call lasting nearly thirty minutes with Individual Defendant Richard Lennerth, who left Marsh McLennan for Howden five days later.  On Sunday, July 20, Amodeo had three calls with Lennerth in short succession, and called Parrish, the mastermind behind the raid, in between those calls.

124.    On July 18, 2025, Wilcox asked one employee for his personal email address so that employee could receive an offer from Howden, even though the employee had not applied for

a job at, submitted a resume to, or interviewed for any position at Howden. Also on July 18, she accessed employment information for at least ten other employees within a span of fifteen minutes, all but one of whom resigned on July 21. On July 20, 2025, she texted another employee to call her "as soon as she could." That employee Wilcox contacted later resigned.

125. By day's end on July 21, 2025, more than 90 Marsh McLennan employees—many reporting directly or indirectly to the Individual Defendants—had resigned or informed Marsh McLennan that Howden had sent them job offers. None interviewed with Howden or provided resumes or applications. All of these Marsh McLennan employees had jobs in the bag. That could not have happened without the Individual Defendants' disloyalty and brazen disregard for their contractual obligations.

126. Individual Defendants' solicitation continued after their departures from Marsh McLennan. For example, the day after leaving Marsh McLennan, Collins texted a group of Marsh McLennan employees, including Layton, Wilcox and Serio, "Rick is with us!"—referring to Individual Defendant Richard "Rick" Lennerth, whom Collins convinced to leave Marsh McLennan for Howden. Layton "loved" the message and responded "Huge!," and Wilcox responded, "Great news!" Lennerth resigned from Marsh McLennan the next day.

127. The raid continues. To date, more than 140 Marsh McLennan employees have defected to Howden since July 21, 2025. These defections could not have occurred without Howden's active participation and interference with Marsh McLennan's non-solicitation agreements with its former employees and facilitating their faithless servitude. While isolated departures are commonly managed, a coordinated lift-out of an entire business unit risks client coverage lapses and significant operational disruption—precisely the harm the narrowly tailored covenants are designed to prevent.

128.    What's more, upon joining Howden, on information and belief, the departing employees, including the Florida Zone Leaders and Individual Defendants executed new employment agreements with Howden.  The Howden employment agreements Marsh McLennan has seen to date contain non-solicitation covenants materially indistinguishable to the ones the Individual Defendants and their co-conspirators had (and breached) with Marsh.

## VII.    Individual Defendants Gronovius, Serio, and Perez solicited and serviced Marsh McLennan's clients in further breach of their duties.

129.    Defendants' raid did not stop with employees.  Starting on the same day as the mass resignation—July 21, 2025—and continuing thereafter, Marsh McLennan clients began notifying Marsh McLennan that they would be moving their business to Howden.  They did so by submitting Broker of Record or "BOR" letters, the industry document that authorizes a new broker to act on a client's behalf and directs insurers to share client information with that broker.  A BOR transfers responsibility for managing a client's insurance program and reflects the client's decision to move its business.  Receipt of a BOR signifies that the account has moved to a new broker—known in the industry as having "BOR'd."  To date, Marsh McLennan has received at least 70 post-raid BORs, at least 60 of which confirmed a client's intention to move to Howden.  Of the clients previously serviced by Marsh that have BOR'ed to Howden, many were serviced directly or indirectly by the Individual Defendants at Marsh.

130.    That these clients BOR'd from Marsh McLennan to Howden shortly following the raid is no coincidence.  Like the Florida Leaders, Individual Defendants Gronovius, Serio, and Perez contacted the clients with whom they worked and solicited them to move from Marsh McLennan to Howden with them.  And move they did.

131.    For example, on July 22, 2025, Gronovius called a Marsh McLennan client he had serviced to solicit that account to move to Howden.  He also prepared BORs for several clients

using his personal email account following his departure, assisting these clients in moving their business from Marsh McLennan to Howden. Further, two clients whose files Gronovius accessed on July 20 and 21 BOR'd immediately after Gronovius resigned from Marsh on July 21, indicating that Gronovius had used the information he accessed on Marsh McLennan's system to solicit them to move to Howden.

132.    Serio engaged in similar solicitation efforts. During the late afternoon of Friday, July 18—the same the day news of the raid leaked to the press—Serio held back-to-back calls with Parrish, the ringleader of the raid, and two Marsh McLennan clients ("Client A" and "Client B"), all within the span of one hour. One of those clients has since BOR'd. Then, in the early morning of July 21 (the day Serio resigned), Serio communicated again with the clients he attempted to solicit on July 18 in coordination with Parrish. Serio sent a text message to Client A, writing: "Apologies for the early text, but please give me a call as soon as you're available." Approximately an hour later, Serio wrote Client A again: "I am sending you your files through a system Marsh McLennan uses called Kiteworks. It'll give you an email with a link and password to download." Using Kiteworks, Marsh McLennan's secured data-transfer site, Serio sent a compressed folder (.zip files) containing hundreds of files. Later that day, Serio also sent a compressed file containing more than 1,000 files through Kiteworks to Client B. These large, compressed folders contained trade secrets, including policy records, pricing and premium allocations, claims histories, renewal schedules, and risk-exposure data. There would be no legitimate explanation for Serio to send a client this large number of files in the ordinary course of Marsh McLennan business, especially not the day he resigned. Transferring the entire history of a client's business with Marsh enables a competitor to seamlessly intercept its business. Indeed, Client B transferred its business from Marsh McLennan after the raid.

133.    Perez also used Kiteworks to send Marsh McLennan clients mass .zip files containing their insurance documents, including on July 17, 2025.  By transferring the client files to the clients, Perez enabled them to seamlessly transfer their business from Marsh McLennan to Howden.  Further, at least two clients whose files Perez accessed at Marsh McLennan shortly before the raid later BOR'd, indicating that Perez had used the Marsh McLennan information he accessed to solicit them to move to Howden.

134.    And at least one Individual Defendant continues to actively violate his NSA.  On October 17, 2025, Gronovius contacted a former client of Marsh McLennan's that had BOR'd for Howden, asking the client to request from Marsh McLennan financial information from the 2020-2025 policy years (during which time Marsh McLennan was the client's broker of record, and during which time Gronovius serviced the account).  Gronovius discussed with the former client the information the former client will need to insure certain of its programs, and noted that he has reviewed information the client provided to him.  This confirms that Gronovius—while at Howden—continues to service the client's account.  In so doing, Gronovius is further violating his NSA, which as noted above, requires he refrain for twelve months from "perform[ing] or supervis[ing] the provision" of the same services he provided at Marsh McLennan to any clients with whom he had contact at Marsh McLennan during the last two years.

135.    Through these coordinated acts, Individual Defendants Gronovius, Serio, and Perez, along with others acting in concert with them, unlawfully lured Marsh McLennan's clients away from the Company and into the hands of its direct competitor, causing Marsh McLennan substantial and ongoing economic harm.  And by taking the business the Individual Defendants'

clients who had BOR'd from Marsh McLennan, and allowing the Individual Defendants to continue servicing those clients at Howden, Howden is tortiously interfering with Marsh McLennan's business and aiding and abetting numerous breaches of contract and fiduciary duties.

**VIII.  Defendants misuse Marsh McLennan's confidential information and trade secrets.**

136.    The Individual Defendants enabled Howden to launch its US insurance business at warp speed and enrich itself through the clients the Individual Defendants and others unlawfully lured away from Marsh McLennan through unlawfully misappropriating trade secrets and confidential information belonging to Marsh McLennan.  Howden misappropriated these trade secrets—including compendia of employment information, compilations of client relationship data, pricing and revenue structures, and internal training and strategic documents—as the foundation to create its US insurance business.

137.    Gronovius repeatedly accessed, printed, and transmitted Marsh McLennan's trade secrets in connection with the raid.  In the months leading up to his resignation, Gronovius emailed confidential company documents, which were prepared specifically to solicit a prospective client, directly from his work account to his personal address in direct violation of Marsh McLennan policy and without any legitimate business justification.  In the final days before his resignation, he also accessed and printed Marsh McLennan client files—including the files for two clients that BOR'd almost immediately after the raid.  And, a few days before his resignation, Gronovius accessed a compilation of client prospects detailing referral information, renewal dates, total premiums, and projected revenue.  Together, the documents Gronovius accessed, electronically transmitted, and printed detail Marsh McLennan's unique strategic approach for providing insurance solutions for its valuable clients—essentially a playbook of Marsh McLennan's strategies developed over years of industry experience and significant investment for assessing exposures, identi-

fying suitable policies, and advising clients on risk tolerance in the client's industry. These confidential documents, which were valuable in part because they were non-public, constituted Marsh McLennan's trade secrets. Gronovius lacked authority or justification for accessing, electronically transmitting, and printing these trade secrets. And because he had no legitimate business reason to do so, it is reasonable to infer that Gronovius has used these trade secrets to benefit Howden.

138.    As described above, in the days and weeks preceding his defection from Marsh McLennan, Serio repeatedly accessed and transmitted client files, including the client files he sent to two clients, without authorization or business justification, on July 21. The compilations of client files Serio transmitted—which contained policy records, pricing and premium allocations, claims histories, renewal schedules, and risk-exposure data—constitute Marsh McLennan's trade secrets.

139.    Just days before Perez resigned for Howden, on Saturday, July 19, Perez spent approximately three hours in the morning accessing Marsh McLennan's client files, including for at least two clients that have since submitted BORs. The files Perez accessed were Marsh McLennan's trade secrets—they provided detailed summaries of each client's insurance coverage, costs, and policies for the 7/31/2025 through 7/31/2026 coverage term, including details on policy premiums, fees, expiration dates, and renewal timelines. Perez did not need to access these client files containing trade secrets—on a weekend—to carry out his duties as a Marsh employee. It is therefore reasonable to infer that Perez's misappropriation was to benefit Howden.

140.    On June 12, a few weeks before the raid began, Wilcox emailed her personal email, without any legitimate business purpose, confidential Marsh McLennan documents containing trade secrets. These documents described Marsh McLennan's strategic relationships with carriers,

joint objectives for market growth, and market projections across a range of industries in the Florida Zone. Disclosure of these documents to a competitor—particularly a new market entrant like Howden—would provide valuable insight into Marsh McLennan's strategic partnerships. The mere disclosure of the relationship between Marsh McLennan and its partners, in addition to details like the revenue and market share derived therefrom, would cause Marsh McLennan significant competitive harm. Since there was no legitimate business reason for her conduct, it is reasonable to infer that Wilcox has used these documents describing Marsh McLennan's strategic relationships with third parties to benefit Howden and to unfairly compete with Marsh McLennan.

141.    On July 16, shortly before he resigned from Marsh McLennan, Collins accessed a document including a detailed list of all of Marsh McLennan's Florida Zone clients, their associated revenue, renewal periods, and renewal status, information that would be highly valuable to any competitor and would cause serious harm to Marsh McLennan's business if disclosed. On July 21, 2025, his last day as a Marsh McLennan employee, Collins inserted a portable USB device into his laptop for approximately twenty minutes. During that brief window, Collins accessed Marsh McLennan's trade secrets, including internal training documents for sales and client representatives, which detail Marsh McLennan's unique process for onboarding new clients, preparing for renewals, and other touchpoints for delivering client service at the high standard Marsh McLennan's clients are accustomed to. The documents additionally offer guidance to new account representatives on managing the lifecycle of a client's renewal process. Such documents would be highly valuable to any competitor broker, especially one looking to start a retail brokerage firm from scratch. On information and belief, Collins accessed these documents for the sole purpose of helping Howden operationalize its new business and capitalize on Marsh McLennan's valuable clients. Though forensic tools cannot reveal whether Collins copied the files onto his USB drive

without first accessing and analyzing the drive, the circumstances imply that he did just that. He would have no other reason to plug in a portable USB drive, access critical documents, and remove the drive in such a short span of time other than to copy documents onto that drive, particularly not on his last day working at Marsh McLennan.

142.    Lennerth downloaded, printed, and emailed himself compilations of Marsh McLennan's trade secrets shortly before resigning from Marsh McLennan. On July 21, 2025, the day most Florida Zone employees resigned, Lennerth printed 18 copies of a document containing a list of client names along with information about those clients' business with Marsh McLennan, such as the Company Number, the name of the Marsh McLennan "executive" who handled the account, and a final column titled "Total," which refers to client revenue. Lennerth had no apparent legitimate business reason to print 18 copies of that document on the same day his colleagues resigned, and two days before he resigned to follow them. On July 23, 2025—Lennerth's last day at Marsh McLennan—he sent to his personal email a file titled "contacts.csv," which contains a list of Marsh McLennan's client names, contacts, their work phone numbers, personal phone numbers, work and personal email addresses, birthdays, and "Notes" with personal details, such as the names and details of the client's minor children or other relationships, and in some cases identifying the revenue associated with that particular client. He had no business justification or authorization to do so. Lennerth took these contacts to leverage the client relationships he built while employed by Marsh McLennan and using Marsh McLennan resources. This compilation of Marsh McLennan's client information constitutes Marsh McLennan's trade secrets; Marsh McLennan obtained it over time and through great company expense. Marsh McLennan is being harmed by Lennerth's use of these trade secrets at Howden.

143.     And Amodeo, in the two weeks leading up to her resignation, accessed files, including confidential files, about several Marsh McLennan clients, which included policy documents, quotes, proposals, and a client's "strategy meeting" agenda.  Amodeo did not need to access these client files containing trade secrets to carry out her duties as a Marsh McLennan employee, and she was not expressly authorized to do so.  Therefore, it is reasonable to infer that she too was acting to benefit Howden.

144.     The Individual Defendants were acting as Howden's agents and for Howden's benefit in misappropriating Marsh McLennan's confidential information and trade secrets.  They had no legitimate Marsh McLennan-related business reason to access these confidential documents and trade secrets in the days preceding their resignations.  And as savvy business professionals and leaders in their field, the Individual Defendants knew that these trade secrets and confidential information would be crucial to build the infrastructure at Howden to get its US business off the ground.  The Individual Defendants were acting in Howden's business interest, not Marsh McLennan's.

145.     The Individual Defendants were obligated to protect Marsh McLennan's confidential information and trade secrets, to which they had access by virtue of their employment with Marsh McLennan, and not to misappropriate the information for their own use or the use of a competitor like Howden.

146.     The Individual Defendants were contractually obligated to return all Marsh McLennan property immediately upon the termination of their employment with Marsh McLennan, and, upon request, to "execute a statement declaring that [they] have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have [they] supplied

the same to any person, except as required to carry out [their] duties as an employee of the Company." The Individual Defendants have not completed either of these contractually obligated actions. This supports the conclusion that they continue to possess Marsh McLennan's trade secrets and confidential information. That some of these trade secrets and documents containing confidential information pertain to clients who moved their business from Marsh McLennan to Howden during the raid indicates that the Individual Defendants continue to use Marsh McLennan's trade secrets and confidential information for the benefit of their new employer, Howden.

147.    Howden, through the Individual Defendants and others, is knowingly using Marsh McLennan's trade secrets and confidential information to operate its business. Indeed, departing employees, including the Individual Defendants, executed new employment agreements upon joining Howden, which contain materially indistinguishable confidentiality provisions like the ones the Individual Defendants and their co-conspirators signed (and breached) with Marsh.

148.    Defendants deliberately exploited Marsh McLennan's trade secrets and confidential information to incentivize clients to leave Marsh McLennan's business—causing harm to Marsh McLennan's tangible interests.

IX.    **In an effort to cover their tracks and harm Marsh McLennan's business, the Individual Defendants further violate their obligations to Marsh McLennan by deleting documents containing trade secrets, confidential information, and Marsh McLennan's intellectual property.**

149.    Individual Defendants Gronovius, Serio, Amodeo, and Perez did not just improperly access and transmit Marsh McLennan's documents—they also deleted them from Marsh McLennan's computer systems on their way out the door. In so doing, they breached their contractual and fiduciary duties to Marsh by concealing their disloyal service, depriving Marsh

McLennan of its property (and the confidential information, trade secrets, and information contained therein), and attempting to sabotage Marsh McLennan by obstructing its ability to compete fairly in the market.

150.    For example, on the day of his resignation, Gronovius accessed and deleted Marsh McLennan client files—including an insurance workbook for a Marsh McLennan client who BOR'd on July 21, 2025, and several files for a Marsh McLennan client who BOR'd on July 22, 2025.  Gronovius deleted the documents to cover his tracks and interfere with Marsh McLennan's client relationships.

151.    Likewise, beginning on July 18 (the day that news of the impending raid leaked) through July 21 (the day he resigned), Serio deleted from his Marsh McLennan laptop and Marsh McLennan's cloud storage system entire client file directories, compilations of client insurance records (such as financial reports, claims history, policy terms, and coverage details) as well as Marsh McLennan's work product reflecting Marsh McLennan's risk assessments, insurance proposals, commission amounts, fee structures, carrier contacts, renewal timelines, and details involving revenue sharing with wholesalers.  Serio also deleted client files pertaining to the clients he attempted to solicit on July 18.  One of those clients whose files he deleted has BOR'd; the other he continues to solicit, while at Howden, in violation of his NSA.  Serio deleted those files to divert clients from Marsh McLennan to Howden while covering his tracks.

152.    Amodeo, in the two weeks leading up to her resignation, deleted numerous confidential files pertaining to several Marsh McLennan clients, including policy documents, quotes, and proposals.

153.    And on July 19, days before Perez resigned, Perez deleted numerous client files, including worksheets summarizing and comparing clients' various coverages for the upcoming

term.   Perez's mass-deletion campaign was an attempt to cover his tracks and impede Marsh McLennan's relationships with those clients.

154.    Deleting these documents, in violation of their duties to their employer, served both to conceal the evidence of Individual Defendants' misdeeds, deprive Marsh McLennan of its property, and to sabotage Marsh McLennan's business—advancing Defendants' overall tortious interference and unfair competition scheme.

## X.    The Individual Defendants stonewall Marsh McLennan's reasonable efforts to investigate their wrongdoing by refusing to comply with lawful subpoenas seeking information about their roles in the raid.

155.    In the *Parrish* action, discovery has commenced.   The parties in that action have served discovery requests on one another.   Among other items, Marsh's requests seek communications with Howden about potential employment, communications with Marsh McLennan employees regarding Howden, and communications transmitting Marsh McLennan documents.

156.    Marsh has also served non-party discovery in that case.   On September 26, 2025, Marsh McLennan issued non-party subpoenas in the *Parrish* action to Gronovius, Amodeo, Serio, Perez, Collins, and Lennerth (and others), seeking the production of documents on or before October 17, 2025.   The subpoenas included 16 requests for the production of documents on topics relating to the raid, including documents containing Marsh McLennan's information or property currently in the individual's possession; documents relating to any book of business that he or she intended to bring to Howden; and communications with Marsh McLennan employees regarding Howden.

157.    Amodeo, Serio, Perez, Collins, and Lennerth accepted service of the subpoenas; Gronovius to date has evaded service.

158.    On October 30, 2025, Amodeo, Serio, Perez, Collins, and Lennerth responded to the subpoenas.   Each refused to comply with any document request, stating that they "will not

produce documents or communications in response" to any of the requests in the subpoena. Individual Defendants did not provide any legitimate basis for their total refusal to comply with any aspect of the subpoenas (indeed, none exists). Even for those requests for which responsive documents are undeniably relevant and should be easy to identify and produce (for example, offers of employment by Howden, or Marsh McLennan property currently in the Individual Defendants' possession), Individual Defendants utterly and completely refused to engage.

159.    Individual Defendants' full-scale obstruction of these lawful subpoenas confirms their intent to stymie Marsh McLennan's efforts to investigate the raid. It also makes clear that Individual Defendants have documents and information they want to hide from Marsh McLennan. Individual Defendants' refusal to comply with their obligations under the Federal Rules of Civil Procedure is consistent with their refusal to comply with their contracts. Individual Defendants' misconduct also confirms their consciousness of guilt—because they are guilty.

## XI.    Howden, through the Florida Zone leaders, continues to damage Marsh McLennan's business by refusing to comply with a court order requiring the return of Marsh's property.

160.    As noted above, Marsh McLennan's CAs also require employees to return all Marsh McLennan property immediately upon the termination of employment.

161.    On August 21, 2025, the Florida Zone Leaders—by this point, executives at Howden—submitted to the court in the *Parrish* action sworn affidavits attesting that they had complied with their obligations to Marsh, which included the duty to return Marsh's property and Confidential Information upon termination of employment. Layton also represented in initial disclosures on August 29, 2025 that she was "not in possession of any Marsh materials."

162.    Despite these sworn assurances from the Florida Zone Leaders that they possessed no Marsh property, in his September 18, 2025 injunction order in the *Parrish* action, Judge Daniels explicitly ordered the Florida Zone Leaders to return "all Marsh property, including Confidential

Information and Trade Secrets."

163.    Following that order, Marsh asked whether the Florida Zone Leaders had any Marsh property to return.  Counsel for Parrish, Lugones, and Lynn responded that they had nothing to return besides Marsh-issued their devices.  Counsel for Layton responded that she was not in possession of any Marsh property and had "nothing to return."  Again, this was untrue.

164.    On October 21, nearly a month later, Parris, Lugones, and Lynn produced more than 280 Marsh documents they stated were "relat[ed] to Marsh's business," including:

      a.  ***Client proposals***: Images of client proposals containing detailed proprietary information regarding Marsh's bid and entries in Marsh's prospective client tracking system.

      b.  ***Strategic business plans***: Documents outlining Marsh's strategy in the Florida Zone, including analyses of organizational strengths and weaknesses, assessment of prevailing market conditions, renewal strategies for specific clients, identification of growth opportunities, revenue data, and a comparative assessment of industry peers.

      c.  ***Compendia of documentation regarding client services***: Communications with clients regarding quotes and coverage, overviews of client policies, premiums, and fees, as well as information regarding carriers, policy limits, and premiums.

165.    Lugones also produced her solicitation playbook, a spreadsheet identifying which Marsh employees to target, providing information about their salary and title, making notes on how to reach them and when to contact them, and analyzing the terms of their employment offers.

166.    Layton later produced 20 additional documents, including images of a phone screen (taken from another device) displaying team members, growth data, and revenue statistics.

167.    The Florida Zone leaders were acting as Howden's agents when they took and/or unlawfully retained Marsh's property despite their contractual, fiduciary, and court-ordered obligations.

## COUNT I
## BREACH OF CONTRACT - SOLICITATION OF EMPLOYEES
*(Gronovius, Amodeo, Serio, Wilcox, Collins)*

168.     Marsh McLennan incorporates the previous paragraphs as if fully restated here.

169.     Marsh McLennan has valid and enforceable employee non-solicitation provisions in its NSAs with Gronovius, Amodeo, Serio, Wilcox, and Collins as detailed above.  In fact, upon joining Howden, on information and belief, Gronovius, Amodeo, Serio, Wilcox, and Collins signed non-solicitation covenants with Howden that were materially indistinguishable from those they had with Marsh McLennan—confirming they agree the terms are reasonable, valid, and enforceable.

170.     Gronovius, Amodeo, Serio, Wilcox, and Collins expressly agreed that their NSAs with Marsh McLennan were reasonable and agreed to refrain from soliciting Marsh McLennan's employees with whom they worked or about whom they had Marsh McLennan's confidential and proprietary information and trade secrets during their employment and for a 12-month restricted period.

171.     Marsh McLennan performed its obligations under the employee non-solicitation provisions of Individual Defendants' NSAs.

172.     As detailed above, Gronovius, Amodeo, Serio, Wilcox, and Collins each individually breached the employee non-solicitation provisions of their NSAs by soliciting other Marsh McLennan employees to terminate their employment with Marsh McLennan and work for Howden instead.

173.     By soliciting employees to join Howden, Gronovius, Amodeo, Serio, Wilcox, and Collins directly and proximately have caused or contributed to Marsh McLennan employees resigning.

174.    Individual Defendants' conduct to date indicates that they do not intend to abide by their NSAs.

175.    Marsh McLennan has no adequate remedy at law.

176.    Gronovius, Amodeo, Serio, Wilcox, and Collins executed binding agreements with Marsh McLennan acknowledging that irreparable injury will result to Marsh McLennan if they breach the employee and client non-solicitation provisions in their respective NSAs, that there is no adequate remedy at law for such breaches, and that Marsh McLennan is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—"incurred by the Company in seeking to enforce the provisions of this Agreement."

177.    Injunctive relief enforcing the contractual obligations of Gronovius, Amodeo, Serio, Wilcox, and Collins to Marsh McLennan is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of the employee non-solicitation provisions of Individual Defendants' NSAs.

178.    Based on Individual Defendants' breaches, Marsh McLennan is entitled to relief as provided for in § 6 of the NSAs of Gronovius, Amodeo, Serio, and Wilcox and § 5 of the NSA of Collins, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

179.    Based on Collins's breach, Marsh McLennan is entitled to liquidated damages as provided for in § 6 of his NSA, in an amount equal to the total fees and commissions received by the Company for such business during the two years prior to the breach.

180.    Marsh McLennan is also entitled to monetary damages for Gronovius's, Amodeo's, Serio's, Wilcox's, and Collins's breaches.

## COUNT II
## BREACH OF CONTRACT - SOLICITATION OF CLIENTS
### *(Gronovius, Serio, Perez)*

181.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

182.    Marsh McLennan has a valid and enforceable NSA with Gronovius, Serio, and Perez, as detailed above.  This agreement prohibits both direct and indirect solicitation as well as the continued servicing of certain Marsh McLennan clients. In fact, upon joining Howden, on information and belief, Gronovius, Serio, and Perez signed non-solicitation and non-servicing covenants with Howden that were materially indistinguishable from those they had with Marsh McLennan—confirming they agree the terms are reasonable, valid, and enforceable.

183.    Gronovius, Serio, and Perez expressly agreed that their NSA with Marsh McLennan was reasonable and agreed to refrain from soliciting or servicing Marsh McLennan's clients during their employment and for a 12-month restricted period.

184.    Marsh McLennan performed its obligations under the client non-solicitation  provisions of its NSAs with Gronovius, Serio, and Perez.

185.    As detailed above, Gronovius, Serio, and Perez breached the client non-solicitation provisions of their NSAs by soliciting Marsh McLennan's clients to terminate business with Marsh McLennan and transfer their accounts to Howden.

186.    Gronovius further breached the client non-solicitation provision of his NSA by continuing at Howden to service a former client of Marsh McLennan's that he serviced while employed at Marsh McLennan.

187.    By these actions, Gronovius, Serio, and Perez directly and proximately caused and allowed clients to move their business to Howden.

188.    Gronovius's, Serio's, and Perez's conduct to date indicates that they do not intend to abide by the client non-solicitation provisions of their NSAs.

189.    Marsh McLennan has no adequate remedy at law.

190.    Gronovius, Serio, and Perez executed binding agreements with Marsh McLennan acknowledging that irreparable injury will result to Marsh McLennan if they breach the client non-solicitation provisions of their respective NSAs, that there is no adequate remedy at law for such breaches, and that Marsh McLennan is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—"incurred by the Company in seeking to enforce the provisions of this Agreement."

191.    Injunctive relief enforcing Individual Defendants' contractual obligations to Marsh McLennan is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of the client non-solicitation provisions of Gronovius's, Serio's, and Perez's NSAs.

192.    Based on Gronovius's, Serio's, and Perez's breaches, Marsh McLennan is entitled to relief as provided for in § 6 of their NSAs, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

193.    Based on Gronovius's, Serio's, and Perez's breaches, Marsh McLennan is also entitled to liquidated damages as provided for in § 7 their NSAs, in "an amount equal to the total fees and commissions received by the Company for such business during the two (2) years prior to the breach."

194.    Marsh McLennan is also entitled to monetary damages for Gronovius's, Serio's, and Perez's breaches.

## COUNT III
## BREACH OF CONTRACT – NON-DISCLOSURE
### (Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, Lennerth)

195.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

196.    Marsh McLennan has valid and enforceable CAs with Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth, as detailed above.  In fact, upon joining Howden, on information and belief, Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's confidentiality agreements with Howden were materially indistinguishable from those they had with Marsh McLennan—confirming they agree the terms are reasonable, valid, and enforceable.

197.    The CAs are also expressly incorporated by reference into Marsh McLennan's valid and enforceable NSAs with Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth.

198.    Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth expressly agreed that their CAs with Marsh McLennan were reasonable and agreed to refrain from using or disclosing Marsh McLennan's confidential information, as defined in the CA, "except as required to carry out [their] duties as an employee of the Company."

199.    Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's valid and enforceable CAs define Marsh McLennan's confidential information as including:

*(iii)    client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;*

*(iv)    personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.*

200.    Marsh McLennan performed its obligations under the CAs.

201.    As detailed above, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth breached their CAs by improperly accessing and transmitting Marsh McLennan's confidential information, including client files, personnel information, strategy documents, financial information, policy documents, quotes, proposals, and strategy meeting agenda. They did so to continue to access and use the information contained in those documents after they left Marsh McLennan for Howden.

202.    By these actions, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth individually breached their respective CAs.

203.    By these actions, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth individually directly and proximately have caused harm to Marsh McLennan through the loss of exclusive control of their confidential and proprietary property.

204.    Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's conduct to date indicates that they do not intend to abide by their CAs.

205.    Marsh McLennan has no adequate remedy at law.

206.    Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth executed binding agreements in their CAs "that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore[.]" Accordingly, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth "acknowledge[d], consent[ed] and agree[d] that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (i) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by [them] and persons

acting for or in connection with [them], and (ii) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

207.    Injunctive relief enforcing Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's contractual obligations to Marsh McLennan is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's CAs.

208.    Based on these breaches, Marsh McLennan is entitled to additional monetary relief as provided for in Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's CAs, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

209.    Marsh McLennan is also entitled to monetary damages for Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's breaches.

### COUNT IV
### BREACH OF FAITHLESS SERVANT DOCTRINE
*(Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, Lennerth)*

210.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

211.    As high-ranking Florida Zone employees, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth owed fiduciary duties and a duty of loyalty to their employer Marsh McLennan.

212.    Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth were employed in positions of trust and confidence and in the course of their employment acquired confidential and trade secrets relating to Marsh McLennan's business.

213.    Marsh McLennan employed Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth to perform economically valuable and operationally essential services for and on behalf of Marsh McLennan and the Florida Zone.

214.    Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth acted contrary to their duties of loyalty and good faith by participating in a scheme to lift out the entire Florida Zone operations, including its employees and clients, and move them *en masse* to Marsh McLennan's direct competitor. Specifically, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth attempted to recruit employees and clients to leave Marsh McLennan for Howden, improperly accessed and transmitted Marsh McLennan's confidential documents, and deleted documents to cover their tracks. Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth further breached their duties of loyalty and good faith by, while employed by Marsh McLennan, actively working with one of its direct competitors (Howden) to create for the U.K.-based Howden a US insurance brokerage business where none previously existed to directly compete with Marsh McLennan. While Marsh McLennan employees, and at times while using Marsh McLennan devices, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth pilfered Marsh McLennan's confidential and proprietary property to use at Howden. In doing so, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth co-opted the investments Marsh McLennan had made in the Florida Zone and transferred an entire business from their employer to a competitor. That service is definitionally disloyal.

215.    Starting no later than March 2025, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth acted as faithless servants.

216.    Marsh McLennan is entitled to disgorge and recover any and all compensation it paid to each Individual Defendant during that period of disloyalty.

## COUNT V
## UNFAIR COMPETITION
### *(All Defendants)*

217.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

218.    The Defendants planned and perpetrated an unlawful and unfair scheme to lift-out a fully formed retail insurance business and transfer that business to a direct competitor in the same market—indeed, the same state—while sabotaging Marsh McLennan's ability to fairly compete in that market.

219.    Within a period of days, the Florida Zone Leaders, Baxter Southern, the Individual Defendants, and other now-former Marsh McLennan employees solicited numerous Florida Zone employees to defect to Howden, some using deceptive practices to convince employees to resign. They solicited clients to do the same, in some cases even preparing the BOR letters required to make the switch.

220.    They also took Marsh McLennan documents and information with them upon their departure, by means of emailing documents to themselves or to clients, or printing documents from Marsh McLennan's systems.  These documents contained trade secrets and confidential information.  The Florida Zone Leaders, Baxter Southern, the Individual Defendants, and other now-former Marsh McLennan employees retain this property of Marsh McLennan's despite contractual obligations to return it upon their termination.  That some of these trade secrets and documents containing confidential information relate to clients who moved their business from Marsh McLennan to Howden during the raid indicates that the former Marsh McLennan employees who defected to Howden, including Individual Defendants, continue to use Marsh McLennan's trade secrets and confidential information for the benefit of their new employer, Howden.

221.    By deleting countless of Marsh McLennan's documents ahead of their departure, the former Marsh McLennan employees who defected to Howden, including Individual Defendants, further attempted to sabotage Marsh McLennan's business by obstructing its ability to compete fairly in the market.

222.    Howden also, through its agents the Florida Zone Leaders, took and unlawfully retain or retained Marsh property including employee information, client proposals, strategic business plans, and compendia of documentation regarding client services, despite contractual, fiduciary, and court-ordered obligations to return this property to Marsh.

223.    And by refusing to comply with lawful subpoenas seeking documents and information about their participation in the raid, the Florida Zone Leaders and Individual Defendants continue their efforts to sabotage Marsh McLennan's business and stymie its investigation into the harm Defendants have caused it.

224.    A recent interview of Howden's vice chair Danielle Lombardo by Insurance Insider US makes clear the company's intent to continue to engage in unfair competition. Rather than express contrition for its theft, deception and unfair competition, Howden has made clear that it is doubling down and will continue to build its U.S. business through the same unlawful means. During that interview, Ms. Lombardo bragged about the large number of employees Howden has recruited in the United States with "established" books of business (approximately half of whom were solicited from Marsh McLennan) and stated that Howden believes its scheme is "changing the game entirely."

225.    Defendants' effort to gut Marsh McLennan's businesses, including Marsh's Florida Zone, and port it over to Howden was textbook unfair competition: taking Marsh McLennan's

staff, clients, and countless documents, the raid was designed and intended to hobble Marsh McLennan's business and cripple its means to fairly compete in the market.

226.    Defendants' actions directly and proximately caused harm to Marsh McLennan's business interests, including by threatening Marsh McLennan's ability to provide its clients continuity of coverage and preying upon the instability that they themselves created.

**COUNT VI**
**CONVERSION**
*(All Defendants)*

227.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

228.    Marsh McLennan's documents, including client files, strategy playbooks, insurance workbooks, client lists, training documents, quotes, proposals, and meeting agenda, are Marsh McLennan's property.

229.    By printing Marsh's documents, emailing them outside of Marsh McLennan (including to personal email accounts), and loading them onto external USB drives to benefit Howden, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth exercised control and dominion over this property of Marsh McLennan's, and in effect deprived Marsh McLennan the ability to exercise control and dominion over its property.

230.    And by deleting Marsh's documents, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth exercised exclusive control and dominion over this property of Marsh McLennan's and excluded Marsh McLennan from exercising any control and dominion over its property.

231.    Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's conduct in printing, emailing, downloading, and deleting Marsh McLennan's property was wrongful.

232.    On information and belief, Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth were acting as Howden's agents in printing these documents, emailing them outside of Marsh McLennan (including to personal email accounts), loading them onto external USB drives, and deleting them from Marsh's systems, and took these actions for the benefit of their new employer, Howden.

233.    Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth were contractually obligated to return all Marsh McLennan property to Marsh McLennan upon the termination of employment.  They have not done so.  Marsh McLennan thus has a good faith reason to believe that Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth continue to exercise control and dominion over the property of Marsh McLennan's that Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth printed or emailed to themselves.  Marsh McLennan has a good faith reason to believe that Gronovius's, Amodeo's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's new employer, Howden, also now exercises control and dominion over Marsh McLennan's property.

234.    Likewise, Howden, through its agents the Florida Zone Leaders, took and unlawfully retain or retained Marsh property including employment information, client proposals, strategic business plans, and compendia of documentation regarding client services, despite contractual, fiduciary, and court-ordered obligations to return this property to Marsh.

235.    This conduct was to Marsh McLennan's detriment.  Without the information that Howden, through its agents including Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth, took and/or deleted, Defendants' design to hamper Marsh McLennan's ability to serve its clients.  Loss of exclusive control over its property will cause serious financial and competitive harm to Marsh McLennan as well.

**COUNT VII**
**TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS**
**ACT, 18 U.S.C. § 1836**
*(Howden, Gronovius, Serio, Perez, Wilcox, Collins, Lennerth)*

236.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

237.    Marsh McLennan has developed and acquired trade secrets of great value to its business.

238.    Marsh McLennan's trade secrets are used in, or intended to be used in, conducting business throughout the United States.

239.    Marsh McLennan invested substantial time and resources to develop its trade secrets.

240.    Marsh McLennan's trade secrets are not generally known or available to the public.

241.    Marsh McLennan's trade secrets derive independent economic value by virtue of not being known or available to the public.

242.    Marsh McLennan takes reasonable, affirmative steps to protect its trade secrets and prevent others from acquiring or using its trade secrets by, for example, requiring those who have access to them, including the Florida Zone Leaders, the Individual Defendants, Baxter Southern, and the other former departing employees to sign agreements restricting the use of Marsh McLennan's confidential information and limiting access to Marsh McLennan's systems, including employee computers, phones, and other devices, through network approvals and password protection.

243.    Marsh McLennan's trade secrets provide Marsh McLennan a competitive advantage over its competitors.

244.    Marsh McLennan provided its employees with Marsh McLennan's trade secrets in confidence and for use only in connection with their employment with Marsh McLennan and for the benefit of Marsh McLennan.

245.    Marsh McLennan's employees, including the Individual Defendants, had a duty to maintain the secrecy of Marsh McLennan's trade secrets or limit the use of Marsh McLennan's trade secrets for the benefit of Marsh McLennan.

246.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth signed multiple agreements—including Confidentiality and Non-Solicitation Agreements—in which they promised to keep Marsh McLennan's trade secrets confidential, to use Marsh McLennan's trade secrets only on behalf of Marsh McLennan, and to return and discontinue use of Marsh McLennan's trade secrets when their employment with Marsh McLennan ended.

247.    As detailed above, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth improperly used and disclosed Marsh McLennan's trade secrets—including compilations of client relationship data, pricing and revenue structures, and internal trainings and strategic documents—for the benefit of a competitor without Marsh McLennan's consent.

248.    Howden also received from Marsh McLennan employees confidential and closely guarded employment information, including compensation, client relationship and performance data—and compendia of the same—that it used to make targeted and unsolicited employment offers to Marsh McLennan's employees.  And in brazen violation of their contractual obligations and a Court Order, the Florida Zone Leaders—one of whom is currently Howden's Chief Executive Officer—retained confidential Marsh property during their employment with Howden.

249.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth knew or had reason to know that they were not to disclose or misuse Marsh McLennan's trade secrets.

250.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth misappropriated Marsh McLennan's trade secrets to aid Howden's efforts to build a new business, and were acting as Howden's agents in so doing.

251.    As detailed above, Howden received and now maintains and uses Marsh McLennan's trade secrets to operate its business—including by using Marsh McLennan's trade secrets to solicit Marsh McLennan's clients and additional employees to defect for Howden.

252.    Howden, a sophisticated business competing in the ultra-competitive insurance brokerage business, knew or had reason to know that the confidential information that the Individual Defendants and others misappropriated to benefit Howden contained ill-begotten trade secrets. Howden accepted and used (and continues to use) these trade secrets despite that knowledge.

253.    As a direct and proximate result of Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unlawful conduct, Marsh McLennan has been irreparably damaged, and Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth have been unjustly enriched. For example, Marsh McLennan has lost clients as a result of Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's misappropriation of its trade secrets. Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unjust enrichment include, for example, value attributable to the misappropriated information; amounts that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth and Howden saved in costs and development by using the misappropriated information; increased productivity resulting from the use of the misappropriated information; and increased market share. The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

254.    The acts described above constituted willful and malicious misappropriation in that Howden, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth accessed Marsh McLennan's trade secrets with the deliberate intent to injure Marsh McLennan's business and improve their own.

## COUNT VIII
## TRADE SECRET MISAPPROPRIATION UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT, FLA. STAT. § 688.001, ET SEQ.
*(Howden, Gronovius, Serio, Perez, Wilcox, Collins, Lennerth)*

255.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

256.    Marsh McLennan has developed and acquired trade secrets of great value to its business.

257.    Defendants used Marsh McLennan's trade secrets in conducting business in Florida.

258.    Marsh McLennan invested substantial time and resources to develop its trade secrets.

259.    Marsh McLennan's trade secrets are not generally known or available to the public.

260.    Marsh McLennan's trade secrets derive independent economic value by virtue of not being known or available to the public.

261.    Marsh McLennan takes reasonable, affirmative steps to protect its trade secrets and prevent others from acquiring or using its trade secrets by, for example, requiring those who have access to them, including Gronovius, Serio, Perez, Wilcox, Collins, Lennerth, and the Florida Zone Leaders to sign agreements restricting the use of Marsh McLennan's confidential information and limiting access to Marsh McLennan's systems, including employee computers, phones, and other devices, through network approvals and password protection.

262.    Marsh McLennan's trade secrets provide Marsh McLennan a competitive advantage over its competitors.

263.    Marsh McLennan provided Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth with Marsh McLennan's trade secrets in confidence and for use only in connection with their employment with Marsh McLennan and for the benefit of Marsh McLennan.

264.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth had a duty to maintain the secrecy of Marsh McLennan's trade secrets or limit the use of Marsh McLennan's trade secrets for the benefit of Marsh McLennan.

265.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth signed multiple agreements—including their Confidentiality and Non-Solicitation Agreements—in which they promised to keep Marsh McLennan's trade secrets confidential, to use Marsh McLennan's trade secrets only on behalf of Marsh McLennan, and to return and discontinue use of Marsh McLennan's trade secrets when their employment with Marsh McLennan ended.

266.    As detailed above, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth improperly used and disclosed Marsh McLennan's trade secrets—including compilations of client relationship data, pricing and revenue structures, and internal trainings and strategic documents—for the benefit of a competitor without Marsh McLennan's consent.

267.    Howden also received from Marsh McLennan employees confidential and closely guarded employment information, including compensation, client relationship and performance data—and compendia of the same—that it used to make targeted and unsolicited employment offers to Marsh McLennan's employees.  And in brazen violation of their contractual obligations and a Court Order, the Florida Zone Leaders—one of whom is currently Howden's Chief Executive Officer—retained confidential Marsh property during their employment with Howden.

268.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth knew or had reason to know that they were not to disclose or misuse Marsh McLennan's trade secrets.

269.    Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth misappropriated Marsh McLennan's trade secrets in order to aid Howden's efforts to build a new business, and were acting as Howden's agents in so doing.

270.    As detailed above, Howden received and now maintains and uses Marsh McLennan's trade secrets to operate its business—including by using Marsh McLennan's trade secrets to solicit Marsh McLennan's clients to defect for Howden.

271.    Howden, a sophisticated business competing in the ultra-competitive insurance brokerage business, knew or had reason to know that the confidential information that the Individual Defendants and others misappropriated to benefit Howden contained ill-begotten trade secrets. Howden accepted and used (and continues to use) these trade secrets despite that knowledge.

272.    As a direct and proximate result of Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unlawful conduct, Marsh McLennan has been irreparably damaged, and Howden, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth have been unjustly enriched. For example, Marsh McLennan has lost clients as a result of Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's misappropriation of its trade secrets. Howden's, Gronovius's, Serio's, Perez's, Wilcox's, Collins's, and Lennerth's unjust enrichment include, for example, value attributable to the misappropriated information; amounts that Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth and Howden saved in costs and development by using the misappropriated information; increased productivity resulting from the use of the misappropriated information; and increased market share. The exact amount of these damages and unjust enrichment is not presently ascertainable but is increasing each month.

273.    The acts described above constituted willful and malicious misappropriation in that Howden, Gronovius, Serio, Perez, Wilcox, Collins, and Lennerth accessed Marsh McLennan's trade secrets with the deliberate intent to injure Marsh McLennan's business and improve their own.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH**
**CONTRACTUAL RELATIONSHIPS**
*(Howden)*

274.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

275.    Marsh McLennan generally requires its employees to execute non-solicitation and confidentiality covenants as a term and condition of their employment.

276.    Marsh McLennan has valid and enforceable employee non-solicitation covenants with many of its employees who resigned and moved (or are moving) to Howden, including the Florida Zone Leaders, Baxter Southern, and the Individual Defendants.

277.    These former Marsh McLennan employees signed non-solicitation agreements in exchange for substantial consideration, employment with Marsh McLennan, and access to its valuable confidential information and trade secrets.

278.    Howden was aware of Marsh McLennan's restrictive covenants agreements with its employees, including those requiring former employees to refrain from soliciting and/or servicing certain Marsh McLennan clients after the termination of their employment, to refrain from soliciting certain Marsh McLennan employees during and for a reasonable period of time after the termination of their employment, and to refrain from using or disclosing Marsh McLennan's confidential information or trade secrets for the benefit of a third party. Indeed, Howden requires its employees to sign restrictive covenant contracts with materially indistinguishable non-solicitation,

non-servicing, and confidentiality provisions as the ones the Individual Defendants and cocon-spirators signed (and breached) with Marsh.

279.    Howden, for its benefit, improperly, and without privilege to do so, intentionally procured the breach of these contracts by inducing, enticing, and directing not only the Individual Defendants but dozens of other Marsh McLennan employees (including the Florida Zone Leaders and Baxter Southern) to breach their contractual obligations to Marsh McLennan, including with-out limitation, by encouraging and assisting them in the solicitation of Marsh McLennan's clients to move their business to Howden, the solicitation of Marsh McLennan's employees to join Howden, and misappropriating, misusing, and exploiting Marsh McLennan's confidential infor-mation.

280.    As a direct and proximate result of Howden's wrongful conduct, Marsh McLennan has suffered and will continue to suffer extensive injury and harm to its business.

281.    Howden's wrongful conduct has caused Marsh McLennan to suffer damages in-cluding, but not limited to, lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.  Moreover, Howden's misconduct was willful, wanton, and outrageous, and therefore entitles Marsh McLennan to punitive damages.

282.    Marsh McLennan is also being irreparably harmed by Howden's tortious interfer-ence with the departing employee's contractual obligations.

283.    If Howden is not enjoined from further interfering with the departing employees' restrictive covenant agreements, Marsh McLennan will continue to lose employees and clients, and suffer additional irreparable harm.

## COUNT X
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
*(All Defendants)*

284.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

285.    Marsh McLennan has contractual relationships with its clients, pursuant to which Marsh McLennan earns revenue in exchange for services.  The agreements that Marsh McLennan enters into with its clients establish business relationships between the parties.

286.    Defendants, including Howden, knew of the business relationship between Marsh McLennan and its clients.

287.    Defendants, for Howden's benefit, intentionally, maliciously, and without any privilege to do so, and by improper motive or means, induced Marsh McLennan's existing and prospective clients to breach their agreements and/or terminate their business relationships with Marsh McLennan.

288.    Defendants unlawfully interfered with Marsh McLennan's relationships and contracts, including but not limited to, the clients which have already tendered BORs, by, among other things, soliciting and/or accepting business from Marsh McLennan's clients for Howden's benefit through conduct by the Individual Defendants, the Florida Zone Leaders, Baxter Southern, and others, in violation of their restrictive covenants and other duties owed to Marsh McLennan, and/or utilizing Marsh McLennan's confidential information to solicit business from its clients.

289.    Defendants' wrongful conduct has caused Marsh McLennan to suffer damages including, but not limited to, lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.  Moreover, Defendants' misconduct was willful, wanton, and outrageous, and therefore entitles Marsh McLennan to punitive damages.

290.    Marsh McLennan is also being irreparably harmed by Defendants' tortious interference with its business relationships.

291.    If Defendants are not enjoined from further interfering with Marsh McLennan's business relationships, Marsh McLennan will continue to lose clients and suffer additional irreparable and monetary harm.

## COUNT XI
## CONSPIRACY
### *(All Defendants)*

292.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

293.    Howden, acting in concert with the Individual Defendants, the Florida Zone Leaders, and Baxter Southern among others reached an agreement among themselves to unlawfully interfere with Marsh McLennan's business relationships and contracts.

294.    In furtherance of this conspiracy, Howden committed overt, unlawful, and tortious acts, including by tortiously interfering with Marsh McLennan's contracts and business relationships.

295.    In furtherance of this conspiracy, the Defendants committed overt, unlawful, and tortious acts, including by converting Marsh McLennan's property and misappropriating its trade secrets.

296.    As a direct and proximate result of Defendants' conspiratorial conduct, Marsh McLennan has suffered damages, including from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.

297.    If Defendants are not enjoined from further interfering with Marsh McLennan's business relationships, Marsh McLennan will continue to lose clients and suffer additional irreparable and monetary harm.

## COUNT XII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *(All Defendants)*

298.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

299.    Marsh McLennan's employees, including the Florida Zone Leaders, Baxter Southern, and each Individual Defendant owed Marsh McLennan fiduciary duties during their employment with Marsh McLennan.

300.    Defendants knew that Marsh McLennan's employees owed a fiduciary duty to their employer, Marsh McLennan, by virtue of their employment.

301.    As detailed above, Marsh McLennan employees including the Florida Zone Leaders, Baxter Southern, and the Individual Defendants have materially breached their fiduciary duties by, among other things, (1) soliciting and inducing Marsh McLennan employees, during their employment and in violation of their contractual duties, to resign from their employment and join Howden; (2) on their own and on Howden's behalf, calling upon and soliciting Marsh McLennan's clients, including prior to the termination of their employment; (3) on their behalf and on Howden's behalf accepting, engaging in, servicing, and performing for Marsh McLennan's clients business services in competition with Marsh McLennan, during their employment and in violation of their contractual duties; and/or (4) misappropriating, misusing, and exploiting Marsh McLennan's confidential information and/or trade secrets.

302.    Defendants assisted, induced, encouraged, and directed the breaches of these fiduciary duties to Marsh McLennan.  And Defendants directly benefitted from the breaches of fiduciary duty described above.

303.    As a direct and proximate result of Defendants' aiding and abetting conduct, Marsh McLennan has suffered damages, including from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.

304.    Marsh McLennan is also being irreparably harmed by Defendants' aiding and abetting the departing employees' breaches of fiduciary duties.

## COUNT XIII
## AIDING AND ABETTING BREACH OF DUTY OF LOYALTY
### *(All Defendants)*

305.    Marsh McLennan incorporates the previous paragraphs as if fully restated here.

306.    The Florida Zone Leaders, Baxter Southern, and the Individual Defendants, among the other employees who defected to Howden, owed Marsh McLennan duties of loyalty during their employment.

307.    Defendants knew that Marsh McLennan's employees owed a duty of loyalty to Marsh McLennan by virtue of their employment.

308.    Among others, the Florida Zone Leaders, Baxter Southern, and the Individual Defendants have materially breached their duties of loyalty by, among other things, (1) soliciting and inducing Marsh McLennan employees, during their employment and in violation of their contractual duties, to resign from their employment and join Howden; (2) on their own and on Howden's behalf, calling upon and soliciting Marsh McLennan's clients, during their employment and in violation of their contractual duties; (3) on their behalf and on Howden's behalf accepting, engaging in, servicing, and performing for Marsh McLennan's clients business services in competition with Marsh McLennan in violation of their contractual duties; and/or (4) misappropriating, misusing, and exploiting Marsh McLennan's confidential information and/or trade secrets.

309.    Defendants assisted, induced, encouraged and directed the breaches of these duties of loyalty to Marsh McLennan.  And Defendants directly benefitted from the breaches of those duties of loyalty described above.

310.    As a direct and proximate result of Defendants' aiding and abetting conduct, Marsh McLennan has suffered damages, including from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.

311.    Marsh McLennan is also being irreparably harmed by Defendants' aiding and abetting the departing employees' breaches of the duty of loyalty.

### PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Marsh McLennan respectfully requests the Court grant the following relief:

a.    Entry of judgment in Marsh McLennan's favor as specified in this Complaint;

b.    Entry of preliminary and permanent injunctive relief;

c.    Equitable tolling of each Individual Defendant's Non-Solicitation Agreement;

d.    Actual damages;

e.    Punitive damages;

f.    Exemplary damages;

g.    Disgorgement of the compensation Marsh McLennan paid to each Individual Defendant during the time they acted as faithless servants;

h.    Prejudgment and post judgment interest and court costs;

i.    Damages for any unjust enrichment pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.*;

j.    Attorneys' fees, as provided for by the NSAs, CAs, and other binding agreements;

k.    Liquidated damages for Gronovius's, Amodeo's, Serio's, Wilcox's. and Collins's breaches of the employee non-solicitation provision of their NSAs, as provided for in Gronovius's, Amodeo's Serio's, and Wilcox's NSAs at § 7 and Collins's NSA at § 6;

l.    Liquidated damages for Gronovius's, Serio's, Perez's, and Collins's, breaches of the client non-solicitation provision of their NSAs, as provided for in Gronovius's, Serio's, and Perez's NSAs at § 7 and Collins's NSA at § 6;

m.    Award of all damages and relief as agreed to by the parties in the Agreements; and

n.    All other relief at law or in equity to which Marsh McLennan is entitled.

### JURY TRIAL DEMANDED

312.    Marsh McLennan demands a jury trial on all claims triable by jury.

Dated: November 10, 2025                    Respectfully submitted,

By:  /s/ *Harris M. Mufson*

Harris M. Mufson
Lee R. Crain
Kelly Herbert
200 Park Avenue
New York, NY 10166
Tel.:  212.351.3805
Fax:  212.817.9505
hmufson@gibsondunn.com
lcrain@gibsondunn.com
kherbert@gibsondunn.com

Jason C. Schwartz (*pro hac vice forthcoming*)
Ryan C. Stewart (*pro hac vice forthcoming*)
Amanda C. Machin (*pro hac vice forthcoming*)
Catherine McCaffrey
Nicole Santora
1700 M Street, NW
Washington, D.C. 20036
jschwartz@gibsondunn.com
rstewart@gibsondunn.com
amachin@gibsondunn.com
cmccaffrey@gibsondunn.com
nsantora@gibsondunn.com

Karl G. Nelson (*pro hac vice forthcoming*)
Rachel W. Robertson (*pro hac vice forthcoming*)
Brian Richman
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
knelson@gibsondunn.com
rrobertson@gibsondunn.com

*Attorneys for Plaintiffs Marsh & McLennan Companies, Inc., Marsh USA LLC, Mercer (US) LLC, and Marsh & McLennan Agency LLC*