**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARSH & MCLENNAN COMPANIES, INC., MARSH USA LLC, MERCER (US) LLC, and MARSH & MCLENNAN AGENCY LLC,

*Plaintiffs*,

v.

HOWDEN US SERVICES, LLC, HOWDEN SPECIALTY, LLC, ALFRED GRONOVIUS, ANDREA AMODEO, CARLOS SERIO, GIOVANNI PEREZ, JANETTE WILCOX, NATHAN COLLINS, and RICHARD LENNERTH.

*Defendants*.

Case No. 1:25-cv-9130-JLR

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF APPLICATION FOR A TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1
STATEMENT OF FACTS ........................................................................ 4
I. The Raid: Marsh McLennan's Own Leaders Orchestrate a Coordinated Attack on Its Florida Operations ........................................ 5
A. Marsh McLennan's Business and the Importance of the Florida Zone ........................................ 5
B. The Conspiracy and the July 21, 2025 Raid ........................................ 6
II. Judge Daniels Finds the Scheme Likely Unlawful and Grants Marsh a Preliminary Injunction That the Ringleaders Promptly Defy ........................................ 8
A. Judge Daniels Holds Marsh Is Likely to Succeed on the Merits of Its Claims and Enjoins the Florida Ringleaders ........................................ 8
B. The *Parrish* Defendants' Defiance and Contempt ........................................ 9
III. The Raid Proceeds Despite Judge Daniels' Order—and Newly Discovered Evidence Shows the Critical Role of the Individual Defendants in the Scheme ........................................ 11
IV. Marsh McLennan Has Suffered and Continues to Suffer Ongoing Injury ........... 16
ARGUMENT ........................................................................ 16
I. The Defendants Should Be Enjoined From Continuing the Unlawful Scheme ........................................ 16
A. Marsh McLennan Is Likely to Succeed on the Merits ........................................ 18
1. Howden's Agents' Breach of Contract ........................................ 18
2. Howden's Tortious Interference ........................................ 22
3. Defendants' Unfair Competition ........................................ 24
B. Marsh McLennan Will Suffer Irreparable Harm Without Immediate Relief ........................................ 26
C. The Balance of Hardships and the Public Interest Strongly Favor Marsh McLennan ........................................ 27
II. Expedited Discovery Is Warranted ........................................ 29
CONCLUSION ........................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abe's Rooms, Inc. v. Space Hunters, Inc.*,
38 A.D.3d 690 (2d Dep't 2007) ....................24

*Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech., Ltd.*,
1994 WL 719696 (S.D.N.Y. Dec. 28, 1994)....................30

*Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*,
59 A.D.3d 473 (2d Dep't 2009) ....................26

*Barbagallo v. Marcum LLP*,
820 F. Supp. 2d 429 (E.D.N.Y. 2011) ....................24

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)....................17

*Capstone Logistics Holdings, Inc. v. Navarrete*,
2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018)....................21

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................27

*KatiRoll Co., Inc. v. Kati Junction, Inc.*,
2015 WL 5671881 (S.D.N.Y. Sept. 25, 2015) ....................25

*Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*,
2025 WL 304500 (S.D.N.Y. Jan. 27, 2025).................... 21, 22, 28

*Marsh USA Inc. v. Karasaki*,
2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008)....................19

*Marsh USA Inc. v. Schuhriemen*,
183 F. Supp. 3d 529 (S.D.N.Y. 2016).................... 19, 28

*Marsh USA LLC v. Parrish*,
2025 WL 2676389 (S.D.N.Y. Sept. 18, 2025) ....................*passim*

*McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.*,
61 A.D.2d 652 (1st Dep't 1978)....................25

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
2019 WL 2536104 (Del. Ch. June 20, 2019). ....................24

*Notaro v. Koch*,
95 F.R.D. 403 (S.D.N.Y. 1982)....................30

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
813 F. Supp. 2d 489 (S.D.N.Y. 2011)....................21

*R.R. Donnelley & Sons Co. v. Marino*,
505 F. Supp. 3d 194 (W.D.N.Y. 2020)....................30

*Rich v. Fox News Network, LLC*,
939 F.3d 112 (2d Cir. 2019)....................22

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*,
672 F.2d 1095 (2d Cir. 1982)....................25

*Springboard Media, LLC v. Augusta Hitech Soft Sols., LLC*,
2022 WL 18465128 (S.D. Fla. June 14, 2022)....................22

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)....................27

*Willis Re Inc. v. Herriott*,
550 F. Supp. 3d 68 (S.D.N.Y. 2021)....................28

**Statutes**

18 U.S.C. § 1836....................24

## PRELIMINARY STATEMENT

This case presents an ongoing emergency. Defendant Howden is a London-based insurance broker with global ambitions but, until recently, no U.S. retail presence. To create one, it conspired with senior Marsh McLennan executives in Florida—Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton—and their subordinates to steal Marsh McLennan's business from within. In spring 2025, while those employees were still on Marsh McLennan's payroll and bound by contractual obligations, Howden formed two Delaware entities—Howden US Services, LLC and Howden US Specialty, LLC—to receive the stolen business. Acting through those insiders, Howden misappropriated Marsh McLennan's confidential data, poached its employees, and targeted its clients. Using internal information on employee compensation and client pricing, Howden crafted targeted offers to recruit key personnel and identified high-value clients for immediate transfer. On July 21, 2025, the plan went into motion: ninety Marsh McLennan employees resigned in a single, coordinated wave, leaving Howden's new entities—empty that morning—fully staffed and immediately servicing stolen Marsh McLennan clients. Howden established its U.S. operation by theft: of Marsh McLennan's workforce, data, and client relationships.

The theft continues. More than 150 employees have left Marsh McLennan, and at least 60 clients have moved their business to Howden. Howden continues to exploit Marsh McLennan's stolen information and relationships—using the same people, data, and clients to compete against the company it looted.

A few months ago, Judge George B. Daniels in this District addressed part of this scheme. In *Marsh USA LLC v. Parrish*, Judge Daniels granted a preliminary injunction, finding that four of Marsh McLennan's most senior Florida executives—one now serving as Howden's U.S. CEO—had orchestrated a deliberate and "coordinated" raid. 2025 WL 2676389, at *2-3 (S.D.N.Y. Sept. 18, 2025). Judge Daniels held that Marsh McLennan "is likely to succeed on its claims for breach

of [the defendants'] non-solicitation and non-disclosure covenants." *Id.* at *3. His injunction properly bound those four executives but could not reach the nonparties who conceived and financed the operation—Howden—or the broader network of lieutenants who carried it out and continue to sustain it. Those actors remain unrestrained, and their exploitation of Marsh McLennan's Confidential Information is inflicting compounding harm.

This case seeks complementary relief to Judge Daniels's order—relief against Howden itself and the lieutenants who continue to execute its directives before the damage becomes permanent.

After the July 21 raid, Marsh McLennan filed a related action against Howden in the Delaware Court of Chancery seeking emergency injunctive relief. *Marsh & McLennan Cos., Inc. v. Howden US Servs., LLC*, No. 2025-0877-MTZ (Del. Ch. 2025). For months, Marsh McLennan pressed for a TRO. The Delaware court declined to act, ultimately concluding last week that the dispute should proceed in New York courts.[1] Marsh McLennan accordingly dismissed the Delaware case and promptly filed this action naming Howden and the lieutenants responsible for their ongoing unlawful conduct. Marsh McLennan also filed a related action against another architect. *Marsh & McLennan Agency LLC v. Charles Baxter Southern III*, No. 1:25-cv-09080-JLR (S.D.N.Y. 2025). Both cases were designated as related to *Parrish*; Judge Daniels declined the relation, and they were reassigned to this Court.

Subsequent investigation shows that the conspiracy was broader and more pervasive than previously known. Forensic evidence and witness testimony confirm that a second tier of Marsh McLennan managers and account executives—including the "Individual Defendants" named here,

---

[1] In addition to *Parrish*, Howden and three former Marsh McLennan employees, Michael Parrish, Giselle Lugones, and Michael Landa, filed a declaratory-judgment action in New York Supreme Court seeking to invalidate Marsh McLennan's restrictive covenants. *Parrish et al. v. Marsh & McLennan Companies, Inc. et al.*, No. 654430/2025 (Sup. Ct. NY 2025). Marsh McLennan's motion to dismiss is pending.

Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth—executed and sustained the raid by soliciting employees, transferring confidential client data, and deleting files to conceal their actions. One of the Individual Defendants sent more than 1,000 client files through Marsh McLennan's secure system to clients who later moved to Howden; others used personal email to transmit pricing and renewal data and proprietary strategy documents.

Meanwhile, the four executives Judge Daniels enjoined, Parrish, Lugones, Lynn, and Layton, have continued to violate both their contracts and his order, retaining more than 440 Marsh McLennan documents they swore under penalty of perjury they no longer possessed. The Individual Defendants also refused to comply with subpoenas seeking information about their roles in the raid.

Marsh McLennan has moved for contempt to enforce Judge Daniels's order, but contempt alone cannot halt the "irreparable harm" he already found—harm to Marsh McLennan's client relationships and Confidential Information. *Parrish*, 2025 WL 2676389, at *3. Howden's ongoing direction of the scheme, and the Individual Defendants' continued participation, demand broader and immediate relief. Marsh McLennan's Confidential Information remains in circulation; former employees now at Howden use it to service clients who were at Marsh McLennan only months ago. Each week, more information is exploited, more client relationships are converted, and more goodwill is irretrievably lost.

Marsh McLennan brings this action to stop the unlawful conduct that Howden set in motion and still directs. It seeks narrowly tailored but urgent equitable relief enjoining defendants from soliciting or servicing Marsh McLennan clients obtained in violation of the obligations owed to Marsh McLennan; from soliciting Marsh McLennan employees in violation of the obligations

owed to Marsh McLennan; and from using, retaining, or destroying Marsh McLennan's confidential or trade-secret materials, and requiring the immediate return of all such information verified through limited forensic inspection. The injunction should also bar Howden from directly or indirectly engaging in or benefiting from any of the same conduct. Each day, Howden expands its U.S. platform using Marsh McLennan's people, data, and clients, boasting that they are "changing the game entirely." Mufson Decl. Ex. 65. Without swift intervention, the harm will deepen. Immediate action is required to end an unlawful raid that has become an ongoing occupation of Marsh McLennan's business.

## STATEMENT OF FACTS

These events are part of the same scheme that Judge Daniels found deliberate and "coordinated" in *Parrish*. 2025 WL 2676389, at *2-3. In early 2025, Howden—a London-based broker with no U.S. retail business—devised a plan to build one starting with a lift-out of Marsh McLennan's Florida operation. To that end, Howden formed two Delaware entities—Howden US Services, LLC and Howden US Specialty, LLC—and enlisted four of Marsh McLennan's most senior Florida executives, Parrish, Lugones, Lynn, and Layton, to execute the lift and shift to Howden while still employed at Marsh McLennan. Judge Daniels already found that these leaders coordinated the near-simultaneous resignation of nearly 100 employees and that Marsh is likely to succeed on its breach and misappropriation claims. *Parrish*, 2025 WL 2676389, at *2.[2]

This case is brought against Howden itself—the architect and financier—and seven former Marsh McLennan managers and account executives (Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth) who, under

[2] On November 13, 2025, in *Parrish*, Judge Daniels denied Howden U.S. Services, LLC's motion to intervene and denied defendants' motion to dismiss for failure to join a necessary party. No. 25-cv-06208, ECF No. 169.

the leaders' direction, solicited employees and clients, transferred Confidential Information, and staffed and serviced the stolen business immediately after the resignations.

After the July 21 raid, on August 1, Marsh McLennan filed a related action in the Delaware Court of Chancery against Howden and its affiliates seeking emergency relief. *Marsh & McLennan Co., Inc.,* No. 2025-0877-MTZ. Concluding the claims belonged in New York, the Court of Chancery deferred; Marsh McLennan dismissed without prejudice and amended this action to add Howden. ECF No. 34 ¶ 8.

## I. The Raid: Marsh McLennan's Own Leaders Orchestrate a Coordinated Attack on Its Florida Operations

### A. Marsh McLennan's Business and the Importance of the Florida Zone

Founded in 1871, Marsh McLennan is a global insurance broker and risk-management firm providing broking, consulting, and claims-advocacy services. Schnabolk Decl. ¶ 3; Mufson Decl. Ex. 48 ¶ 4. Its client relationships reflect years of investment—of expertise, reputation, and, above all, Confidential Information. Schnabolk Decl. ¶¶ 5-6; Mufson Decl. Ex. 48 ¶ 4.

Marsh McLennan operates in regional "Zones." Schnabolk Decl. ¶ 3; Mufson Decl. Ex. 48 ¶ 5. Marsh McLennan invested significant time and resources to expand its business in the Florida Zone, including devoting an outsized share of the company's budget compared to other established zones. Schnabolk Decl. ¶ 6. The Florida Zone's success resulted from Marsh McLennan's sustained investment in specialized personnel, advanced training, and proprietary technology. *Id*. ¶¶ 6-7; Mufson Decl. Ex. 48 ¶ 6. In return for that investment, Marsh McLennan required its employees to maintain loyalty and comply with contractual and ethical obligations safeguarding its clients and Confidential Information. Schnabolk Decl. ¶ 17.

The Florida Zone's leadership—the *Parrish* defendants Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton—were responsible for the region's operations and were entrusted

with Marsh McLennan's most sensitive information. *Id.* ¶¶ 5, 8; Mufson Decl. Ex. 48 ¶ 5. Parrish served as Zone Leader, Lugones as Healthcare Sales Leader, Lynn as Regional Sales Leader, and Layton as Risk Management Segment Leader. Mufson Decl. Exs. 43 ¶ 2; 44 ¶¶ 2, 14; 47 ¶ 11. Their employment agreements defined "Confidential Information" broadly to include information relating to Marsh McLennan's "products, services, clients, suppliers, vendors, business partners, and employees," including but not limited to "financial and business information," "plans for future business," "product and technical information," "client information" such as details about clients' policies, and "any and all information in whatever form relating to any client or prospective client of the Company." *Id.* Exs. 3; 9; 16; 21; 28; 37-38; 42, at Schedule 1; 51 ¶¶ 17, 20. "Confidential Information," as used here, has the same meaning as in those agreements.

Reporting to these executives were the defendants in this action—senior managers and account executives Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth. Schnabolk Decl. ¶¶ 9-15. They managed key client relationships and had full access to Marsh McLennan's systems. *Id.* ¶¶ 6, 16. Each signed confidentiality and non-solicitation agreements acknowledging that Marsh McLennan's data, clients, and employees were proprietary and could not be used for a competitor's benefit. *Id.* ¶ 17; Mufson Decl. Exs. 2-3; 8-9; 15-16; 21; 27-28; 35-38; 41-42.

### B. The Conspiracy and the July 21, 2025 Raid

In early 2025, while still employed by Marsh McLennan, the Florida Zone's leaders entered into a secret agreement with Howden, a London-based insurance brokerage with global ambitions but no U.S. presence. Mufson Decl. Exs. 43 ¶ 6; 44 ¶ 6; 45 ¶¶ 3-4; 50 ¶ 3; 59. They promised Howden an immediate U.S. platform built entirely from Marsh McLennan's Florida operations, including its workforce, clients, and Confidential Information. *Id.* Exs. 43 ¶ 6; 44 ¶ 6; 45 ¶¶ 3-4; 50 ¶ 3; 59.

Over the following months, Howden and the Florida leaders used Marsh McLennan's systems to plan the lift-out—identifying employees to recruit, clients to target, and data to extract. *Id.* Exs. 43 ¶ 6; 44 ¶¶ 3-4, 6; 45 ¶ 7; 46 ¶ 4; 47 ¶ 19; 49 ¶ 7; 50 ¶ 5. As Judge Daniels found, they "solicited Marsh employees to leave Marsh and join them at Howden . . . by contacting Marsh colleagues to announce their departure to Howden, sharing higher compensation and promotions being offered by Howden, and offering to connect them to Howden," and they "accessed and misused" pricing models, renewal timelines, growth strategies, and detailed compensation data. *Parrish*, 2025 WL 2676389, at *2; *see* Jorgenson Decl. ¶¶ 3-7. They used personal phones and private email to avoid detection, shared Marsh McLennan's Confidential Information with Howden, and coordinated resignations to occur simultaneously so Howden could open overnight. *Parrish*, 2025 WL 2676389, at *2; Mufson Decl. Exs. 46 ¶ 3; 49 ¶ 6; 50 ¶ 5; Jorgenson Decl. ¶¶ 4-5.

On July 18, 2025, the press learned of Howden's planned raid, and three days later it unfolded. Mufson Decl. Exs. 50 ¶ 4; 60. On July 21, nearly 100 Marsh McLennan employees in Florida resigned in a single, synchronized wave. Schnabolk Decl. ¶ 29. Within hours, clients began informing Marsh McLennan they were moving to Howden. *Id.* ¶ 30. A company that had no prior U.S. operations was suddenly fully staffed with former Marsh McLennan personnel, equipped with its client lists and Confidential Information, and servicing its accounts.

The damage was immediate and relentless. Entire client teams vanished, major accounts were disrupted, and Marsh McLennan's Florida business was effectively dismantled in a single day. Mufson Decl. Exs. 46 ¶ 4; 48 ¶ 10. Marsh McLennan's goodwill and client relationships were, and continue to be, severely damaged. As Judge Daniels found, the mass resignation was the product of a deliberate, "coordinated" plan, and Marsh McLennan suffered and continues to

face "irreparable harm" from the loss of clients and misuse of Confidential Information. *Parrish*, 2025 WL 2676389, at *2-3.

## II. Judge Daniels Finds the Scheme Likely Unlawful and Grants Marsh a Preliminary Injunction That the Ringleaders Promptly Defy

### A. Judge Daniels Holds Marsh Is Likely to Succeed on the Merits of Its Claims and Enjoins the Florida Ringleaders

Marsh McLennan acted quickly. Within days of the raid, it filed *Marsh USA LLC v. Parrish*, No. 1:25-cv-06208, seeking emergency relief to halt the damage and prevent the Florida ringleaders from profiting from its stolen business. After expedited discovery and a five-hour hearing on September 4, 2025, Judge Daniels issued findings and a preliminary injunction.

The Court found that the near-simultaneous resignation of nearly 100 Marsh McLennan employees was the product of a deliberate, "coordinated" plan. *Parrish*, 2025 WL 2676389, at *2. It rejected as "disingenuous" the claim that the exodus was coincidental, crediting testimony that employees were offered higher pay and promotions to move to Howden and that Marsh McLennan's Confidential Information was accessed and misused in the solicitation. Hr'g Tr. 66:25-68:10 (Sept. 4, 2025). Judge Daniels held that Marsh McLennan was likely to succeed on its claims for breach of the executives' non-solicitation and non-disclosure covenants and that the loss of client relationships and misuse of Confidential Information caused irreparable harm—injury that cannot be remedied by money alone. *Parrish*, 2025 WL 2676389, at *2-3.

The Court enjoined the Florida Zone leaders—Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton—from (1) soliciting Marsh McLennan employees, (2) soliciting Marsh McLennan clients with whom they had dealings, and (3) using or disclosing Marsh McLennan's confidential information or trade secrets. *Parrish*, ECF No. 129 at 2-3. It also ordered them to return "all Marsh property, including Confidential Information and Trade Secrets" by September

23, 2025, clarifying that this included all financial data, client and personnel information, pricing models, and strategic plans. *Id.* at 2 n.1, 3.

In granting this relief, Judge Daniels recognized that Marsh McLennan's reputation and goodwill—the foundation of its business—were at stake, and that injunctive relief was necessary to prevent further erosion of client trust and misuse of proprietary information. The injunction simply enforced the executives' existing contractual duties, which already required them to return " all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in my possession or control which contain or pertain to Confidential Information or trade secrets" upon termination. *Parrish*, ECF Nos. 16-3 at § 4; 16-9 at § 4; 16-16 at § 4; 16-21 at § 4.

**B. The *Parrish* Defendants' Defiance and Contempt**

Within days of the injunction, counsel for the *Parrish* defendants assured Marsh McLennan and Judge Daniels that they were in full compliance with the Court's directive to return all Marsh property and had "nothing to return." Mufson Decl. Ex. 87. That assurance was false. In reality, the defendants retained hundreds of Marsh McLennan's confidential and trade-secret materials on personal laptops, email accounts, and cloud storage while continuing to work for Howden.

On October 21, 2025—nearly a month after the court's September 23 deadline—the *Parrish* defendants produced 280 documents "related to Marsh's business" that had been stored on personal devices and cloud accounts. *Id.* Ex. ¶ 89. Those materials included:

- Photos of Marsh McLennan computer screens displaying client proposals with proprietary pricing and bids, *id*. ¶ 89.a-c.;
- A strategic business-planning deck analyzing Florida market strategy, growth opportunities, and revenue data, *id*. ¶ 89.d.;

- Renewal-strategy slide decks containing client policy details and premiums, *id.* ¶ 89.e.;
- A Marsh McLennan broker-of-record ("BOR") draft letter naming Marsh McLennan as broker, *id.* ¶ 89.f.;
- Client text messages discussing quotes and coverage, Mufson Decl. ¶ 89.g.; and
- Policy-summary spreadsheets showing carriers, limits, and premiums, *id*. ¶ 89.h-i.

Nine days later, Layton produced an additional 20 documents, and Lugones and Lynn produced 143 more, including:

- Phone screenshots displaying team growth data and revenue statistics, Mufson Decl. ¶ 91.;
- An internal email thread debating whether to accept a client engagement, *id*. ¶ 92.a.;
- A spreadsheet titled "2024 New Business" listing revenue and new clients, *id*. ¶ 92.b.;
- A draft RFP response for a Marsh client, *id*. ¶ 92.c.; and
- A multi-tabbed spreadsheet detailing play-by-play the *Parrish* defendants' recruitment strategy for Howden, including a compilation of Marsh employees' titles and salaries, proposed increases to those salaries and promotional titles, along with notes on when, how, and through whom to recruit them—a clear playbook for prohibited employee solicitation, *id*. Ex. 69; Schnabolk Decl. ¶ 38.

In total, the defendants produced over 440 Marsh McLennan documents. Even then, as of October 30, they admitted their review was "continuing" and that additional materials "may be identified and returned on a rolling basis." Mufson Decl. Exs. 91 at 3; 92 at 2.

Marsh McLennan has moved before Judge Daniels for an order of civil contempt to enforce the injunction and compel full compliance. *Parrish*, ECF No. 163.

## III. The Raid Proceeds Despite Judge Daniels' Order—and Newly Discovered Evidence Shows the Critical Role of the Individual Defendants in the Scheme

After Judge Daniels imposed his injunction, Marsh McLennan continued to investigate the raid. That investigation revealed that the raid's success—and its continuation—depended on a second circle of insiders: the Individual Defendants named here—Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, and Richard Lennerth. These senior and client-facing employees in the Florida Zone, who reported to the *Parrish* leaders, played key operational roles in the departures Judge Daniels found to be part of a deliberate, coordinated plan. Schnabolk Decl. ¶¶ 9-16.

Marsh McLennan's forensic review and witness testimony show that, in the days before and after the July 21 raid, defendants solicited Marsh McLennan employees and clients, transferred confidential data to personal accounts and devices, deleted evidence of their conduct, and have refused to cooperate with discovery.

***1. Solicitation of Marsh McLennan Employees.*** The Individual Defendants helped orchestrate the near-simultaneous resignation of nearly 100 Marsh McLennan employees. Gronovius, Amodeo, Serio, Wilcox, Nathan Collins urged colleagues to join Howden, promising higher compensation and promotions, and coordinated the timing of resignations. Martino Decl. ¶ 4; Mufson Decl. Exs. 44 ¶ 11; 45 ¶¶ 9, 11; 46 ¶¶ 4, 5. The evidence uncovered to date—without the benefit of discovery, and in the face of defendants' coordinated obstruction—establishes that:

- Between July 15 and 17, 2025, **Gronovius** exchanged multiple calls with employees who resigned within days. Fuest Decl. ¶ 9.

- On July 18, 2025, **Serio** spoke with Parrish and other employees about opportunities at Howden. *Id.* ¶¶ 20-21.
- That same day **Wilcox** accessed confidential salary data for at least ten employees, *id*. ¶ 29, then asked one of them for his personal email address to receive an offer from Howden, Mufson Decl. Ex. 46 ¶ 5. On Sunday, July 20, using her personal number, she texted another employee to call her "as soon as [he] can"; nearly all of those employees resigned the next morning. *Id*. Ex. 70.
- **Amodeo** called a Marsh McLennan colleague multiple times on July 20 between calls with Parrish, Fuest Decl. ¶ 16; that colleague resigned within days. Schnabolk Decl. ¶ 15.
- **Collins**, the day after leaving Marsh McLennan, texted a group chat of Marsh McLennan employees, "Rick is with us!"—referring to Lennerth, who resigned the following day to join Howden. Mufson Decl. Ex. 71.

Employees who received offers never applied or interviewed with Howden; their offer letters were prepared using information taken from Marsh McLennan systems. Mufson Decl. Exs. 43 ¶ 9, 44 ¶ 8, 46 ¶ 7, 52 ¶ 6. The mass exodus could not have occurred without these defendants' active participation, in direct breach of their non-solicitation covenants. *Cf. Parrish*, 2025 WL 2676389, at *2-3 (crediting "direct and circumstantial evidence" of coordinated raid).

***2. Solicitation of Marsh McLennan Clients.*** Several defendants also solicited Marsh McLennan clients to move their business to Howden using Marsh McLennan's Confidential Information. The record shows that:

- **Serio**: On July 18, 2025, the same day news of the raid leaked to the press, Serio held back-to-back calls with Parrish and two Marsh McLennan clients, [Client A][3] and [Client B], Fuest Decl. ¶ 23; Mufson Decl. Ex. 67, before texting one client early on July 21: "I'm sending you your files through a system Marsh McLennan uses called Kiteworks," Mufson Decl. Ex. 72. He then used Marsh McLennan's secure Kiteworks platform to send two compressed folders containing more than 1,000 client files to those clients—including policy documents, pricing spreadsheets, renewal schedules, and claims histories—allowing their immediate transfer to Howden. Schnabolk Decl. ¶ 35; Martino Decl. ¶ 10. Serio called Client A immediately after the raid to come to Howden, Fuest Decl. ¶ 23; Client B later executed a BOR letter. Martino Decl. ¶¶ 9-10; Schnabolk Decl. ¶ 30. Serio continues to solicit Client A. Martino Decl. ¶ 8.
- **Gronovius**: On July 22, 2025, Gronovius called a Marsh McLennan client to solicit its account and helped prepare BOR letters for multiple clients naming Howden as their new broker. Schnabolk Decl. ¶ 31; Mufson Decl. Ex. 68. Two of those clients, [Client C] and [Client D], executed the BORs immediately after the raid. *Id.*
- **Perez**: On July 17, he sent one of those clients compressed folders of its insurance records—detailed summaries of coverages, premiums, and renewal timelines—through Marsh McLennan's secure systems; that client named Howden as their new broker shortly after the raid. Schnabolk Decl. ¶ 37; Martino Decl. ¶ 21. On July 19, Perez spent hours accessing Marsh McLennan client files, including two clients who subsequently BOR'd. Schnabolk Decl. ¶ 31.

[3] Client names have been anonymized.

Their conduct enabled Howden to launch immediately with ready-made accounts and full documentation—something impossible without their unlawful assistance.

***3. Misuse and Deletion of Marsh McLennan's Confidential Information.*** Forensic evidence confirms the defendants misappropriated and then deleted Marsh McLennan Confidential Information to conceal their tracks:

- **Collins** inserted a USB device into his Marsh McLennan-issued laptop on July 21, 2025, accessing internal training documents for sales and client representatives, which detail Marsh McLennan's unique process for onboarding new clients, preparing renewals, and delivering Marsh McLennan's gold-standard client service. Fuest Decl. ¶ 31. Days earlier he accessed a compilation of the Florida Zone client renewals. Martino Decl. ¶ 24.
- **Wilcox** emailed client lists and renewal worksheets from her Marsh McLennan account to her personal email account in June 2025, including documents describing Marsh McLennan's strategic relationships with carriers, joint objectives for market growth, and market projections across a range of industries in the Florida Zone. Martino Decl. ¶ 21.
- **Perez**, on Saturday, July 19, two days before he resigned, spent approximately three hours in the early morning accessing Marsh McLennan's client files, including files related to at least two clients that have since BOR'd, one of which confirmed its move to Howden. Fuest Decl. ¶ 25; Schnabolk Decl. ¶ 37. These files included detailed summaries of each client's insurance coverage, costs, and policies for the 7/31/2025 through 7/31/2026 coverage term, including details on policy premiums, fees, expiration dates, and renewal timelines. Martino Decl. ¶ 22.

- **Gronovius** and **Perez** deleted client files from Marsh McLennan's systems on the days they resigned—including workbooks and summaries for clients who immediately moved to Howden. Fuest Decl. ¶¶ 15, 27; Martino Decl. ¶ 17.
- **Amodeo** deleted numerous client policy documents, quotes, and proposals during the two weeks before her resignation. Fuest Decl. ¶ 19.
- **Serio** deleted entire client directories between July 18-21, 2025, including those for the same clients he solicited and whose data he transmitted by Kiteworks, as well as Marsh McLennan's proprietary risk analyses, fee structures, and renewal schedules. Mufson Decl. Ex. 76.
- **Lennerth**, on July 21, printed 18 copies of a document listing all Marsh McLennan Florida Zone clients, their account executives, and revenue; on July 23, the same day he resigned, he emailed himself a file titled "contacts.csv" containing Marsh McLennan client names, personal phone numbers, email addresses, birthdays, and personal notes, including revenue. Fuest Decl. ¶¶ 33-34; Martino Decl. ¶ 24; Mufson Decl. Ex. 75.

Each action violated their confidentiality agreements and replicated the same misuse Judge Daniels found likely unlawful in *Parrish*.

***4. Employment at Howden.*** All seven defendants joined Howden within days of their resignations—most by July 28—and immediately began servicing the same or overlapping clients whose accounts they handled at Marsh McLennan. Two of those clients transferred their accounts to Howden within days. Schnabolk Decl. ¶ 30. By November 2025, at least 60 Marsh McLennan clients had moved to a Howden entity, along with more than 150 employees. *Id*. ¶¶ 29-30. Servicing those same clients constitutes an ongoing breach of their contractual non-servicing obligations.

## IV. Marsh McLennan Has Suffered and Continues to Suffer Ongoing Injury

The scope of Marsh McLennan's losses has been substantial. Internal reporting shows that more than 150 Marsh McLennan employees—including nearly the entire Florida Zone—and at least 70 Marsh McLennan clients have left Marsh McLennan, 60 confirming their intention to move all or part of their business to a Howden entity. Schnabolk Decl. ¶¶ 29-30. Many of these clients were serviced at Marsh McLennan by the same individuals now employed by Howden, and at least 60 of those clients confirmed their intention to move all or part of their business to a Howden entity. *Id.* ¶ 30. These tremendous losses confirm that the harm Judge Daniels found irreparable in September 2025 has accelerated. *Parrish*, 2025 WL 2676389, at *3. His decision held that the coordinated raid on Marsh McLennan's employees and clients, and the misuse of its Confidential Information, destroyed goodwill and client trust that cannot be repaired through money damages. *Id.* The same harm continues each day Howden and its agents use Marsh McLennan's proprietary data and relationships to service those diverted clients.

## ARGUMENT

## I. The Defendants Should Be Enjoined From Continuing the Unlawful Scheme

The coordinated scheme that Judge Daniels found likely unlawful did not end with the departure of Marsh McLennan's Florida Zone leaders. Howden—as architect and financier—has remained unrestrained, continuing to profit from the same unlawful scheme and boasting about it publicly. Acting through the lieutenants named here, Howden has carried on the very conduct Judge Daniels condemned: inducing Marsh McLennan's employees and clients to defect through contractual breaches and misuse of Marsh McLennan's Confidential Information, transferring and deleting proprietary data, and using Marsh McLennan's trade secrets to service clients now doing business with Howden.

Judge Daniels's prior findings leave no doubt that such conduct violates enforceable agreements, tortiously interferes with Marsh McLennan's contracts and business, and constitutes unfair competition. Those findings are not the end of this dispute—they are the starting point for the relief this Court must now extend to reach Howden itself and the individuals who continue to act unlawfully under its direction.

The harm to Marsh McLennan is ongoing. To date, Howden remains beyond the reach of any existing injunction, expanding its U.S. operations each week using Marsh McLennan's stolen workforce, clients, and confidential data. Relief of the same kind Judge Daniels granted—extended to reach Howden and the Individual Defendants—is warranted here. And given the *Parrish* defendants' evasion of the prior injunction, broader relief is necessary to ensure that Howden and its agents cannot continue to profit from their unlawful conduct while Marsh McLennan suffers irreparable harm.

A temporary restraining order and preliminary injunction are warranted where the movant demonstrates: (A) a likelihood of success on the merits (or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor); (B) a likelihood of irreparable harm absent relief; (C) that the balance of hardships favors the movant; and (D) that the public interest would not be disserved by the injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

Judge Daniels has already applied that standard and found Marsh McLennan met it. *Parrish*, 2025 WL 2676389, at *1-3. The same contracts, facts, and equitable principles apply here—but this time the injunction must reach the additional former Marsh McLennan employees who executed the scheme from within and the entity that conceived, funded, and still directs it: Howden.

### A. Marsh McLennan Is Likely to Succeed on the Merits

The record shows that Marsh McLennan is likely to prevail on its claims against both Howden and the Individual Defendants acting under its direction. Howden was the architect and driving force behind the scheme—it conceived, financed, and coordinated the raid Judge Daniels found likely unlawful. *Id.* at *2-3. Acting through Marsh McLennan employees bound by confidentiality and non-solicitation agreements, Howden directed the misuse of proprietary data to recruit personnel, divert clients, and replicate Marsh McLennan's operations. The Individual Defendants' breaches were not isolated acts of disloyalty but the means by which Howden executed its plan. Together, Howden and its agents orchestrated a coordinated raid that used Marsh McLennan's Confidential Information to build and operate Howden's new U.S. business.

#### 1. Howden's Agents' Breach of Contract

Each of the Individual Defendants signed binding confidentiality and non-solicitation agreements as a condition of their employment with Marsh McLennan. Schnabolk Decl. ¶ 17; Mufson Decl. Exs. 2-3; 8-9; 15-16; 21; 27-28; 35-38 41-42. Those contracts prohibit employees from directly or indirectly (i) soliciting Marsh McLennan's employees during and for twelve months after employment, (ii) soliciting or servicing certain Marsh McLennan clients during and for twelve months after employment, and (iii) using or disclosing any of Marsh McLennan's Confidential Information except as required to perform their duties for Marsh McLennan. Mufson Decl. Exs. 2-3; 8-9; 15-16; 21; 27-28; 35-38 41-42. "Confidential Information" was defined broadly to include all non-public information concerning Marsh McLennan's clients, pricing, and business operations, encompassing Marsh McLennan's trade secrets. Mufson Decl. Exs. 3; 9; 16; 21; 28; 37; 38; 42. Each of the now former Florida Zone employees who have resigned since the July 21 raid is subject to substantially the same non-solicitation, non-servicing, and confidentiality obligations as the Individual Defendants. Schnabolk Decl. ¶ 25. The agreements are supported

by consideration, limited in time and scope, and routinely enforced under New York law. *See Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *16-18 (S.D.N.Y. Oct. 31, 2008); *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 535 (S.D.N.Y. 2016), *amended*, 2016 WL 2731588 (S.D.N.Y. May 3, 2016). Judge Daniels already upheld these very agreements as valid and enforceable. *Parrish*, 2025 WL 2676389, at *2-3.

The record shows these breaches were deliberate steps in Howden's scheme. Acting through insiders bound by these covenants, Howden induced and financed contractual violations to strip Marsh McLennan of its workforce and clients and to secure its proprietary data for Howden's competitive use. Judge Daniels's decision confirms that conduct of this kind—raiding employees and clients while misappropriating confidential information—violates enforceable contractual and equitable duties. *Id.*

***Employee Solicitation.*** At Howden's direction, the Individual Defendants used confidential compensation data to craft targeted employment offers designed to extract Marsh McLennan's most valuable personnel. Mufson Decl. Exs. 44 ¶ 11; 45 ¶ 11; 46 ¶ 5; 69; Fuest Decl. ¶ 28. Days before the raid, Gronovius repeatedly spoke with a colleague who soon resigned. Fuest Decl. Decl. ¶ 10. Serio spoke back-to-back with Parrish and another employee who then resigned. Fuest Decl. ¶¶ 24. Wilcox sought personal email addresses and accessed confidential personnel records to send Howden offers. Mufson Decl. Ex. 46 ¶¶ 5, 8; Fuest Decl. ¶ 27; Martino Decl. ¶ 20. Amodeo made multiple calls to a Marsh McLennan colleague who later resigned, using her personal phone and communicating with Parrish between those calls. Fuest Decl. ¶ 16. The day *after* the raid, Collins texted a group chat, "Rick is with us!"—referring to Lennerth. Mufson Decl. Ex. 71. These solicitations followed a "playbook" later produced by Lugones, identifying employees to target, their salaries and titles, contact methods, and timing. Mufson Decl. Ex. 69.

***Client Solicitation.*** To populate its new entities with immediate revenue, Howden directed these insiders to use Marsh McLennan's client data—including pricing, renewal schedules, and account histories—to identify and transfer high-value accounts. Serio held back-to-back calls with two Marsh McLennan clients, one of which later transferred its account to Howden by executing a BOR letter; Serio then sent those clients Marsh McLennan Confidential Information. Fuest Decl. ¶ 24; Martino Decl. ¶ 10. As late as October 2025, Serio continues to solicit one of those clients. Martino Decl. ¶ 8. Gronovius assisted in preparing additional BOR letters for multiple clients using his personal email account. Schnabolk Decl. ¶ 31; Mufson Decl. Ex. 73. Now, using his new Howden email account, Gronovius continues to service (and solicit) another client that moved one of their accounts to Howden after the raid. Mufson Decl. Ex. 66. And Perez accessed client files in the days immediately preceding the raid. Schnabolk Decl. ¶ 33; Fuest Decl. ¶ 28.

***Misuse of Confidential Information.*** Around the time of the raid, the defendants accessed and transferred Marsh McLennan's Confidential Information to personal accounts and external storage devices. The materials included client proposals, renewal data, pricing analyses, and strategic plans. Fuest Decl. ¶¶ 13, 16, 28, 30; Martino Decl. ¶¶ 10-24. Serio used Marsh McLennan's secure Kiteworks platform to send compressed folders containing hundreds of files to at least two Marsh McLennan clients, one of which soon transferred their business to Howden. Schnabolk Decl. ¶¶ 35-36. Collins inserted a USB device into his Marsh McLennan-issued laptop on the day of his resignation and accessed internal training materials and client onboarding strategy; days earlier he accessed a confidential compilation of the Florida Zone client renewals. Martino Decl. ¶¶ 21-22. Lennerth printed and emailed confidential client lists to his personal account on the day of and immediately following the raid, and Gronovius prepared BOR forms transferring Marsh McLennan accounts to Howden immediately after he resigned. Fuest Decl. ¶ 35; Schnabolk Decl.

¶ 31; Mufson Decl. Exs. 68; 73. These actions were coordinated steps in Howden's misappropriation—the same pattern of misconduct Judge Daniels found likely unlawful. *Parrish*, 2025 WL 2676389, at *2-3.

Courts consistently hold that employees who engage in coordinated raids like this—especially when directed by a competitor—breach enforceable covenants and fiduciary duties and are liable for trade-secret misappropriation. *See Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500, at *5-8 (S.D.N.Y. Jan. 27, 2025); *Capstone Logistics Holdings, Inc. v. Navarrete*, 2018 WL 6786338, at *30-33 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 516-18, 521-22 (S.D.N.Y. 2011). Judge Daniels reached the same conclusion in *Parrish*, holding that these agreements are valid and enforceable and that coordinated solicitation, misuse of confidential data, and diversion of clients are likely unlawful and cause irreparable harm. 2025 WL 2676389, at *2-3.

The same reasoning applies here. The Individual Defendants, bound by the same Marsh McLennan agreements Judge Daniels upheld, engaged in the same misconduct he found likely unlawful—using Marsh McLennan's Confidential Information and soliciting employees and clients in violation of their covenants. Their breaches are clear on this record. The evidence shows that, while still employed, they accessed proprietary data, coordinated resignations, and transferred Marsh McLennan's information to Howden to facilitate client and employee departures. These actions fall squarely within the contractual prohibitions that *Parrish* and other courts have upheld, making Marsh McLennan overwhelmingly likely to prevail on its breach-of-contract claims.

**2. Howden's Tortious Interference**

Howden was not a passive beneficiary of the breaches—it was their architect and driving force. It conceived and financed the plan, directed the enjoined executives and their subordinates

in executing it, and continues to profit from the violations. Mufson Decl. Exs. 43 ¶¶ 6-8; 44 ¶¶ 6-7; 45 ¶¶ 3-4; 50 ¶¶ 3-5; 54-60; 65. Howden's deliberate recruitment of Marsh McLennan employees—knowing they were bound by restrictive covenants—and its use of Marsh McLennan's Confidential Information to obtain clients satisfies each element of tortious interference.

A claim for tortious interference with contract requires (1) the existence of a valid contract, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of its breach without justification, (4) actual breach, and (5) resulting damages. *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019); *Springboard Media, LLC v. Augusta Hitech Soft Sols., LLC*, 2022 WL 18465128, at *4 (S.D. Fla. June 14, 2022). Each element is met here.

*First*, the Individual Defendants were bound by the same confidentiality and non-solicitation agreements Judge Daniels found enforceable in *Parrish*, 2025 WL 2676389, at *3. *Compare* Mufson Decl. Ex. 51 ¶¶ 20-28 *with* Schnabolk Decl. ¶¶ 17-24. New York courts—including in cases involving Marsh McLennan—regularly uphold these covenants as reasonable and necessary to protect legitimate business interests. *Alliant Ins. Servs.,* 2025 WL 304500, at *7-8. Those contracts prohibited the very conduct Howden orchestrated—soliciting employees and clients and using Confidential Information to compete.

*Second*, Howden knew of these obligations. Its executives reviewed the agreements during recruitment, and Howden itself imposes similar (and even broader) non-solicitation and confidentiality restrictions on its own employees, including a two-year post-employment period. Schnabolk Decl. ¶¶ 17-24; Mufson Decl. Exs. 44 ¶ 9; 49 ¶ 8. It even distributes self-serving "Guidelines for New Joiners" instructing recruits not to solicit colleagues or clients, but it ignored these "Guidelines" and encouraged such violations here. Mufson Decl. Ex. 44 ¶ 12.

*Third,* Howden intentionally induced these breaches. It created Delaware shell entities—including Praetorian Holdco, Inc., the immediate parent of Howden US Services, LLC (Dkt. 50)—to receive Marsh McLennan's people and clients, promised equity and senior roles to the Florida leaders, including the U.S. CEO role, and directed them to use Marsh's proprietary data to recruit colleagues and solicit clients. Schnabolk Decl. ¶¶ 28-39; Fuest Decl. ¶¶ 29, 33; Martino Decl. ¶¶ 3-24; Mufson Decl. Exs. 44 ¶¶ 6-7; 46 ¶¶ 3-7; 47 ¶ 19; 50 ¶ 3-5; 69. The choice of name—evoking the Praetorian Guard—aptly reflects Howden's effort to shield a foreign actor behind U.S. corporate forms while executing the raid. Howden relied on Marsh McLennan's Confidential Information—including salary data and contact details—to structure individualized offers exceeding Marsh compensation and timed those offers to coincide with coordinated resignations, ensuring Howden opened with a fully staffed, revenue-producing business unit. Martino Decl. ¶¶ 8-24; Mufson Decl. Exs. 43 ¶¶ 7-11; 44 ¶ 6-7; 46 ¶ 6; 52 ¶ 6; Schnabolk Decl. ¶¶ 28-39.

*Fourth*, the Individual Defendants breached their agreements by soliciting Marsh McLennan employees and clients and by using and disclosing Marsh McLennan's Confidential Information. Schnabolk Decl. ¶¶ 28-39; Fuest Decl. ¶¶ 9, 11, 15, 21-23, 24-26, 29, 31-34; Martino Decl. ¶¶ 44-45; Mufson Decl. Exs. 44 ¶ 11; 45 ¶ 11; 46 ¶ 5; 62; 63; 65-70.

*Fifth*, Howden's interference caused significant, foreseeable harm. To date, more than 150 employees and at least 60 client accounts have moved to Howden. Schnabolk Decl. ¶¶ 27-28. That loss of workforce, client relationships, and proprietary information is precisely the damage these covenants were designed to prevent.

Howden's interference was neither accidental nor privileged. It was a calculated strategy to accelerate its U.S. expansion using Marsh McLennan's assets. Nor is this its first offense: In 2023, Howden acknowledged that it and certain executives had engaged in "unlawful recruitment,"

against Guy Carpenter, a Marsh McLennan affiliate. Mufson Decl. Ex. 58. It has repeated the same playbook here—inducing disloyal employees to breach their contracts and misappropriate Confidential Information. Such conduct fits squarely within the well-established framework of tortious interference recognized by the courts. In *Mountain West Series of Lockton Cos., LLC v. Alliant Insurance Services, Inc.*, as here, the competitor "spent months recruiting and then working closely with [employees] to plan and coordinate their departures," and "induced [them] to breach" by timing a mass resignation. 2019 WL 2536104, *1, *19 n.1 (Del. Ch. June 20, 2019). The court held such intentional inducement—coupled with knowledge of the restrictive covenants—constituted tortious interference and was not justified by ordinary competition. *Id.* at *18.[4] The same reasoning applies here.

### 3. Defendants' Unfair Competition

All defendants also engaged in unfair competition under New York law. To prove unfair competition, a plaintiff must show that the defendant (1) "misappropriated the plaintiff's labors, skill, expenditures, or goodwill," and (2) acted in bad faith in doing so. *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011) (quoting *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 38 A.D.3d 690, 692 (2d Dep't 2007)). The doctrine prohibits "any form of commercial immorality" or an " endeavor[] to reap where one has not sown," including appropriating "the skill, expenditures, and labors of a competitor" or misappropriating another's property for commercial advantage. *KatiRoll Co., Inc. v. Kati Junction, Inc.*, 2015 WL 5671881, at *5 (S.D.N.Y. Sept. 25,

[4] Marsh McLennan also asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and related state-law trade-secret provisions, which independently support injunctive relief. For purposes of this motion, the contractual breaches Howden knowingly induced provide the most direct and comprehensive basis for relief. Marsh McLennan's confidentiality agreements define "Confidential Information" more broadly than trade secrets—meaning an injunction protecting Marsh McLennan's Confidential Information will also protect its trade secrets.

2015) (quoting *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).

The First Department's decision in *McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.*, 61 A.D.2d 652 (1st Dep't 1978), is directly on point. There, two senior managers conspired with a new competitor to divert the plaintiff's clients and business using confidential information and client relationships developed during their employment. *Id.* at 654-55. The court held both the individuals and the company liable for unfair competition, finding that they engaged in a "plan to take away as much of plaintiff's business as [they] could and divert it" to the rival. *Id.* at 655.

The same pattern exists here. While still employed by Marsh McLennan, the Individual Defendants—acting under Howden's direction—used Marsh McLennan's Confidential Information, resources, and goodwill to establish Howden's new U.S. platform. *Supra* Part III. Howden knowingly accepted and exploited that disloyalty, misappropriating Marsh McLennan's labor, skill, and goodwill to build its business overnight. By using Marsh McLennan's employees, clients, and data, defendants avoided the cost and effort of developing their own operations and instead appropriated Marsh McLennan's investment in its people and relationships. This is precisely the type of "endeavor[] to reap where one has not sown" that New York law forbids. *Kati-Roll*, 2015 WL 5671881, at *5.

The evidence also establishes bad faith. Defendants carried out the scheme covertly—using personal emails and devices, timing resignations to inflict maximum harm, and deleting Marsh McLennan files to conceal their misconduct. *Supra* Part III. Even after Judge Daniels's injunction barred the ringleaders from using or retaining Marsh McLennan's Confidential Information, Howden and its agents continued exploiting it to service the same clients and grow

Howden's business. *Supra* Part II.B. Such deliberate disloyalty and concealment are hallmarks of bad faith. *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 59 A.D.3d 473, 478-79 (2d Dep't 2009).

By conspiring to replicate Marsh McLennan's operations, divert its clients, and service those clients with stolen information, defendants have engaged in "commercial immorality" that equity cannot tolerate.

**B. Marsh McLennan Will Suffer Irreparable Harm Without Immediate Relief**

Judge Daniels already found that Marsh McLennan faces irreparable harm from the loss of client relationships and the misuse of its Confidential Information. *Parrish*, 2025 WL 2676389, at *3. Those findings were correct when issued and are even more compelling now. The same conduct that warranted injunctive relief against the *Parrish* defendants continues through the defendants here, who remain in possession of Marsh McLennan's Confidential Information and continue to solicit its employees and clients on Howden's behalf.

The loss of client relationships is, by nature, an injury that money cannot remedy. Marsh McLennan's business depends on long-term client trust and professional relationships that cannot be replaced once broken. Schnabolk Decl. ¶¶ 6-7, 30; Mufson Decl. Exs. 48 ¶¶ 6-10; 51 ¶¶ 17-19. When clients move their business to Howden—often at the urging of former Marsh McLennan employees—Marsh McLennan loses not only current revenue but also future goodwill and referrals built over years. As the Second Circuit observed, "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *accord Parrish*, 2025 WL 2676389, at *3. That is precisely the case here.

Marsh McLennan also faces irreparable harm from the continuing use and disclosure of its Confidential Information—client lists, pricing models, and strategy materials that represent years of investment and derive their value from secrecy. Once compromised, their competitive advantage is permanently lost. *Parrish*, 2025 WL 2676389, at *3. The defendants' possession and use of those materials give Howden an artificial head start in competing for Marsh McLennan's clients, allowing it to tailor pricing and coverage with precision no legitimate competitor could match. Howden cannot be trusted to police itself: its executives, including its U.S. CEO, made false sworn statements about returning Marsh McLennan property and violated Judge Daniels's injunction. Mufson Decl. Exs. 87-92; *Parrish*, ECF Nos. 81 ¶ 5; 82-5 ¶¶ 30-31; 82-8 ¶ 20; 82-11 ¶ 20. The ongoing loss of employees compounds this harm. The Florida Zone remains destabilized, and remaining employees continue to be targeted by their former colleagues at Howden. The departure of key personnel undermines client service and demoralizes the workforce, threatening further attrition. Courts recognize that such cascading losses—of people, clients, and goodwill—constitute classic irreparable harm. *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004).

### C. The Balance of Hardships and the Public Interest Strongly Favor Marsh McLennan

The balance of hardships is not close. The relief Marsh McLennan seeks would impose no unfair burden on any defendant. It would simply require Howden and its former-Marsh McLennan employees to do what the law already demands: stop soliciting or servicing restricted Marsh McLennan clients through unlawful means, stop soliciting Marsh McLennan colleagues through unlawful means, cease using or retaining Marsh McLennan's Confidential Information, and return proprietary materials they have no right to possess. For Howden, that means refraining from using stolen data and relationships to compete; for the individuals, it means honoring the reasonable

restrictive covenants and confidentiality obligations they freely undertook. Courts in this District routinely grant non-servicing injunctions to enforce such covenants, recognizing that continuing to service clients obtained through misuse of confidential information perpetuates the breach and irreparable harm. *See Schuhriemen*, 183 F. Supp. 3d at 537; *Alliant Ins. Servs., Inc.*, 2025 WL 304500, at *10.

By contrast, denying relief would reward misconduct that has already defied a federal court order. Judge Daniels's injunction in *Parrish* required Marsh McLennan's former executives to return company property and cease soliciting on Howden's behalf. *Parrish*, ECF No. 129 at 3; *Parrish*, 2025 WL 2676389, at *3. Yet those same executives, including Howden's U.S. CEO, retained hundreds of confidential documents and are now the subject of a pending contempt motion. Their disobedience underscores why broader relief is necessary here. The equities cannot favor a company and its agents who continue to profit from a scheme already enjoined by this District and who have shown their willingness to disregard the Court's authority.

Requiring defendants to comply with valid agreements and existing duties does not create hardship; it restores fairness. Each Individual Defendant received substantial compensation for promises of loyalty and confidentiality. Howden—an experienced market participant that imposes similar restrictions on its own employees, Schnabolk Decl. ¶ 17; Mufson Decl. Ex. 44 ¶ 9—cannot claim unfairness from being held to the same standard. *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 104 (S.D.N.Y. 2021) ("New York courts have routinely found that an individual does not suffer undue hardship where a restrictive covenant merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time.").

The hardship to Marsh McLennan absent relief is severe and continuing. The loss of client relationships, competitive advantage, and workforce stability cannot be undone once the information is used, the clients depart, or the employees move on. Each week without injunctive protection allows further exploitation of its trade secrets and greater damage to its goodwill. The requested injunction simply preserves the status quo ante—the very purpose of equitable relief. *Parrish*, 2025 WL 2676389, at *3.

The public interest likewise favors an injunction. Enforcing valid contracts and protecting trade secrets promotes fair competition and respect for judicial orders. As Judge Daniels observed, "there is 'undoubtedly a public interest in enforcing valid contracts including such restrictive covenants as they may contain.'" *Id.* at *3. That interest is stronger here, where Howden and its agents persist despite a standing injunction. The public has no stake in allowing competitors to flout court orders and profit from ongoing misconduct.

The hardship to Marsh McLennan absent relief far outweighs any inconvenience to Howden or its employees in complying with obligations they already owe. The injunction sought does not stifle competition—it preserves it, ensuring Howden competes on a level playing field rather than on the foundation of stolen information. Both equity and public policy therefore compel entry of a temporary restraining order and preliminary injunction.

## II. Expedited Discovery Is Warranted

This Court should authorize expedited discovery in advance of the hearing on Marsh McLennan's motion for a preliminary injunction. Courts have wide discretion to permit such discovery, and "[e]xpedited discovery is often available in cases where preliminary relief is sought." *Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech., Ltd.*, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994). In the Second Circuit, most courts apply a flexible "reasonableness and

good cause" standard. *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 209 (W.D.N.Y. 2020). Even under the more stringent four-part *Notaro v. Koch* test—requiring a showing of (1) irreparable injury, (2) some likelihood of success, (3) a connection between expedited discovery and avoidance of irreparable injury, and (4) that the balance of injury favors discovery—Marsh McLennan readily satisfies each factor. 95 F.R.D. 403, 405 (S.D.N.Y. 1982).

Limited discovery is necessary to uncover and prevent further misuse of Marsh McLennan's Confidential Information and to ensure a fair, informed hearing on its preliminary injunction request. Marsh McLennan seeks narrowly tailored document requests, limited interrogatories, and depositions of the Defendants. The key evidence—communications, data transfers, and other stolen materials—remains mostly in Defendants' possession, and expedited discovery is required to prevent further loss or concealment. Defendants will suffer no prejudice from producing materials and testimony concerning their own conduct.

## CONCLUSION

The Court should enter a temporary restraining order as set forth in the accompanying proposed Order to Show Cause. The Court should further, by order to show cause, authorize expedited discovery—including no more than ten document requests and five interrogatories per party, party depositions, and forensic inspection of the Individual Defendants' devices and accounts—in preparation for the preliminary injunction hearing. Following that hearing, the Court should enter a preliminary injunction granting the same relief provided by the temporary restraining order.

Dated: November 13, 2025

Respectfully submitted,

By: /s/ *Harris M. Mufson*

Harris M. Mufson
Lee R. Crain
Kelly Herbert
200 Park Avenue
New York, NY 10166
Tel.: 212.351.3805
Fax: 212.817.9505
hmufson@gibsondunn.com
lcrain@gibsondunn.com
kherbert@gibsondunn.com

Jason C. Schwartz (*pro hac vice forthcoming*)
Ryan C. Stewart (*pro hac vice forthcoming*)
Amanda C. Machin (*pro hac vice forthcoming*)
Catherine McCaffrey
Nicole Santora
1700 M Street, NW
Washington, D.C. 20036
jschwartz@gibsondunn.com
rstewart@gibsondunn.com
amachin@gibsondunn.com
cmccaffrey@gibsondunn.com
nsantora@gibsondunn.com

Karl G. Nelson (*pro hac vice forthcoming*)
Rachel W. Robertson (*pro hac vice forthcoming*)
Brian Richman
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
knelson@gibsondunn.com
rrobertson@gibsondunn.com

*Attorneys for Plaintiff Marsh McLennan*

**WORD COUNT CERTIFICATION**

I, Harris M. Mufson, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 and Individual Rule 3.C. that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1 and Individual Rule 3.C. because it contains 8,750 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
November 13, 2025

*/s/ Harris M. Mufson*
Harris M. Mufson