**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH & MCLENNAN COMPANIES, INC., MARSH USA LLC, MERCER (US) LLC, and MARSH & MCLENNAN AGENCY LLC, <br><br> Plaintiffs, <br><br> v. <br><br> HOWDEN US SERVICES, LLC, HOWDEN US SPECIALTY, LLC, ALFRED GRONOVIUS, ANDREA AMODEO, CARLOS SERIO, GIOVANNI PEREZ, JANETTE WILCOX, NATHAN COLLINS, and RICHARD LENNERTH, <br><br> Defendants. | Case No. 1:25-cv-09130-JLR <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW OF DEFENDANTS**
**HOWDEN US SERVICES, LLC AND HOWDEN US SPECIALTY, LLC**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT....................................................................................1

BACKGROUND .......................................................................................................3

   I. The Prior Actions .........................................................................................3

   II. The Pending Action ......................................................................................5

ARGUMENT ...........................................................................................................7

   I. Marsh Fails to Plead a Plausible Federal CLaim ..........................................7

     A. Pleading a Claim Under the DTSA ...........................................................7

       1. Elements of a Trade Secret...................................................................7

       2. Elements of Misappropriation...............................................................9

     B. Marsh Fails to Allege All Elements for Any Single Piece of Information ......................10

       1. Marsh Fails to Plead a DTSA Claim with Respect to Employment Information .........10

         a) Marsh Does Not Allege that It Took Reasonable Measures to Protect Employment Information ...........................................................10

         b) Marsh Does Not Allege Facts Connecting Employment Information to Howden ..11

       2. Marsh Fails to Plead a DTSA Claim with Respect to Client Information ..................12

         a) Marsh Fails to Adequately Allege that Any Client Information Constitutes Trade Secrets ...........................................................12

         b) Marsh Fails to Allege Reasonable Measures to Protect Client Information ............14

         c) Marsh Fails to Allege Specific Facts Connecting Client Information to Howden...15

       3. Marsh Fails to Plead a DTSA Claim with Respect to Internal Training Documents....16

         a) Marsh Does Not Allege Any Protectable Trade Secrets in Its Internal Training Documents ...........................................................16

         b) Marsh Fails to Allege Specific Economic Value or Reasonable Measures Taken with Respect to Internal Training Materials ..........................................................17

         c) Marsh Does Not Allege Specific Facts Connecting Any Internal Training Materials to Howden ...........................................................17

   II. The Court Should Decline To Exercise Supplemental Jurisdiction Over Marsh's State-Law Claims...........................................................................................18

     A. Supplemental Jurisdiction Should Be Denied Upon Dismissal of DTSA Claim..............18

     B. Predomination of State-Law Claims Supports Declining Supplemental Jurisdiction.......19

       1. State-Law Claims Predominate Over the Lone Federal Claim....................................19

         a) State-Law Issues and Proofs Predominate .........................................................20

         b) State-Law Claims Will Predominate in Terms of Judicial Resources.....................23

c) Remedies for State-Law Claims Predominate Over Those for DTSA Claim ..........23

d) Procedural History Verifies Predominance of State-Law Claims ...........................24

2. Judicial Economy, Convenience, Fairness, and Comity Favor Dismissal of the State-Law Claims ................................................................................................................25

a) Judicial Economy Favors Dismissal .................................................................25

b) Considerations of Convenience Favor Dismissal ...................................................26

c) Principals of Fairness Favor Dismissal ...................................................................27

d) Principles of Comity Favor Dismissal ...................................................................28

CONCLUSION ...............................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aira Jewels, LLC v. Mondarian Collection, LLC*,
2024 WL 1255798 (S.D.N.Y. Mar. 25, 2024) ........................................................7, 8, 16, 19

*Aon Risk Servs. NE, Inc. v. Kornblau*,
No. 1:10-cv-2244, 2010 U.S. Dist. LEXIS 38140 (S.D.N.Y. Apr. 19, 2010) ........................21

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*,
2022 WL 889145 (S.D.N.Y. Mar. 25, 2022) ...................................................................8

*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017)..................................................................9, 10, 11, 14

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988)...................................................................................................19

*Chenensky v. N.Y. Life Ins. Co.*,
942 F. Supp. 2d 388 (S.D.N.Y. 2013).......................................................................26

*Dedalus Foundation v. Banach*,
2009 WL 3398595 (S.D.N.Y. Oct. 16, 2009) ...........................................22, 23, 28

*Dewitt Stern Grp. v. Eisenberg*,
257 F. Supp. 3d 542 (S.D.N.Y. 2017)....................................................................13

*Elsevier Inc. v. Doctor Evidence, LLC*,
2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ................................................. *passim*

*GMH Capital Partners v. Fitts*,
2025 WL 950674 (S.D.N.Y. Mar. 28, 2025) ........................................................9

*Insulet Corp. v. EOFlow, Co.*,
104 F.4th 873 (Fed. Cir. 2024) .......................................................................9, 14

*Int'l Bus. Machs. Corp. v. De Freitas Lima*,
2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020).......................................................14

*Intrepid Fin. Partners, LLC v. Fernandez*,
2020 WL 7774478 (S.D.N.Y. Dec. 30, 2020) ............................................9, 12, 16

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)..................................................................13

*In re MTBE Prods. Liability Litig.*,
    613 F. Supp. 437 (S.D.N.Y. 2009) ....................................................................20, 24, 25, 27

*My Mavens, LLC v. Grubhub, Inc.*,
    2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023) ...........................................................................12

*Negative, Inc. v. McNamara*,
    770 F. Supp. 3d 472 (E.D.N.Y. 2005) .....................................................................................19

*Oneida Indian Nation of N.Y. v. Madison Cty.*,
    665 F.3d 408 (2d Cir. 2011) ...........................................................................................18, 25

*Pauwels v. Deloitte LLP*,
    83 F.4th 171 (2d Cir. 2023) ....................................................................................................11

*Rodney v. United Masters*,
    2023 WL 2184865 (E.D.N.Y. Feb. 10, 2023)..............................................................9, 14, 17

*Talenthub Worldwide, Inc. v. Talenthub Workforce, Inc.*,
    2025 WL 2578385 (S.D.N.Y. Sept. 5, 2025)...........................................................................10

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    556 F. Supp. 3d 222 (S.D.N.Y. 2021).....................................................................................13

*UBS Secs. LLC v. Dondero*,
    705 F. Supp. 3d 156 (S.D.N.Y. 2023)...............................................................................25, 27

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966)...........................................................................................................19, 28

*Universal Processing LLC v. Weile Zhuang*,
    2018 WL 4684115 (S.D.N.Y. Sept. 28, 2018).........................................................................8

*VW Credit Leasing Ltd. v. Runway Towing Corp.*,
    757 F. Supp. 3d 271 (E.D.N.Y. 2024) ..........................................................................20, 22, 28

*Whiteside v. Hover-Davis, Inc.*,
    995 F.3d 315 (2d Cir. 2021)....................................................................................................18

*Xavian Ins. Co. v. Marsh & McLennan Cos.*,
    2019 WL 1620754 (S.D.N.Y. Apr. 16, 2019).........................................................................11

*Zebra Strategies Inc. v. Gonzalez-Nazario*,
    764 F. Supp. 3d 144 (S.D.N.Y. 2025).......................................................................15, 17, 18

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Howden[1] moves to dismiss (1) Count VII of the Amended Complaint filed by Marsh, alleging trade-secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; and (2) the supplemental state law claims asserted against Howden (Counts V, VI, and VIII-XIII), in accordance with 28 U.S.C. § 1367(c).

## PRELIMINARY STATEMENT

This Action constitutes Marsh's latest effort to forum-shop its way out of New York State Court, where the first-filed action involving the same common nucleus of facts (the NYS Action) is pending, and where all relevant parties already are present or readily could be joined.  In this case, Marsh's strategy for evading the New York state forum is to manufacture a purported DTSA claim, which Marsh had not pled in the four months following the occurrence of the events at issue, either in the NYS Action or in the two lawsuits Marsh filed this past summer involving the same purported Marsh information (the *Parrish* Action and the Delaware Action).

The timing of this Action is hardly coincidental.  Marsh filed the Amended Complaint immediately after the Delaware Court of Chancery issued an order staying the Delaware Action against Howden in deference to the NYS Action, concluding that having "both cases proceed in parallel risks wasting resources and could produce conflicting results."  *See* Rabin Decl., Ex. A at 3.  The Delaware Court noted that the New York State Court "is capable of doing prompt and complete justice . . . given its expertise in New York law and the fact that the key employees, [Michael Parrish and Giselle Lugones] and their contracts, are before it."  *Id.*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the glossary of Defined Terms appended to Howden's Opposition to Plaintiffs' Application for a Preliminary Injunction, filed concurrently herewith.

Yet rather than proceed against Howden in the NYS Action, Marsh instead amended the complaint in this action, which had been filed only a week earlier, to add Howden as a defendant via the assertion of a federal DTSA claim. As a result of this strategy, Howden is a co-defendant with the purported "second tier" of Recent Howden Hires recruited in July 2025, who are one step removed from the four alleged "masterminds" behind the alleged "raid."

The Amended Complaint rehashes the same substantive allegations that Marsh has made to the Delaware Court and several other courts, only with a change of semantics: Instead of describing the Marsh information at issue as "confidential information," the Amended Complaint uses the phrase "trade secrets." But trade-secret claims are not simply an alternative to contract claims. Rather, a plaintiff asserting a DTSA claim must plead facts addressing certain interrelated elements. The alleged "trade secret" must be clearly defined, independently valuable, adequately protected, and have been misappropriated by the defendant. As discussed below, the Amended Complaint fails to satisfy these elements.

Marsh did not act with any urgency or confidence to bring a trade-secret claim, waiting until an amended pleading in this fifth-filed action to add Howden and first raise this claim against it. Even now, as Marsh seeks emergency relief and alleges irreparable harm, it does not do so based on the DTSA claim. Rather, Marsh seeks such relief based solely on the same torts it has been peddling for months, which remain the focus of its efforts.

Even if the Court does not dismiss the DTSA claim (which it should), dismissal of Marsh's state-law causes of action against Howden ("State-Law Claims") is warranted because they clearly predominate over the lone federal claim. The State-Law Claims implicate numerous issues requiring separate proof that are not raised by the DTSA claim, including (among many others) the interpretation, enforceability, and alleged breach of multiple employment contracts on which

the tortious-interference claims against Howden are premised; the existence, scope, and alleged breach of fiduciary duties and duties of loyalty on which the aiding-and-abetting claims against Howden are based; and the elements of the various other torts of which Howden has been accused. The scale and scope of issues raised by the State-Law Claims, and the wide-ranging relief sought in connection therewith, dwarfs the scope of the lone DTSA claim.

Dismissal also promotes judicial economy and practical case management. Rejecting Marsh's serial forum-shopping and claim-splitting efforts—and requiring Marsh to bring its State-Law Claims in the NYS Action—is efficient, convenient, and fair, and would show appropriate deference to New York State by avoiding unnecessary decisions of state law by federal courts, particularly where the State-Law Claims are the real substance of the case.

## BACKGROUND

This case has a tortured history which is more fully set forth in Howden's Opposition to Plaintiffs' Application for a Preliminary Injunction. The following recitation focuses only on the background details relevant to the instant motion.

## I.    THE PRIOR ACTIONS

***The NYS Action.*** The NYS Action was brought by Howden and two of the Recent Howden Hires (Parrish and Lugones) on July 27, 2025, in New York Supreme Court, in accordance with the forum selection provisions of Parrish and Lugones' RCAs. NYS Action; Compl. ¶ 52. Parrish and Lugones are two of the four alleged "masterminds" who purportedly conspired with Howden in connection with the alleged "raid" of Marsh. Compl. ¶ 1. The NYS Action seeks declaratory judgment that, *inter alia*, the RCAs are unenforceable and that Howden did not tortiously interfere with them.

Rather than asserting counterclaims against Howden in the NYS Action and seeking injunctive relief, Marsh filed four separate lawsuits:

3

***The Parrish Action***.  On July 29, 2025, Marsh brought an action in the Southern District of New York against Parrish, Lugones, and two other former senior Marsh employees.  Compl., *Parrish* Action [ECF No. 1], ¶ 2.  Marsh did not name Howden as a defendant, and when Howden moved to intervene, ***opposed Howden's intervention***, arguing that Howden "would not clarify or streamline the issues" but instead "would complicate them."  Pl.'s Mem., *Parrish* Action, [ECF No. 85], at 6, 15.[2]  Marsh accused the *Parrish* Defendants of having access to "confidential and proprietary information," Compl., *Parrish* Action, [ECF No. 1], ¶¶ 15, 16, 19, 23, but did not allege misappropriation of any trade secrets or assert a claim under the DTSA.

***The Delaware Action.***  Two days after bringing the *Parrish* Action, Marsh sued Howden in the Delaware Action, again seeking a TRO, expedited discovery, and a preliminary injunction. Rabin Decl., Ex. B.  As it did in the *Parrish* Action, Marsh raised allegations relating to Marsh's "confidential information," but did not allege that this information rose to the level of trade secrets. On November 6, 2025, the Delaware Court granted Howden's motion to stay, while declining to entertain Marsh's demand for emergency relief.  Rabin Decl., Ex. A.  In doing so, the Delaware Court referred pointedly to the NYS Action as the ideal forum to resolve the parties' disputes:

> The Howden entities either are or have agreed to be parties in the New York Supreme Court action. . . . That Court is capable of doing prompt and complete justice . . . given its expertise in New York law and the fact that the key employees, and their contracts, are before it.  The New York Supreme Court action involves substantially the same parties and issues. . . . Having both cases proceed in parallel risks wasting resources and could produce conflicting results.

*Id.* at 3.  Marsh voluntarily dismissed the Delaware action next day.  Rabin Decl., Ex. C.[3]

---

[2] The Court ultimately denied Howden's motion.  Memorandum Decision and Order, *Parrish* Action, [ECF No. 169].

[3] On October 31, 2025, Marsh brought the fourth-filed action against Charles Baxter Southern III, whom Marsh alleges led the recruitment of certain Marsh employees to join Howden.  Compl., *Southern* Action [ECF No. 1].

II.    **THE PENDING ACTION**

Marsh did not follow that court's direction to proceed in the New York Supreme Court. Instead, Plaintiffs amended the complaint in this Action to assert claims against Howden. Here, for the first time—and more than four months after the Recent Howden Hires had joined Howden—Marsh alleged that Howden had misappropriated Marsh's trade secrets in violation of the DTSA. The other 12 causes of action in the Amended Complaint, including the other eight asserted against Howden, arise under state law.

The purported "trade secrets" in this action are the same "Confidential Information" at issue in the prior actions, in which they were not alleged to constitute "trade secrets": (1) employment information, (2) client-related information, and (3) internal training documents. In many cases, Marsh simply appears to have repurposed the same factual allegations from the *Parrish* Action and Delaware Action, replacing the term "confidential information" with "trade secrets." A few examples are as follows:

**Employment Information**

| *Parrish* Action (¶¶ 15, 19) | Amended Complaint (¶¶ 25, 33, 41) |
|---|---|
| ". . . Marsh's highly confidential and proprietary information, include[s]:<br><br>**personnel information** regarding Florida Zone employees' **salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures**." | ". . . Marsh McLennan's highly confidential and proprietary information, **including Marsh McLennan's trade secrets** . . . include[s]:<br><br>**personnel information** . . . including [employees'] **salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures**." |

5

**Client Information**

| Delaware Action (¶ 42) | Amended Complaint (¶ 70) |
|---|---|
| "Marsh McLennan employees are provided with Marsh McLennan's Confidential Information . . . including information about **current clients, prospective clients . . . and terms and conditions of contracts with clients . . .**" | "Marsh McLennan trusted its employees . . . with access to Marsh McLennan's confidential information **and trade secrets**, including the identities of Marsh McLennan's **clients and prospects, terms and conditions of Marsh McLennan's contracts**." |

**Internal Training Documents**

| *Parrish* Action (¶¶ 15, 19) | Amended Complaint (¶¶ 25, 29, 33, 37, 41, 45, 49) |
|---|---|
| ". . . Marsh's highly confidential and proprietary information, include[s]:<br><br>. . . **financial and business information related to Marsh and the Florida Zone; [and] strategic plans**." | ". . . Marsh McLennan's highly confidential and proprietary information, **including Marsh McLennan's trade secrets** . . . include[s]:<br><br>**financial and business information related to Marsh McLennan and the Florida Zone; [and] strategic plans**." |

The Amended Complaint reprises all of the state-law causes of action contained in the Delaware complaint.[4]   The relief Marsh seeks also is substantially similar to that sought in Delaware, including highly intrusive injunctive relief that would bar the solicitation or hiring of Marsh personnel around the world, the solicitation or servicing of Marsh's current or former clients, and various damages and other relief.  *Compare* Rabin Decl., Ex. B (Prayer for Relief), *with* Compl. (Prayer for Relief).

---

[4] These causes of action include (1) tortious interference with contractual relationships; (2) tortious interference with business relationships; (3) conspiracy; (4) aiding and abetting breach of fiduciary duty; (5) aiding and abetting breach of the duty of loyalty; and (6) temporary, preliminary, and permanent injunctive relief.  Rabin Decl., Ex. B, ¶¶ 120-178.

**ARGUMENT**

To survive a motion to dismiss, a plaintiff must assert "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *2 (S.D.N.Y. Jan. 23, 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In applying this standard, a court will accept as true all well-pled factual allegations but will not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id*.  Where the court can "infer no more than the mere possibility of misconduct from the factual averments . . . , dismissal is appropriate." *Id*.

## I.    MARSH FAILS TO PLEAD A PLAUSIBLE FEDERAL CLAIM

Marsh's efforts to recast its state-law contract claim as a federal trade-secret claim fail for several independent reasons.  Certain of its supposed "trade secrets" are expressly disclosable under the same confidentiality agreements that Marsh relies upon (and selectively quotes from) in support of its allegations.  Other supposed "trade secrets" are disclosable to third parties, and some of the information belongs to Marsh's clients rather than to Marsh.  Marsh's trade-secret allegations also are too vague, conclusory, and speculative to state the basic elements of a claim.

### A.    Pleading a Claim Under the DTSA

To adequately plead a DTSA claim, a plaintiff must "plausibly allege that (i) it possessed a trade secret, and (ii) the defendant misappropriated the trade secret."  *Aira Jewels, LLC v. Mondarian Collection, LLC*, 2024 WL 1255798, at *2 (S.D.N.Y. Mar. 25, 2024).  In turn, adequately pleading the first prong—i.e., possession of a trade secret—requires satisfying several subsidiary elements.

#### 1.    Elements of a Trade Secret

A "trade secret" is information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper

means by, another person who can obtain economic value from the disclosure or use of the information," and which the plaintiff has taken reasonable measures to keep secret. 18 U.S.C. § 1839(3). Thus, a plaintiff must (1) identify particular information that it owns and that derives independent economic value from its secrecy, and (2) allege facts showing that the plaintiff exercised reasonable measures to protect such information. *Id.*; *see also Universal Processing LLC v. Weile Zhuang*, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (granting motion to dismiss for failing to adequately allege trade secret).[5] Further, a plaintiff must plead its "trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Aira Jewels, LLC*, 2024 WL 1255798, at *4; *see also Elsevier*, 2018 WL 557906, at *6 (alleging a trade secret requires "much more specificity as to the information owned by the claimant").

Trade secrets form a "narrow category of confidential information." *Aira Jewels, LLC*, 2024 WL 1255798, at *5. "[T]he law requires that before information may be accorded trade secret status, it must be shown that it is ***truly*** a trade secret—a standard ***far greater*** than the standard for confidentiality of business information." *Id.* (emphasis added). Further, "[a]lleging the existence of general categories of 'confidential information,'" without providing details sufficient to "'generally define the trade secrets at issue,' does not give rise to a plausible allegation of a trade secret's existence." *Elsevier*, 2018 WL 557906, at *6; *see also Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, 2022 WL 889145, at *4 (S.D.N.Y. Mar. 25,

---

[5] Under New York state law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *Elsevier*, 2018 WL 557906 at *3. Because the elements of a trade-secret-misappropriation claim under New York law are "fundamentally the same" as those of a DTSA claim, courts often rely on cases discussing misappropriation under New York law in their analysis of DTSA claims. *Aira Jewels,* 2024 WL 1255798 at *2.

2022) (finding that pleading "broad categories of information" was "legally insufficient to state a claim").

For any specific trade secret, a plaintiff also must allege facts plausibly showing independent economic value, i.e., how its "processes, plans, or conclusions provided a valuable edge over competitors, or why such value was due to the secrecy of the underlying information." *Rodney v. United Masters*, 2023 WL 2184865, at *6 (E.D.N.Y. Feb. 10, 2023) (finding no plausible allegations supporting independent economic value). In addition, a plaintiff must allege that it exercised reasonable measures to maintain the confidentiality of the particular trade secret at issue. 18 U.S.C. § 1839(3). Alleging "measures to protect some unidentified set of information" is not the same as alleging "reasonable measures to protect specific information alleged to be a trade secret." *Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 881 (Fed. Cir. 2024); *see also Intrepid Fin. Partners, LLC v. Fernandez*, 2020 WL 7774478 at *4 (S.D.N.Y. Dec. 30, 2020) (rejecting, for example, general allegations that all employees were obliged to keep information confidential).

## 2.    Elements of Misappropriation

A claim for misappropriation further requires allegations demonstrating "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (citing *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016)). A plaintiff must plead specific facts plausibly alleging that a specific trade secret was actually taken and/or used by the defendant. Such allegations pled only on "information and belief" do not state a claim. *GMH Capital Partners v. Fitts*, 2025 WL 950674 at

*10 (S.D.N.Y. Mar. 28, 2025) (holding such allegations to be "precisely the kind of speculative 'naked assertion[s]' that are insufficient to survive a motion to dismiss").

### B.    Marsh Fails to Allege All Elements for Any Single Piece of Information

Plaintiffs fail to plead facts demonstrating that any Marsh-owned information derived economic value from its secrecy, was protected by Marsh, and was misappropriated by Howden.

#### 1.    Marsh Fails to Plead a DTSA Claim with Respect to Employment Information

None of the employment information described in the Amended Complaint rises to the level of a trade secret.  As alleged by Marsh, this information (described in previous actions only as "confidential") includes salaries, bonuses, benefits, skills, qualifications, abilities, key business relationships, team structures, and a "detailed roadmap" of Marsh's workforce.  Compl. ¶¶ 3, 12, 25, 33, 41, 71(e), 84, 105.  Even if Marsh could have protected any of this information as a trade secret, it chose not to do so.

##### a)    Marsh Does Not Allege that It Took Reasonable Measures to Protect Employment Information

Marsh selectively quotes the Recent Howden Hires' confidentiality agreements, while omitting other portions of the same agreements that drive a hole through its claims:  Marsh quotes Schedule 1, which defines "Confidential Information and Trade Secrets," yet omits the "Nondisclosure" section of the agreement, which provides that ***much of this information may be disclosed to other employees and to third parties***:

> I understand that nothing in this Agreement is intended to prohibit me from discussing with employees, ***or with third parties who are not future employers or competitors of the Company***, wages, hours, or other terms and conditions of employment.

Perez Confidentiality Agreement, Section 3(b), [ECF 56-21] (emphasis added).  Information that Marsh employees are free to share with each other and with third parties does not constitute trade

secrets. *See, e.g.*, *Talenthub Worldwide, Inc. v. Talenthub Workforce, Inc.*, 2025 WL 2578385 (S.D.N.Y. Sept. 5, 2025) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the trade secret, his property right is extinguished.") (citing *Pauwels v. Deloitte LLP*, 83 F.4th 171, 182 (2d Cir. 2023)); *Zalta*, 280 F. Supp. 3d at 517-18 (where plaintiff discloses information to third party without at least "binding them to confidentiality agreements, [plaintiff] is unlikely to be able to show that it undertook reasonable measures").

This logic extends equally to the information that Marsh alleges was included in the purported "roadmap" of employee information. Compl. ¶¶ 3, 105, 165. Because each employee was free to share information regarding their compensation, benefits, and other terms and conditions of employment with each other (and with third parties), such information cannot be a trade secret. *See Pauwels*, 83 F.4th at 181-82; *Zalta*, 280 F. Supp. 3d at 517-18.

Moreover, even if Marsh's agreements were not porous, "[t]aking steps to protect information through a confidentiality agreement does not, on its own, suggest the existence of a bona fide trade secret." *See Elsevier*, 2018 WL 557906, at *6.

### b) Marsh Does Not Allege Facts Connecting Employment Information to Howden

Even if some employment information could have been protected as a trade secret and had been adequately safeguarded by Marsh (neither of which is the case), Marsh's DTSA claim nevertheless would fail, as the Amended Complaint does not allege any act of misappropriation of such information by Howden. Marsh's vague and conclusory allegations about "several" unspecified Individual Defendants who solicited other employees and then "provided Howden with confidential personnel information," Compl. ¶ 10, are insufficient to state a claim. *See Xavian Ins. Co. v. Marsh & McLennan Cos.*, 2019 WL 1620754 (S.D.N.Y. Apr. 16, 2019) (dismissing

trade-secret claim where plaintiff "failed to make any factual allegations regarding actions taken by [defendant] that could plausibly constitute misappropriation of trade secrets").

Similarly, Marsh's allegation, "on information and belief," that "[a]ll of [the Recent Howden Hires] had offers in the bag because Howden knew who to target and hire" based on the information it received from Marsh's "turncoat employees," Compl. ¶ 102, is pure speculation. Marsh fails to allege that any specific Recent Howden Hire gave any particular trade secret to anyone at Howden, and Marsh "cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *See My Mavens, LLC v. Grubhub, Inc.*, 2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023) (finding dismissal appropriate where "well-pled allegations of the complaint have not nudged plaintiff's claims across the line from conceivable to plausible").

### 2.    Marsh Fails to Plead a DTSA Claim with Respect to Client Information

Marsh likewise fails to adequately allege a DTSA claim with respect to client-related information.  Compl. ¶ 71(a)-(c)

### a)    Marsh Fails to Adequately Allege that Any Client Information Constitutes Trade Secrets

Marsh fails to allege that any particular client information constitutes a trade secret under the DTSA.  Instead, the Amended Complaint deals in generalities, describing three broad and largely overlapping subcategories of such information—"Client Folders," "Client Relationship Data," and "Client Playbooks"—without identifying any specific client whose information allegedly was misappropriated, the nature of this information, or how such information satisfies the necessary elements to constitute a trade secret. *See id.*  Marsh thus falls far short of its pleading obligations. *See Intrepid*, 2020 WL 7774478, at *4 (dismissing complaint where plaintiff "merely references categories of information concerning its clients and ordinary business operations . . .

[but] does not plead any specific facts demonstrating that [plaintiff] has such unique customer preference information or has specialized knowledge of customers' operations or needs that is organized or used in a way that is unique to plaintiff").

The closest the Amended Complaint comes to referencing a specific client is its allusion to "Client A" and "Client B," which one of the Individual Defendants is alleged to have contacted on July 18, 2025, while still employed by Marsh. Compl. ¶ 132. But the information this Individual Defendant is alleged to have shared is ***the clients' own files***. *Id.* ("I am sending you ***your files*** . . . .") (emphasis added). Client-file information ***does not belong to Marsh at all*** and therefore cannot constitute Marsh's trade secrets. *See, e.g.*, *Dewitt Stern Grp. v. Eisenberg*, 257 F. Supp. 3d 542, 582 (S.D.N.Y. 2017) ("[I]nsurance account information such as policy information, expiration dates, terms and conditions, and pricing all belong to clients, not brokers."). Nor does Marsh allege how sending a client ***the client's own information*** could possibly constitute misappropriation.

Further, as a matter of law, "[n]othing about the names or identities of accounts or clients, nor the contacts at those accounts, is confidential or a trade secret belonging to" Marsh. *See Dewitt Stern Grp.*, 257 F. Supp. 3d at 582. An insurance broker's "own recollection of his customers or pre-existing relationships" also cannot constitute trade secrets. *See id.*; *see also Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) (recognizing that "trade secret protection will not attach to customer information that can easily be recalled or obtained from the customers themselves.") (citations omitted); *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021) (under New York law, "a trade secret must not be publicly available and well-known in the industry") (internal quotes omitted).

Marsh's allegations concerning a non-party's compilation of a SharePoint file during her Marsh employment, Compl. ¶ 104, further illustrate its pleading shortfall.  First, as Marsh has admitted, this SharePoint is owned and maintained by Marsh, not by this non-party, and is accessible only on Marsh's network.  *See* Decl. of Ryan Gonzalez, *Parrish* Action, [ECF No. 23], ¶ 3 ("The Risk Management *Sharepoint is a shared drive on Marsh's network that is accessible to members of the Global Risk Management Team*.") (emphasis added).  Marsh does not allege that this non-party or any other Recent Howden Hire has had access to this site since leaving Marsh.  Compl. ¶ 104.  Second, Marsh fails to allege any facts concerning any independent value of the information contained on this internal SharePoint.

> **b)** **Marsh Fails to Allege Reasonable Measures to Protect Client Information**

Marsh also does not adequately allege that it took reasonable measures to protect any client information.  As noted above, the mere fact that it entered into confidentiality agreements with the Individual Defendants is insufficient to protect a trade secret.  *See Elsevier*, at *6.  Similarly, Marsh's recitation of its general corporate policies and security practices, Compl. ¶ 74, is insufficient, as Marsh does not show that these policies and practices are applied to any specific client, trade secret, file, folder, or database that it alleges is a trade secret.  *See Insulet Corp.*, 104 F.4th at 881 (recognizing need to allege "reasonable measures to protect specific information alleged to be a trade secret").

Indeed, Marsh concedes that "on a need-to-know basis" it shares client information with third parties, with no indication that these disclosures are subject to any type of restriction, Compl. ¶ 71(a), thus further undermining a claim to trade-secret protection.  *See, e.g.*, *Zalta*, 280 F. Supp. 3d at 517-18 (disclosures to third parties undercut claim to trade-secret protection).

Marsh also concedes that it shares confidential information widely across its various subsidiaries, such that employees of Marsh McLennan Agency LLC and Mercer also "have access to and rely upon Marsh McLennan's confidential and proprietary information and/or trade secrets." Compl. ¶¶ 63, 64. Such broad access and disclosure further dilute any plausible allegation that Marsh takes reasonable measures to protect purported trade secrets. *See Rodney*, 2023 WL 2184865, at *5 (noting that "sharing information with employees on a need-to-know basis" could be a reasonable measure); *cf. Int'l Bus. Machs. Corp. v. De Freitas Lima*, 2020 WL 5261336, at *8 (S.D.N.Y. Sept. 3, 2020) (upholding use of reasonable measures where "information [was] not known outside of the business or even shared with the larger IBM operation" and was only shared with "IBM's top executives").

### c)    Marsh Fails to Allege Specific Facts Connecting Client Information to Howden

Marsh does not sufficiently allege that Howden acquired, used, or benefited from any particular Marsh client information. While Marsh claims that certain Individual Defendants accessed, printed, and/or transferred information to their personal accounts, Compl. ¶¶ 137, 139-143, it fails to connect any of those actions to Howden. Rather, the best it can do is speculate, suggesting that it is "reasonable to infer" that these actions were taken to benefit Howden. *Id.* ¶¶ 137, 139, 140, 143. These allegations "do not permit the court to infer more than the mere possibility of misconduct," which is insufficient to state a claim. *See Zebra Strategies Inc. v. Gonzalez-Nazario*, 764 F. Supp. 3d 144, 157 (S.D.N.Y. 2025).

Marsh's allegations with respect to its internal SharePoint (discussed above) fare no better. Marsh does not allege that Howden had access to the SharePoint site or assert facts supporting that the non-party extracted and/or shared any information from that site with Howden. Nor does the

Amended Complaint attempt to factually connect any information from the SharePoint with any particular client solicitation.

Marsh's speculation that Howden would need client information to build out a full-service brokerage firm is similarly speculative and unfounded. *See* Compl. ¶ 12. The Individual Defendants are seasoned client-service professionals, *id.* ¶¶ 23-50, whom Marsh admits "maintained relationships" with clients, *id.* ¶ 9. The mere allegation that clients followed individuals with whom they had relationships does not plausibly plead the misuse of any Marsh trade secrets. *See Croner*, 419 F. Supp. 3d at 1069 ("[T]he fact that [plaintiff] has lost business to [defendant employer] . . . fails to support a plausible inference that [employee] has misappropriated trade secrets. By all accounts, [employee] is an effective salesman; he doubtless had strong relationships with many of his clients. In that light, it is hardly surprising, or probative of misappropriation, to learn that some of the companies with which he had worked while at [plaintiff] had followed him to [defendant employer].").

### 3.    Marsh Fails to Plead a DTSA Claim with Respect to Internal Training Documents

#### a)    Marsh Does Not Allege Any Protectable Trade Secrets in Its Internal Training Documents

Marsh also fails to adequately plead that its training documents constitute trade secrets. The Amended Complaint suggests that these materials contain information about how Marsh operates its business, including processes for onboarding clients; preparing and managing renewals; identifying unique aspects of Marsh's business model; delivering Marsh's service model; and skills-based trainings, training documents for sales and client representatives, strategic documents, data analytics, and research. Compl. ¶¶ 9, 71(d). But Marsh fails to describe any portion of these documents with enough factual detail to put Howden on "sufficient notice of the contours of [Marsh's] claim for misappropriation." *See Aira Jewels*, 2024 WL 1255798, at *4

16

(quotation omitted).  Rather, the Amended Complaint repeatedly describes these materials in vague and general terms.  Compl. ¶¶ 9, 12, 71(d), 136, 247, 266.  Such general descriptions are insufficient to plead the existence of trade secrets.  *See Intrepid*, 2020 WL 7774478, at *2, *4 (generalized allegations regarding categories of information, such as client service and operation strategies, marketing strategies and techniques, detailed service and investment models, and pricing information, lack "requisite specificity" needed to state a claim).

> b)    **Marsh Fails to Allege Specific Economic Value or Reasonable Measures Taken with Respect to Internal Training Materials**

The Amended Complaint also fails to adequately allege that Marsh took "reasonable measures" to safeguard its internal training materials.  Instead, Marsh alleges in vague and conclusory fashion that such materials are "non-public and safeguarded."  *See* Compl. ¶ 71(d). Such allegations are insufficient.  *See Rodney*, 2023 WL 2184865, at *6.

Marsh also fails to describe any independent economic value purportedly derived from its training materials.  The vague and conclusory allegation that "[m]aintaining the secrecy of these documents provides economic value to Marsh," Compl. ¶ 71(d), is insufficient to state a cause of action.  *See Rodney*, 2023 WL 2184865, at *6 (finding no plausible pleading of independent economic value where plaintiff failed to allege how "processes, plans, or conclusions provided a valuable edge over competitors, or why such value was due to the secrecy of the underlying information").

> c)    **Marsh Does Not Allege Specific Facts Connecting Any Internal Training Materials to Howden**

Finally, Marsh broadly alleges that Howden misappropriated "internal training and strategic documents . . . as the foundation to create its US insurance business."  Compl. ¶ 136.  But the Amended Complaint lacks factual assertions in support of this legal conclusion, including what documents Howden acquired; when, where, or how it acquired them; or how Howden otherwise

17

purportedly benefited from these materials.  Marsh's allegations thus are insufficient.  *See Zebra Strategies*, 764 F. Supp. 3d at 156 (dismissing trade-secret claim where complaint did not allege misappropriation "through any non-conclusory allegations").

Marsh's bare conclusions that the Recent Howden Hires engaged in various conduct "for Howden's benefit," and that Howden "now maintains and uses Marsh McLennan's trade secrets to operate its business," similarly are insufficient to state a claim.[6]  *See id.*

**** 

For each and all of the above reasons, Marsh fails to state 's DTSA claim against Howden, and this cause of action should be dismissed.[7]

## II.    THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER MARSH'S STATE-LAW CLAIMS

### A.    Supplemental Jurisdiction Should Be Denied Upon Dismissal of DTSA Claim

The Second Circuit has "repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well."  *Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011) (quotation omitted); *see also Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 325 (2d Cir. 2021).  "Although this is not a mandatory rule, the Supreme Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward declining jurisdiction over the remaining

---

[6] *See* Compl. ¶ 12 (alleging Individual Defendants accessed, stole, or deleted internal trainings and strategic documents for Howden's benefit); *id.* ¶ 141 (alleging Individual Defendant accessed Marsh trade secrets, including internal training documents for sales and client representatives, which, "[o]n information and belief, [the employee] accessed . . . for the sole purpose of helping Howden operationalize its new business and capitalize on Marsh McLennan's valuable clients").

[7] For various reasons, Marsh also fails to state viable state-law tort claims against Howden. Howden reserves all rights to move to dismiss those claims at the appropriate time if and as necessary.

state-law claims.'" *Whiteside*, 995 F.3d at 325 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The DTSA claim is the only federal claim brought against Howden and is the sole basis for original jurisdiction. If the Court dismisses the DTSA claim, it should follow the usual rule and decline supplemental jurisdiction over all of the State-Law Claims. This Court reached precisely that conclusion in *Aira Jewels, LLC*, 2024 WL 1255798, when it dismissed the plaintiff's claims for breach of a non-competition agreement, breach of a confidentiality agreement, tortious interference with contract and economic advantage, and various other state-law tort claims upon the dismissal of the plaintiff's DTSA claim. *Id.* at *6; *see also Negative, Inc. v. McNamara*, 770 F. Supp. 3d 472 (E.D.N.Y. 2005) (declining to exercise supplemental jurisdiction over state-law claims following dismissal of all federal claims, including DTSA claim).

### B.    Predomination of State-Law Claims Supports Declining Supplemental Jurisdiction

Even if the Court does not dismiss the DTSA claim (which it should), the Court should decline to exercise supplemental jurisdiction over the State-Law Claims against Howden because they clearly predominate over the lone federal claim. *See* 28 U.S.C. § 1367(c)(2). Principles of "judicial economy, convenience, fairness and comity" similarly support dismissal of the State-Law Claims. *See Carnegie-Mellon*, 484 U.S. at 350 n.7 (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

### 1.    State-Law Claims Predominate Over the Lone Federal Claim

A court's rejection of pendent state-law causes of action is appropriate where, as here, "the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised or the comprehensiveness of the remedy sought." *See Giordano*, 274 F.3d at 745; *accord Gibbs*, 383 U.S. at 726-27. This standard serves to prevent precisely the circumstance presented by the

Amended Complaint, where "the state claim constitutes the real body of a case, to which the federal claim is only an appendage," and where "litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog." *See In re MTBE Prods. Liability Litig.*, 613 F. Supp. 437, 442-43 (S.D.N.Y. 2009); *see also VW Credit Leasing Ltd. v. Runway Towing Corp.*, 757 F. Supp. 3d 271, 293 (E.D.N.Y. 2024) (dismissal warranted where "federal law claims are merely peripheral or cover a much narrower issue than the state law claims"). Denial of pendent jurisdiction also is appropriate where the "state law claims are more complex or require more judicial resources to adjudicate." *MTBE*, 613 F. Supp. at 442-43. All of the foregoing factors demonstrate the predominance of the State-Law Claims here.

### a)    State-Law Issues and Proofs Predominate

Marsh's State-Law Claims present a far wider range of issues, and will require more extensive proofs, than its lone DTSA claim.

At its core, Marsh's DTSA claim alleges that Howden "received and now maintains and uses Marsh McLennan's trade secrets to operate its business." Compl. ¶ 251. As set forth above, the essential proofs are that Marsh owned and maintained particular information that derives independent economic value from its secrecy, that Marsh exercised reasonable measures to protect such information, and that Howden received or used such information (*see* Part I, at 2), along with demonstrating any resulting damages or available remedies. While these issues are multifaceted and must be pled with specificity, they are relatively cabined and revolve around the particular purported "trade secrets" at issue.

By contrast, the issues and proofs with respect to the State-Law Claims are extensive. These claims will require, among other things, assessment of the Marsh RCAs and confidentiality agreements signed by the seven Individual Defendants, Compl. ¶¶ 79-97, on which Plaintiffs' tortious interference claims against Howden are based; the enforceability of the restrictive

covenants (and, if any such covenants are unenforceable, an assessment of whether they can be "blue-penciled" or instead are simply void); whether any Individual Defendants breached their non-solicitation provisions with respect to Marsh employees or clients, *e.g.*, *id.* ¶¶ 129, 134; whether any of the Individual Defendants breached their Marsh confidentiality agreements, *e.g.*, *id.* ¶ 147; whether Howden tortiously interfered with any non-solicitation provision or confidentiality agreement, *e.g.*, *id.* ¶¶ 120-128, 278-79; whether Howden tortiously interfered with any of Marsh's business relationships, *e.g.*, *id.* ¶ 135; whether any Individual Defendant owed fiduciary duties or duties of loyalty to Marsh, the scope of any such duties, and whether any Individual Defendant breached such duties, *e.g.*, *id.* ¶¶ 210-216, and whether Howden aided and abetted a breach of any such duties, *e.g.*, *id.* ¶¶ 298-311; whether, when, and how Howden engaged in a conspiracy with any of the Individual Defendants, *e.g.*, *id.* ¶ 293; and any damages flowing from any of the above conduct (among myriad other factual and legal issues).

The court's decision in *Aon Risk Servs. NE, Inc. v. Kornblau*, No. 1:10-cv-2244, 2010 U.S. Dist. LEXIS 38140 (S.D.N.Y. Apr. 19, 2010), in which Marsh was a defendant, is directly on point. Rabin Decl., Ex. D. There, as here, the plaintiff sought a preliminary injunction alleging, *inter alia*, that (1) the individual defendants had breached the confidentiality and non-solicitation provisions of their employment agreements and their fiduciary duties to Aon; (2) Marsh had tortiously interfered with the employees' employment contracts and with Aon's economic advantage; and (3) the defendants collectively engaged in unfair competition, a conspiracy, and the misappropriation of trade secrets under state law. Rabin Decl., Ex. E at 20-25. Aon also asserted a single federal cause of action, under the Computer Fraud and Abuse Act ("CFAA"), based on the defendants' alleged accessing and downloading of Aon's confidential information. *Id.* at 16-17; *see also* Rabin Decl., Ex. D at *1. The defendants moved to dismiss the pendent

state-law claims, and the court granted the motion, observing that the "[n]on-federal issues appear to substantially predominate in terms of proof, the scope of the issues raised, and the comprehensiveness of the remedy sought." Rabin Decl., Ex. D at *1; *see also id.* at *1 n.1 (quoting *Contemporary Servs. Corp. v. Hartman,* 2008 WL 3049891, at *4-5 (C.D. Cal. Aug. 4, 2008) for the proposition that "[p]laintiffs' claims for breach of fiduciary duty and breach of contract derive from the parties' rights and responsibilities under the employment contract" and "[t]hus, [p]laintiffs' state law claims involve a broader scope of issues and proof than the CFAA claim")). Upon dismissing the plaintiff's state-law claims, the court limited the scope of the upcoming preliminary-injunction hearing to Aon's claim under the lone federal cause of action. *Id.* at *1.

Similarly, in *Dedalus Foundation v. Banach*, 2009 WL 3398595 (S.D.N.Y. Oct. 16, 2009), the court dismissed the plaintiff's six state-law causes of action against a former member of the plaintiff's board of directors, including claims for breach of fiduciary duty and conversion, finding that the state-law claims formed the "real body of the case" to which the lone federal claim was "merely 'an appendage'":

> The CFAA claim will likely involve limited discovery and analysis of the narrow legal issue of whether [defendant] accessed a protected computer without authorization and caused damage to the hard drives. In contrast, [plaintiff's] six state law claims revolve around allegations that [defendant] breached her fiduciary duties and misappropriated [plaintiff's] artwork. These allegations focus on a much longer time span than the CFAA claim and are likely to involve extensive discovery. The state law claims will also require legal analysis distinct from the CFAA claim. These state law claims are at the heart of this case and substantially predominate over the CFAA claim.

*See id.* at *16-17 (citations omitted); *see also VW Credit Leasing*, 757 F. Supp. 3d 271 (declining to exercise supplemental jurisdiction over state-law claims where they "cover a broader set of issues than the . . . federal claim, and require factual and legal analyses unrelated to that claim, which a state court is in a better position to conduct").

**b)      State-Law Claims Will Predominate in Terms of Judicial Resources**

For similar reasons, the State-Law Claims will require far more judicial resources to adjudicate than the lone federal cause of action. Each of the State-Law Claims has multiple elements that will need to be analyzed and applied, and the Court would need to preside over a wide-ranging set of facts and issues. The claims are likely to directly impact various non-parties, including those who are defending the *Parrish* Action and *Southern* Action, various other Recent Howden Hires, other Marsh personnel, and a number of insureds who are current, former, or prospective clients of Marsh or Howden. Marsh already has served at least 12 subpoenas in the *Parrish* Action, Compl. ¶¶ 152-157, and the Court could anticipate third-party discovery in this Action. Nor is the resolution of any of the State-Law Claims necessary to resolve the DTSA claim, further weighing in favor of dismissal. *See Dedalus*, 2009 WL 3398595, at *6 (declining to exercise supplemental jurisdiction where establishment of state law causes of action is "not necessary to establish the [alleged federal] violation").

**c)      Remedies for State-Law Claims Predominate Over Those for DTSA Claim**

The remedies Marsh seeks in connection with its State-Law Claims also dwarf any relief available under the DTSA. As noted above, Marsh seeks highly invasive injunctive relief, including provisions barring Howden "and persons in active concert or participation with Howden" from "accepting, engaging in, servicing or performing any business services for any current or former clients of Marsh" who were solicited by any Recent Howden Hire who is "subject to non-solicitation restrictions" and from "soliciting clients and employees from Marsh McLennan" through any Marsh current or former employees who are "subject to nonsolicitation restrictions, duties of loyalty, and/or fiduciary duties." [ECF No. 53], ¶ 2. None of this relief is

available under the DTSA, which instead focuses on securing the protection of trade secrets and providing monetary relief in connection with proven violations.  *See* 18 U.S.C. § 1836(b)(3).

Indeed, Marsh itself has acknowledged that greater remedies are available under its State-Law Claims than under the DTSA.  In explaining its decision to seek emergency injunctive relief solely on its State-Law Claims, Marsh stated that "***the contractual breaches Howden knowingly induced provide the most direct and comprehensive basis for relief***."  [ECF No. 60], 24 n.4 (emphasis added).

### d)    Procedural History Verifies Predominance of State-Law Claims

The procedural history of Marsh's claims against Howden further confirms the predominance of the State-Law Claims.  *See MTBE*, 613 F. Supp. at 442-43.  As set forth above, Marsh has been pursuing substantially the same claims against Howden for more than four months, originally filing the Delaware Action on August 1, 2025, yet it did not allege a DTSA claim against Howden until immediately after the Delaware court stayed Marsh's claims in that forum.  By all appearances, Marsh's sudden articulation of a DTSA claim against Howden was based on its desire for a federal jurisdictional "hook" as part its continuing efforts to avoid the NYS Action.  Courts in this District disapprove of forum-shopping and have dismissed pendent state-law claims where it appears that such tactics are at play.  *Id.* (dismissing pendent claims amidst allegations of forum-shopping; "if there was forum shopping, it was done by plaintiffs, who originally filed most of these actions without mentioning the [Toxic Substances Control Act ("TSCA")], then added TSCA claims only after it was pointed out to them that there was no federal jurisdictional base in their original Complaints").

### 2. Judicial Economy, Convenience, Fairness, and Comity Favor Dismissal of the State-Law Claims

Where grounds exist to decline supplemental jurisdiction under 28 U.S.C. § 1367(c), a court should "weigh several factors in determining whether to exercise supplemental jurisdiction . . . including the familiar factors of judicial economy, convenience, fairness and comity." *UBS Secs. LLC v. Dondero*, 705 F. Supp. 3d 156, 167 (S.D.N.Y. 2023) (quotation omitted). Here, these factors overwhelmingly favor dismissal of the State-Law Claims.

#### a) Judicial Economy Favors Dismissal

Principles of judicial economy strongly support the dismissal of the supplemental State-Law Claims. When assessing judicial economy, courts consider their "familiarity with the facts, the timing of the case, the number of parties and claims, the amount of discovery, and whether there is ongoing parallel litigation." *Id.* at 169 (cleaned up). Here, this Action is in its infancy, with no discovery having been conducted, thus supporting dismissal of the pendent claims. *See MTBE*, 613 F. Supp. 2d at 445 (supporting dismissal of state-law claims where "these cases were filed a few months ago; no opinions or orders have issued in these cases; [and] there has been no discovery"). Further, there exists prior parallel litigation, in the form of the NYS Action, to which the seven Individual Defendants could readily be joined based on the RCAs' forum-selection provisions. Compl. ¶¶ 52, 55. As noted above, the Delaware court strongly suggested that claims regarding this nexus of facts should be resolved in the "the New York Supreme Court action" which "is capable of doing prompt and complete justice." Rabin Decl., Ex. A at 3; *see also Oneida*, 665 F.3d at 437 (dismissing pendent claims where "there are already pending state-court proceedings in which the [petitioner] appears to have raised [this] issue").

Marsh's litigation strategy flouts principles of judicial economy. The Delaware court reached this conclusion in its initial ruling in that case, criticizing Marsh for placing the court at

risk of "unwittingly stepping on two other courts' toes, in violation of principles of . . . judicial efficiency." Rabin Decl., Ex. F at 2-3. The Delaware court reiterated this point in its November 6, 2025, order staying the Delaware proceedings, noting that having "both [the Delaware Action and the NYS Action] proceed in parallel risks wasting resources and could produce conflicting results." *See* Rabin Decl., Ex. A at 3. The same is true with respect to this Action.

### b)    Considerations of Convenience Favor Dismissal

Considerations of convenience similarly weigh in favor of dismissing the State-Law Claims. By splintering what should be one dispute into five different cases, Marsh has multiplied the burdens on the courts, the parties, and the witnesses. The various defendants' interests are being litigated concurrently in multiple venues, with the risk that decisions in one court will directly or indirectly prejudice other rights or positions in another. The costs of litigation also are elevated, as a result of duplication in discovery, briefing, and proceedings. Witnesses similarly will be unduly inconvenienced, risking having to respond to discovery in multiple cases. Indeed, as Marsh acknowledges, most of the Individual Defendants in this Action are under subpoena in the *Parrish* Action. Compl. ¶¶ 15, 155-157. Most importantly, multiple different courts and judges are unduly inconvenienced, being asked to referee discrete parts of a broader mosaic, including potentially duplicating each other's efforts or, as the Delaware court feared, "stepping on . . . other courts' toes." Rabin Decl., Ex. F at 2. Every step courts can take toward consolidating these matters—including dismissing the State-Law Claims in this Action so that they may be consolidated with the allegations in the first-filed NYS Action—reduces these inconveniences. *See, e.g.*, *Chenensky v. N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 393 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction so state-law claims could be resolved "along with its companion [case] in a New York state court").

### c)    Principals of Fairness Favor Dismissal

Considerations of fairness also weigh in favor of dismissing the State-Law Claims. Fairness "involves questions of equity," including determining whether declining pendent jurisdiction will "prejudice the parties," and whether "the parties [are] responsible for any such prejudice." *UBS*, 705 F. Supp. 3d at 169-70. Here, Marsh will not be prejudiced at all by the dismissal of the State-Law Claims, as it can pursue such claims in the NYS Action, as suggested by the Delaware court. Further, any resulting delay in litigating these issues is due to Marsh's own litigation tactics. Rabin Decl., Ex. A at 3 ("Marsh complains of urgency . . . yet I do not see Marsh has sought relief from the New York court since my August 19 ruling. Howden's conduct is not before the New York Supreme Court because Marsh has not brought it there."); *see also* Hr'g Tr. (Dec. 1, 2025), at 11:11-17 ("Nor have plaintiffs consistently acted in the manner reflected of their alleged need to expedite matters. For example . . . , in the first-filed New York state court action between plaintiffs and Howden Defendants, rather than bring counterclaims or seek a preliminary injunction with expedited discovery, Marsh sought the exact opposite and sought to stay the case . . . .").

Indeed, it would be decidedly *unfair* to permit Marsh to engage in tactical forum shopping at the expense of the various courts, defendants, and witnesses. Fairness is served by requiring Marsh to proceed in state court, as the State-Law Claims are the real substance of this Action, with the sole federal claim as an afterthought for federal jurisdiction. *See MTBE*, 613 F. Supp. 2d at 445 (holding fairness is served by dismissing state-law claims when they "are the real substance of these suits").

### d)        Principles of Comity Favor Dismissal

"Comity and respect for New York State courts dictate that where possible, state courts should decide matters of state law, and that absent exceptional circumstances, federal courts should decline to exercise supplemental jurisdiction over [state-law] claims." *See VW Credit Leasing*, 757 F. Supp. 3d at 295 (quoting *Wilson v. Dantas*, 2013 WL 92999, at * 9 (S.D.N.Y. Jan. 7, 2013)); *see also Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided . . . as a matter of comity."); *Dedalus*, 2009 WL 3398595, at *19 ("[A]djudication of the issues in state court . . . will promote justice by procuring . . . a surer-footed reading of applicable law.").  Here, federal jurisdiction over the predominating State-Law Claims is unnecessary, and the Court thus should dismiss them in deference to the previously filed NYS Action.

## <u>CONCLUSION</u>

For all the above reasons, Howden respectfully requests that the Court grant this Motion to Dismiss.

Dated: December 12, 2025
      New York, New York

Respectfully submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  */s/ Richard J. Rabin*
Richard J. Rabin
Michael Kahn
Katherine Porter
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
rrabin@akingump.com
mkahn@akingump.com
kporter@akingump.com

Robert G. Lian, Jr. (*pro hac vice admission*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4358
Facsimile: (202) 887-4288
blian@akingump.com

Laura P. Warrick (*pro hac vice admission*)
2300 N. Field St., Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
lwarrick@akingump.com

*Attorneys for Defendants Howden US Services, LLC and Howden US Specialty, LLC*

**CERTIFICATION**

I hereby certify that this Memorandum of Law was produced on a computer using Microsoft Word 365 and does not exceed 8,750 words, as determined by the computer software's word-count function, excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, pursuant to Local Civil Rule 7.1(c).


Dated: December 12, 2025
         New York, New York

                                   /s/    *Richard J. Rabin*
                                        Richard J. Rabin