UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARSH & MCLENNAN COMPANIES
INC.; MARSH USA LLC; MERCER (US)
LLC; and MARSH & MCLENNAN
AGENCY LLC,

                    Plaintiffs,

            -against-

HOWDEN US SERVICES, LLC; HOWDEN
US SPECIALTY, LLC; ALFRED
GRONOVIUS; ANDREA AMODEO;
CARLOS SERIO; GIOVANNI PEREZ;
JANETTE WILCOX; NATHAN COLLINS;
and RICHARD LENNERTH,

                    Defendants.

Case No. 1:25-cv-09130 (JLR)

**<u>OPINION AND ORDER</u>**

---

JENNIFER L. ROCHON, United States District Judge:

On November 13, 2025, Plaintiffs Marsh USA LLC, Marsh & McLennan Companies

Inc., and Marsh & McLennan Agency LLC (collectively "Plaintiffs" or "Marsh"), filed an

Application for a Temporary Restraining Order, Preliminary Injunction, and Expedited

Discovery against Defendants Alfred Gronovius ("Gronovius"), Andrea Amodeo ("Amodeo"),

Carlos Serio ("Serio"), Giovanni Perez ("Perez"), Janette Wilcox ("Wilcox"), Nathan Collins

("Collins"), Richard Lennerth ("Lennerth") (collectively "Individual Defendants"), Howden US

Services, LLC, and Howden US Specialty, LLC (collectively "Howden" and, together with the

Individual Defendants, "Defendants"). Dkt. 52. Plaintiffs ask the Court to bar Defendants from

soliciting Marsh's employees, soliciting and servicing Marsh clients, and using or disclosing

Marsh's confidential information, as well as to instruct certain Defendants to return any Marsh

property in their possession. *See* Dkts. 53, 172-1.

The TRO and expedited discovery applications have been resolved.  A preliminary injunction hearing was held over two days on February 12 and 13, 2026.  February 12-13, 2026 Preliminary Injunction Transcript ("Tr.").  For the following reasons, the Court GRANTS in part and DENIES in part Plaintiffs' Application for a Preliminary Injunction.

## BACKGROUND

The parties elected not to present live testimony during the preliminary injunction hearing. The following facts are drawn from the parties' evidentiary submissions.  Dkt. 56 ("Mufson Decl."); Dkt. 57 ("Schnabolk Decl."); Dkt. 59 ("Martino Second Decl."); Dkt. 62 ("Fuest Decl."); Dkt. 63 ("Jorgenson Decl."); Dkt. 113-1 ("Gronovius Decl."); Dkt. 116 ("Amodeo Decl."); Dkt. 117 ("Collins Decl."); Dkt. 118 ("Lennerth Decl."); Dkt. 119 ("Perez Decl."); Dkt. 120 ("Serio Decl."); Dkt. 121 ("Wilcox Decl."); Dkt. 126 ("Lian Decl."); Dkt. 137 ("Mufson Reply Decl."); Dkt. 138 ("Schnabolk Reply Decl."); Dkt. 139 ("Sartain Decl."); Dkt. 141 ("Martino Third Decl."); Dkt. 142 ("Fuest Reply Decl."); Dkt. 166 ("McClellan Supplemental Decl."); Dkt. 168 ("Mufson Supplemental Decl.").

## I.    Factual Background

This case arises from Howden's acquisition of numerous Florida Zone employees and clients of Marsh in the past several months.  Marsh is a global insurance broker and risk management firm, providing brokerage, consulting, and claims-advocacy services.  Schnabolk Decl. ¶ 3; Mufson Decl., Ex. 48 ("McClellan Decl.") ¶ 4.  Marsh organizes its businesses by geographic regions, referred to as "Zones."  Schnabolk Decl. ¶ 3; McClellan Decl. ¶ 4.  Over the years, Marsh invested significant resources into building its Florida Zone.  Schnabolk Decl. ¶ 6. At the core of Marsh's Florida Zone strategy was its substantial investment in specialized personnel, advanced training, and proprietary technology, all of which resulted in significant revenue for Marsh.  *See* Schnabolk Decl. ¶¶ 6-7; McClellan Decl. ¶¶ 4-6, 8.

Marsh's Florida Zone was led by Michael Parrish ("Parrish"), Giselle Lugones ("Lugones"), Robert Lynn ("Lynn"), and Julie Layton ("Layton") (collectively "Florida Zone Leaders").[1]  The Florida Zone Leaders were responsible for the Florida Zone's operations and had access to Marsh's confidential information.  *See* Schnabolk Decl. ¶¶ 8-16; McClellan Decl. ¶ 5.  The Individual Defendants in this case — Gronovius, Amodeo, Serio, Perez, Wilcox, Collins, and Lennerth — were senior managers and account executives who reported to the Florida Zone leaders and held client-facing positions.  Schnabolk Decl. ¶¶ 8-16.  Gronovius reported to Lugones; Wilcox and Perez reported to Parrish; Serio and Collins reported to Wilcox; Lennerth reported to Lynn; and Amodeo reported to Layton.  *See id.*; *see also* Tr. at 147:6-9.  In their capacity as senior managers and account executives, the Individual Defendants had access to Marsh's confidential information and trade secrets.  Schnabolk Decl. ¶ 5.

Each of the Individual Defendants agreed to the same Non-Solicitation Agreement ("NSA") and Confidentiality Agreement ("CA").  *See* Mufson Ex. 2 ("Gronovius NSA"); Mufson Decl. Ex. 3 ("Gronovius CA"); Mufson Decl. Ex. 8 ("Amodeo NSA"); Mufson Decl. Ex. 9 ("Amodeo CA"); Mufson Decl. Ex. 15 ("Serio NSA"); Mufson Decl. Ex. 16 ("Serio CA"); Mufson Decl. Ex. 21 ("Perez NSA"); *id.* ("Perez CA"); Mufson Decl. Ex. 27 ("Wilcox NSA"); Mufson Decl. Ex. 28 ("Wilcox CA"); Mufson Decl. Ex. 35 ("Collins NSA"); Mufson Decl. Ex. 38 ("Collins CA"); Mufson Decl. Ex. 41 ("Lennerth NSA"); Mufson Decl. Ex. 42 ("Lennerth CA").  As part of the NSA, the Individual Defendants agreed to an employee non-solicitation clause, which stated:

> Employee acknowledges and agrees that solely as a result of employment with [Marsh], and in light of the broad responsibilities of such employment which include working with other employees of [Marsh], Employee has and will come

---

[1] The Florida Zone Leaders are defendants in *Marsh USA LLC v. Parrish*, No. 25-cv-06208 (GBD), and are subject to an injunction similar to the one sought here, *see Marsh USA LLC v. Parrish*, No. 25-cv-06208 (GBD), 2025 WL 2676389, at *3 (S.D.N.Y. Sept. 18, 2025).

into contact with and acquire Confidential Information and Trade Secrets regarding [Marsh]'s other employees.  Accordingly, both during employment with [Marsh] and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of [Marsh] with whom Employee, during the last two (2) years of his or her employment with [Marsh], came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with [Marsh].

See, e.g., Gronovius NSA at 2.  The NSA also included a client non-solicitation clause, which

stated:

Employee covenants and agrees that in the event of separation from employment with [Marsh], whether such separation is voluntary or involuntary, Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients or prospective clients of [Marsh] for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by [Marsh]; (ii) induce clients or prospective clients of [Marsh] to terminate, cancel, not renew, or not place business with [Marsh]; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by [Marsh] on behalf of any clients or prospective clients of [Marsh]; or (iv) assist others to do the acts specified in Sections 1(b) (i)-(iii).  This restriction shall apply only to those clients or prospective clients of [Marsh] with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with [Marsh] or its predecessors.  For the purposes of Section 1, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of [Marsh].

See, e.g., id. at 1-2.  Finally, the CA prohibited the Individual Defendants from misusing Marsh's

confidential information and trade secrets, stating:

[The Employee] will not, while associated with [Marsh] and for so long thereafter as the pertinent information or documentation remains confidential, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information and Trade Secrets, except as required to carry out my duties as an employee of [Marsh], and except as expressly authorized by the President or highest executive officer of [Marsh].

See, e.g., Gronovius CA at 2.  The CA defined "Confidential Information and Trade Secrets" in

Schedule 1 to include information, "not generally known or available to the general public," and

4

that "has been developed, compiled or acquired by [Marsh] at its effort and expense," relating to Marsh's "products, services, clients, suppliers, vendors, business partners, and employees," including but not limited to "financial and business information," "plans for future business," "product and technical information," "client information" such as details about clients' policies, and "any and all information in whatever form relating to any client or prospective client of [Marsh]." *See, e.g.*, *id.*, Schedule 1.

Marsh alleges that the Individual Defendants breached these covenants as part of a scheme involving the Florida Zone Leaders and Howden to further Howden's acquisition of Marsh's Florida Zone employees and clients. *See generally* Dkt. 34 ("Am. Compl."). Howden, a UK-based insurance broker and Marsh competitor, sought to enter the United States insurance brokerage market. *See* Mufson Decl., Ex. 45 ("Martino First Decl.") ¶¶ 3-4; Mufson Decl., Ex. 50 ("Maffai Decl.") ¶ 3. Marsh claims that after Howden failed to acquire a United States-based brokerage, *see* Mufson Decl., Ex. 59, Howden began soliciting the Florida Zone Leaders to build out a United States retail presence. Lugones received and accepted an offer on May 27, 2025, *see* Mufson Supplemental Decl., Ex. 23, Parrish accepted an offer on June 6, 2025, *see id.*, Ex. 22, Layton received an offer on June 30, 2025, *see Marsh USA LLC v. Parrish*, 25-cv-06208, Dkt. 81 ("Layton Decl.") ¶ 2, and Lynn received an offer from Howden on July 7, 2025, Mufson Supplemental Decl., Ex. 24. After receiving their offers, Marsh alleges that the Florida Zone Leaders, and later the Individual Defendants, solicited employees and clients to move to Howden, and impermissibly accessed and collected Marsh's confidential information. *See* Am. Compl. ¶¶ 100-13.

On July 21, 2025, nearly 100 Marsh employees resigned *en masse*, *see* Schnabolk Decl. ¶ 29, including the Individual Defendants, except for Lennerth, who resigned on July 23, 2025, *see id.* ¶ 15. Soon after the resignations, Marsh clients began submitting Broker of Record

("BOR") forms, which are used to inform insurance brokers that a client is moving their business to another insurance broker. Schnabolk Decl. ¶ 30. This sudden exodus of employees and clients, most of whom joined Howden, *see id.*, effectively dismantled the Florida Zone's operations and facilitated Howden's entry into the United States market with clients and staff.

Clients and employees continued to move from Marsh to Howden. As of November 13, 2026, Marsh had lost 150 employees and 60 clients to Howden. *Id.* ¶¶ 29-30. And as of February 9, 2026, that number rose to 160 employees and 82 clients. *See* Schnabolk Reply Decl. ¶ 2; McClellan Supplemental Decl. ¶ 5.

## II.    Procedural Background

The present suit is the fifth filed action related to Howden's acquisition of Marsh clients and employees. On July 27, 2025, after receiving a legal letter from Marsh, Howden Services, and three former Marsh employees, Parrish, Lugones, and Landa, filed an action for declaratory judgment in New York State Court claiming that the restrictive covenant agreements ("RCAs") were unenforceable. *See* Lian Decl., Ex. A. Marsh did not pursue emergency relief in that action, and the New York State Supreme Court denied Marsh's motion to dismiss last month. *See* Decision & Order on Motion, *Parrish v. Marsh & McLennan Cos., Inc.*, No. 654430/2025 (N.Y. Sup. Ct. January 12, 2026), NYSCEF Doc. No. 77.

Two days after the state court action was filed, on July 29, 2025, Marsh sued the Florida Zone Leaders in the Southern District of New York for violations of their restrictive covenants. *See* Complaint, *Marsh USA LLC v. Parrish et al.*, No. 25-cv-06208 (S.D.N.Y. July 29, 2025), Dkt. 1. Marsh sought emergency relief in that case, and on September 18, 2025, Judge Daniels granted Marsh's application for a preliminary injunction, enjoining the Florida Zone Leaders "from soliciting Marsh clients and employees or utilizing and disclosing Marsh's confidential information." *Parrish*, 2025 WL 2676389, at *1. Howden attempted to intervene in that action

pursuant to Federal Rule of Civil Procedure ("Rule") 24(a), but the motion was denied. *See*

*Marsh USA LLC v. Parrish*, No. 25-cv-06208 (GBD), 2025 WL 3171894, at *4 (S.D.N.Y. Nov.

13, 2025).

Within days of filing the *Parrish* action, on August 1, 2025, Marsh brought an action

against Howden in the Delaware Court of Chancery. Lian Decl., Ex. F. Marsh sought a TRO

and a preliminary injunction against Howden in the Delaware action. *Id.* The court rejected that

request and instead stayed the case on November 6, 2025, given that there was an action

proceeding in New York State Court involving Howden and Marsh. *Id.*, Ex. H at 4. Following

the stay, Marsh voluntarily dismissed the Delaware action on November 7, 2025. *Id.*, Ex. I.

At around the same time, on November 3, 2025, Marsh commenced this action against

the Individual Defendants. *See* Dkt. 1 ("Compl.").[2] On November 10, 2025, Plaintiff amended

the complaint to add Marsh & McLennan Companies Inc., Mercer (US) LLC, and Marsh &

McLennan Agency LLC as plaintiffs and Howden as defendants. *See* Am. Compl. On

November 13, 2025, Plaintiffs filed an Application for a Temporary Restraining Order,

Preliminary Injunction, and Expedited Discovery. Dkt. 52. Plaintiffs sought to restrain the

Individual Defendants and Howden from soliciting Marsh employees, servicing and/or soliciting

Marsh clients, and using, disclosing, retaining, destroying, or otherwise misappropriating

confidential information; they also sought an order directing Howden to return all Marsh

property in Defendants' possession. *See* Dkt. 53. Defendants opposed this relief.

On November 19, 2025, the Court held a hearing on Plaintiffs' Application for a TRO.

At that hearing, the Court denied the TRO but scheduled a preliminary injunction hearing for

---

[2] On October 31, 2025, Marsh also brought an action against Charles Baxter Southern III, another former Marsh employee that left for Howden. *See* Complaint, *Marsh & McLennan Agency, LLC v. Charles Baxter Southern III*, 25-cv-09080-JLR (S.D.N.Y. Oct. 31, 2025), Dkt. 1. Marsh did not seek injunctive relief in that case.

February 12, 2026, to provide Defendants time to simultaneously brief their anticipated motions to dismiss. *See* Dkt. 78. On December 1, 2025, the Court denied Plaintiffs' request for Expedited Discovery. *See* Dkt. 97.

The motion for a preliminary injunction is now fully briefed. *See* Dkt. 60 ("Br."); Dkt. 113 ("Gronovius Opp."); Dkt. 115 ("Individuals Opp."); Dkt. 125 ("Howden Opp."); Dkt. 136 ("Reply").[3] The parties also filed motions to seal exhibits submitted in this case. *See* Dkt. 133; Dkt. 162; Dkt. 177. A preliminary injunction hearing was held on February 12 and 13, 2026. After the hearing, the Court permitted Marsh to file a revised proposed order for a preliminary injunction on February 16, 2026, to address some of the issues raised at the hearing. *See* Tr. at 288:22-289:2. Marsh filed its revised proposed order on February 16, 2026. Dkt. 172-1. Defendants then filed objections to the revised order on February 18, 2026, *see* Dkt. 173; Dkt. 174; Dkt. 175, and a proposed alternative order, *see* Dkt. 175-1.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an

---

[3] The motions to dismiss are also fully briefed. *See* Dkt. 110; Dkt. 111; Dkt. 122; Dkt. 123; Dkt. 132; Dkt. 150; Dkt. 151; Dkt. 152. Both motions sought in part to dismiss the single federal claim in the Amended Complaint, brought under the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836. *See* Dkt. 111 at 15; Dkt. 123 at 18. If those motions succeed, Howden and Individual Defendants argue, the Court would lack subject matter jurisdiction since there exists no basis for diversity jurisdiction. *See* Dkt. 111 at 15; Dkt. 123 at 18. The Court heard argument on the motions to dismiss on February 12, 2026, and will take the motions under advisement. At this point, the Court is not persuaded that the DTSA claim is likely to be dismissed at the pleading stage, and thus the Court will continue to examine the exigent preliminary injunction motion.

injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (omission in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).  To attain such "an extraordinary and drastic remedy," the movant must "carr[y] the burden of persuasion" "by a clear showing."  *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (quoting *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005)).

The burden is even greater when a movant seeks a mandatory injunction — an injunction that "requires the non-movant to take some action."  *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).  When a party seeks a mandatory injunction, that party must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm."  *Id.* (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

In evaluating a preliminary injunction, the Court makes findings of fact and conclusions of law pursuant to Rules 52(a) and 65.  *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." (quoting *Johnson v. Newport Lorillard*, No. 01-cv-09587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003))).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. . . .  A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made" at the hearing are "not binding at trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Broadly speaking, Marsh seeks a preliminary injunction that prohibits (i) Defendants Gronovius, Amodeo, Serio, Wilcox, and Collins from soliciting Marsh employees, (ii) Defendants Gronovius, Serio, and Perez from soliciting, servicing, or accepting business from Marsh clients or prospective clients, and (iii) all Individual Defendants from misappropriating Marsh's confidential information. *See* Dkt. 172-1 at 6-7. Marsh also now seeks a mandatory injunction requiring the Individual Defendants to return all Marsh Property, including confidential information in their possession, to Marsh. *Id.* at 7. As to Howden, Marsh seeks an injunction that restrains Howden from (i) aiding former Marsh employees in the violation of their contractual obligations, (ii) soliciting or servicing former and current Marsh clients procured by Marsh employees in violation of their employment contracts, and (iii) misappropriating Marsh's confidential information. *Id.* at 5-6. Marsh also asks the Court to order Howden to return any of Marsh's confidential information in its possession. *Id.* at 6.

The Court finds that Marsh has satisfied its burden for its requested prohibitory injunction against Defendants' further solicitation of employees, solicitation and servicing of current and prospective Marsh clients, and misuse of confidential information. Moreover, Marsh is entitled to a mandatory injunction requiring that the Individual Defendants and Howden return all of Marsh's confidential information with a sworn certification. However, for the following reasons, Marsh is not entitled to a preliminary injunction prohibiting the Individual Defendants or Howden from servicing former Marsh clients who are presently at Howden.

## I. Likelihood of Success on the Merits

To start, Marsh has demonstrated that it is likely to succeed on the merits of at least some of its claims. "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. [It] need only make a showing that the probability

10

of . . . prevailing is better than fifty percent." *New York by James v. Rescue*, 705 F. Supp. 3d 104, 122 (S.D.N.Y. 2023) (alteration and omission in original) (quoting *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018)).  When the movant seeks a "mandatory injunction[], which 'alter[s] rather than maintain[s] the status quo,' . . . 'the movant must show a "clear" or "substantial" likelihood of success' on the merits." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003)).

Moreover, "[w]here a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims." *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*, No. 25-cv-06936 (RA), 2025 WL 3442819, at *8 (S.D.N.Y. Dec. 1, 2025) ("*Oldenburg*") (quoting *Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 487 (S.D.N.Y. 1997)). When injunctive relief is sought against multiple defendants, the movant "must establish its burden as to each [d]efendant to obtain an injunction against that [d]efendant." *Id.*; *see also Haymount Urgent Care PC v. Gofund Advance, LLC*, No. 22-cv-01245 (JSR), 2022 WL 836743, at *1 (S.D.N.Y. Mar. 21, 2022) ("To obtain a preliminary injunction, a party need only demonstrate likelihood of success on one claim against each defendant.").

Here, Marsh argues that it is likely to succeed on the merits of its (1) breach of contract claims against the Individual Defendants, (2) tortious interference with contract claims against Howden, and (3) unfair competition claims against all Defendants.  *See* Br. at 18.  The Court finds that Marsh is likely to succeed on the merits of its breach of contract claims against the Individual Defendants and its tortious interference with contract claim against Howden, and thus need not reach the unfair competition claims.  *See Oldenburg*, 2025 WL 3442819, at *11 n.9

11

(declining to address the likelihood of success on the merits of tort claims against a defendant when the burden was already met as to the contract claims).

### A.    Breach of Contract

Marsh alleges that it is likely to succeed on the merits of its breach of contract claims against the Individual Defendants, specifically that Gronovius, Amodeo, Serio, Wilcox, and Collins breached the employee non-solicitation clauses in their NSAs, *see* Am. Compl. ¶¶ 168-80; Gronovius, Serio, and Perez breached the client non-solicitation clauses in their NSAs, *see id.* ¶¶ 181-94; and Gronovius, Amadeo, Serio, Perez, Wilcox, Collins, and Lennerth breached their CA, *see id.* ¶¶ 195-209.  The Individual Defendants argue that Marsh has not met its burden because the NSAs' restrictive covenants with respect to employees and clients are likely unenforceable.  *See* Gronovius Opp. at 17-19; Individual Opp. at 14, 17.  Alternatively, even if they are enforceable, the Individual Defendants assert that Marsh has not demonstrated a likelihood of success as to any breaches under the NSA or CA.  *See* Gronovius Opp. at 18-19, 23-27; Individual Opp. at 14-25.  The Court addresses each argument in turn.

### 1.    Enforceability of the Restrictive Covenants

Starting with enforceability of the restrictive covenants, Marsh has demonstrated that the employee and client non-solicitation clauses are likely enforceable.  New York "courts will enforce a restrictive covenant" in an employment agreement "only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public."  *Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 361 (N.Y. 2015) (quoting *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999)).  The Individual Defendants argue that Marsh's employee non-solicitation clause is unenforceable because there is no protectible interest in restraining at-will employees and Marsh similarly lacks a legitimate protectable interest in prohibiting solicitation

and servicing of personal clients and prospective clients sufficient to justify the client non-solicitation clause.  Gronovius Opp. at 17-20, 23-24; Individual Opp. at 14, 17.  The Court does not agree.

First, New York courts do not categorically prohibit the enforcement of employee non-solicitation clauses against at-will employees, so long as the restriction is reasonably tailored to protect the employers' legitimate interests.  *See QBE Ams., Inc. v. Allen*, No. 22-cv-00756 (JSR), 2022 WL 889838, at *11 (S.D.N.Y. Mar. 25, 2022) ("New York state courts have recognized that breach of an employee non-solicitation clause may be a viable claim[,] [b]ut these covenants' enforceability plainly depends on whether the clause at issue protects cognizable employer interests."); *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (finding one-year employee non-solicitation clause enforceable when the employer "expends substantial resources to help its [employees] develop customer relations").  Here, Marsh "has a legitimate interest in limiting the solicitation of its employees to depart for its direct competitors," *see Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, No. 24-cv-09914 (MKV), 2025 WL 304500, at *7 (S.D.N.Y. Jan. 27, 2025) ("*Osborne*"), because these employees possess Marsh's confidential information, *see* Schnabolk Decl. ¶¶ 5, 18, and Marsh expends significant resources developing these employees through "training, client development resources, and cross-selling opportunities," *id.* ¶ 7; *see* McClellan Decl. ¶¶ 4, 6.  Furthermore, Marsh's employee non-solicitation clause is narrowly tailored to protect its legitimate interest, thus avoiding any undue burden on the Individual Defendants or injury to the public.  The employee non-solicitation clause remains in effect only for "twelve (12) months" after the employee leaves Marsh, and only applies to Marsh employees with whom the former employee, "during the last two (2) years," (i) "came into contact for the purpose of soliciting or servicing business" or (ii) "about whom [the] Employee obtained Confidential Information and Trade

13

Secrets." *See, e.g.*, Gronovius NSA at 2. Courts analyzing similar employee non-solicitation clauses have found them likely to be enforceable. *See, e.g.*, *Parrish,* 2025 WL 2676389, at *2 (holding that similar employee non-solicitation clause was likely enforceable under New York Law); *Oldenburg*, 2025 WL 3442819, at *9 (same); *Marsh USA Inc. v. Karasaki*, No. 08-cv-04195 (JGK), 2008 WL 4778239, at *15-17 (S.D.N.Y. Oct. 31, 2008) (same).

Second, the Court disagrees with the Individual Defendants that the client non-solicitation clauses in the NSAs are unenforceable because they do not exclude personal clients and apply to prospective clients. Gronovius Opp. at 17-19; Individual Opp. at 17. An "employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *BDO Seidman*, 712 N.E.2d at 1225. However, this legitimate interest does not extend to client relationships that the employee "did not develop through assignments to perform direct, substantive [work]" for the employer. *Id.*; *see also Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 350 (S.D.N.Y. 2018) ("The employer's legitimate interest . . . does not extend to clients with whom the employee never acquired a relationship through the resources provided by the employer, nor to client relationships that the employee developed independently and without the benefit of any expenditure of effort or resources by the employer."). Notably, the question is not whether the client is more loyal to the employee than to the employer, but rather "whether [the employee] developed those [client] relationships independently of any efforts or expenditures made by [the employer]." *Karasaki*, 2008 WL 4778239, at *17. Thus, a client non-solicitation clause cannot be enforced to prevent an employee from soliciting or servicing "personal clients of [the employee] who came to the firm solely to avail themselves of [the employee's] services and only as a result of [the employee's] own independent recruitment efforts, which [the employer]

14

neither subsidized nor otherwise financially supported as part of a program of client development." *BDO Seidman*, 712 N.E.2d at 1225; *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 532 & n.3 (S.D.N.Y. 2016) (enforcing client non-solicitation clause but carving out clients that were "attracted to Marsh solely by the opportunity to be serviced by [defendant-employee], who were recruited to Marsh solely by [defendant], and whose development as clients was not subsidized by Marsh"), *amended*, No. 16-cv-02998, 2016 WL 2731588 (S.D.N.Y. May 3, 2016).

Marsh has presented evidence that it subsidized the development of the lost clients through compensation tied to client recruitment, servicing, and development, specialized and industry-specific trainings relevant to the clients, expense reimbursement, fostering carrier relationships, and providing proprietary resources and platforms to service the clients. *See* Schnabolk Decl. ¶¶ 6-7; Schnabolk Reply Decl. ¶¶ 11-14. The client non-solicitation provision is also limited to "those clients or prospective clients of [Marsh] with which Employee had contact or about which Employee obtained Confidential Trade Secrets during the last two (2) years of his or her employment with [Marsh] or its predecessors." *See, e.g.*, Gronovius NSA at 3. Furthermore, Gronovius is the only Individual Defendant who claims that some of the Marsh clients who moved to Howden were personal clients (although they are personal to Lugones or her team, not necessarily Gronovius). But, even under Gronovius's assessment of the client relationships, he admits that there were at least five Marsh clients who followed him to Howden that were not personal clients. *See* Gronovius Decl. ¶ 25. Marsh has therefore shown in the present case that it "has a legitimate interest in protecting its client relationships to justify enforcement of the [client non-solicitation clause]." *Karasaki*, 2008 WL 4778239, at *17.

A restriction on prospective client solicitation also does not render the client non-solicitation clause overbroad and unenforceable. Gronovius Opp. at 19-20. The client non-

solicitation provision only applies for "twelve (12) months" after the employee leaves Marsh, and again only applies to prospective clients that the Individual Defendants "had contact [with] or about which [the] Employee obtained Confidential Information and Trade Secrets during the last two (2) years of [their] employment with [Marsh]." *See, e.g.*, Gronovius NSA at 1-2.  Courts have repeatedly found client non-solicitation clauses that include similar prospective client restrictions not to be overbroad, unduly burdensome, or injurious to the public.  *See e.g.*, *Oldenburg*, 2025 WL 3442819, at *10; *Osborne*, 2025 WL 304500, at *7.  Thus, the client non-solicitation clauses in the NSA are likely enforceable.

### 2.  Breach of the NSA or CA

Turning to the merits of the breach claims, Marsh has also demonstrated that each of the Individual Defendants likely breached at least one provision of the NSA or CA.  "'[T]o recover . . . for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between [plaintiff] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach.'"  *Grewal v. Cuneo Gilbert & LaDuca LLP*, No. 13-cv-06836 (RA), 2018 WL 4682013, at *4 (S.D.N.Y. Sept. 28, 2018) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)), *aff'd*, 803 F. App'x 457 (2d Cir. 2020) (summary order).  There is no dispute that contracts exist between Marsh and the Individual Defendants, *supra* at 3 (identifying exhibits containing Individual Defendants' NSAs and CAs), and there is no dispute that Marsh performed its obligations under these employment contracts.

Marsh has submitted evidence that Gronovius, Serio, Amodeo, Wilcox, and Collins likely breached the employee non-solicitation provisions of their NSAs.  Gronovius made repeated calls with seven direct and indirect reports just before their departures to Howden.  *See* Fuest

Decl. ¶ 10; *cf.* Gronovius Decl. ¶ 21. Serio used his wife's personal phone to solicit a Marsh employee and had meetings with top Marsh employees right before July 21, 2025, all of whom then resigned to join Howden. *See* Mufson Decl., Ex. 46 ("Minton Decl.") ¶ 4; Martino Second Decl. ¶¶ 3-7; *cf.* Serio Decl. ¶¶ 24-27, 31. Amodeo made multiple calls to a Marsh colleague who later resigned to join Howden, and communicated with Parrish between those calls. *See* Fuest Decl. ¶ 17. Wilcox solicited two employees, Sam Nation and Mark Minton, to join Howden, asking for Nation's personal email so Howden could send him an offer, and instructing Minton to respond to his offer "quickly" and "not to speak to anyone else about [their] conversation." *See* Mufson Decl., Ex. 44 ("Gonzalez Decl.") ¶ 11; Minton Decl. ¶ 5. And Collins' celebratory message to Layton, Serio, and Wilcox, saying "Rick is with us!" supports a finding that he was involved with the solicitation of Rick Lennerth to Howden. *See* Mufson Decl., Ex. 71. While the Individual Defendants deny that they violated their employee non-solicitation obligations, at this preliminary juncture, the evidence supports a finding that Marsh is likely to succeed in its claims against Gronovius, Amodeo, Serio, Wilcox, and Collins, given the timing and the context of the various communications with Marsh employees, the coordinated departures to Howden, and the movement of employees contacted by the Individual Defendants without formal employment applications to Howden. *See Take-Two Interactive Software, Inc. v. Zipperer*, No. 18-cv-02608 (LLS), 2018 WL 4347796, at *8 (S.D.N.Y. Aug. 16, 2018) ("[A] party seeking a preliminary injunction . . . is not required to prove its claim, but only to show that it is likely to succeed on the merits.").

Furthermore, Marsh has presented evidence that Gronovius, Serio, and Perez likely breached the client non-solicitation provision of their NSAs. The record reflects that Gronovius accessed several clients' information shortly before those same clients submitted BOR letters, Schnabolk Decl. ¶ 31; Mufson Decl., Ex. 73, took at least 12 Marsh clients to Howden, some of

17

whom he does not even argue are prior personal clients, *see* Gronovius Decl. ¶ 25, and emailed Marsh clients as recently as October 2025, *see* Mufson Decl., Ex. 66; Gronovius Decl. ¶¶ 38-39. Serio contacted two clients who moved to Howden shortly before the mass departure of employees and clients to Howden, one of whom submitted a BOR. *See* Serio Decl. ¶ 28; Schnabolk Decl. ¶ 36; Martino Second Decl. ¶ 9. And Perez transmitted policy materials days before July 21, 2025, to a client that later submitted a BOR and joined him at Howden. *See* Perez Decl. ¶ 24; Schnabolk Decl. ¶ 37. Again, these Individual Defendants deny violating their employee non-solicitation clauses, but the evidence, at least at this preliminary stage, demonstrates that Marsh is likely to succeed on its claim that they breached the client non-solicitation provisions of their NSAs given the timing and the context surrounding the client transfers.

Lastly, Marsh has shown that it has a "substantial likelihood of success on the merits" of its claim that the Individual Defendants breached their CAs. *Daileader*, 96 F.4th at 356. The CA defines "Confidential Information and Trade Secrets" in Schedule 1 to include information "not generally known or available to the general public," and that "has been developed, compiled or acquired by [Marsh] at its effort and expense," relating to Marsh's "products, services, clients, suppliers, vendors, business partners, and employees," including but not limited to "financial and business information," "plans for future business," "product and technical information," "client information" such as details about clients' policies, and "any and all information in whatever form relating to any client or prospective client of [Marsh]." *See, e.g.*, Gronovius CA, Schedule 1. Here, Marsh has submitted evidence that each of the Individual Defendants violated the CA by misusing or taking confidential information. For example, Gronovius sent nonpublic pitch decks, renewal strategies, and client lists to his personal email. *See* Martino Second Decl. ¶¶ 13-17; Schnabolk Reply Decl. ¶ 5. Serio sent zip files of client information to clients on the date of

18

his departure that far exceeded what a client would need in the normal course of business, Schnabolk Reply Decl. ¶¶ 9-11, and admits that these files contained information that was "created by or developed by Marsh outside of the client relationship," Serio Decl. ¶ 18. Amodeo accessed client contacts, premium breakdowns, and renewal pricing days before the departures on July 21, 2025, suggesting that he was accessing this information in connection with his departure. *See* Fuest Decl. ¶¶ 18-20; Martino Second Decl. ¶ 18. Wilcox emailed herself and printed confidential presentations containing information about strategic relationships with carriers and market growth objectives of high value competitors and heavily accessed Workday records a few days before July 21, 2025. *See* Mufson Decl., Ex. 74; Martino Second Decl. ¶ 20; Fuest Decl. ¶ 28; Fuest Reply Decl. ¶¶ 14-19. Collins accessed confidential files that he did not regularly access on his final day of employment while a personal USB device was connected to his Marsh laptop. *See* Fuest Decl. ¶¶ 30-32; Martino Second Decl. ¶¶ 22-23; Fuest Reply Decl. ¶¶ 10-11. On the day of the mass departure to Howden on July 21, 2025, Lennerth printed up to 18 copies of the Florida Zone client list and emailed the contacts with revenue premium notes to his personal account. *See* Lennerth Decl. ¶¶ 15, 18-22, 31; Sartain Decl. ¶ 8; Martino Third Decl. ¶ 5. Perez accessed client files over the weekend before the July 21 departures and then deleted several files before departing. *See* Fuest Decl. ¶¶ 26-27. Despite the Individual Defendants' attempts to provide alternative explanations for these actions, *see* Gronovius Opp. at 24-26; Individual Opp. at 19-22, given the context, timing, and evidence provided, the Court finds that Marsh has pointed to enough evidence to establish that it is likely to succeed on its claims that the Individual Defendants breached their CAs.

Lastly, Marsh has shown that it suffered damages from these breaches, given that it lost revenue and proprietary information from the loss of clients, employees, and confidential information. Schnabolk Decl. ¶ 29; McClellan Supplemental Decl. ¶ 5. Therefore, Marsh has

19

demonstrated a likelihood of success on its breach of contract claims against each Individual Defendant.

### B.    Tortious Interference with Contract

The record also supports a finding that Marsh has a "substantial likelihood of success on the merits" of its tortious interference with contract claim against Howden.  *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013).  A claim for tortious interference with contract requires a plaintiff to prove "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (1996)).  Marsh has provided sufficient evidence to show a substantial likelihood of establishing each element.

First, the Individual Defendants and the Florida Zone Leaders are bound by contracts with restrictive covenants that are likely enforceable.  *See supra* at 12-16; *see also Parrish,* 2025 WL 2676389, at *1-2 (finding Parrish, Lugones, Lynn, and Layton's similar non-solicitation and confidentiality agreements likely enforceable).

Second, the record reflects that Marsh has a substantial likelihood of showing that Howden had actual knowledge of the contracts.  Restrictive covenants like the Marsh NSA and CA are standard in the insurance industry.  Schnabolk Decl. ¶ 18.  Howden also acknowledged that incoming employees likely have non-solicitation and confidentiality restrictions in Howden's "Guidelines for New Joiners," telling new employees to cooperate with former employment contract restrictions.  Gonzalez Decl., Ex. F.  Most importantly, Lugones's June 5, 2025 document (that Marsh deems a "playbook") for recruiting employees to Howden expressly

references the Marsh "non-competes" and discusses modeling the Howden restrictive covenants on Marsh's restrictive covenants, illustrating that Howden was aware of the Marsh restrictive covenants. *See* Mufson Decl., Ex. 69 at 7 (stating that the new employee contracts at Howden should "Match Marsh's" restrictive covenants). This document is not simply Lugones's internal personal task list; rather, it indicates coordination with Howden because there are references to Howden working on BORs, the office space that Howden was securing in Florida, and meeting the London Howden team. *Id.* at 3. Thus, Marsh "has met its burden of establishing that there is a strong likelihood that [Marsh] will eventually be able to prove [Howden] had actual knowledge of the Individual Defendants' agreements." *See Oldenburg*, 2025 WL 3442819, at *12.

Third, Marsh has shown a substantial likelihood of establishing that Howden induced the breach of Marsh employees' restrictive covenants. Marsh presented evidence that Howden targeted the Florida Zone Leaders and directed them to use Marsh's proprietary data to recruit colleagues and solicit clients. *See* Schnabolk Decl. ¶¶ 28-39; Martino Second Decl. ¶¶ 3-24; Gonzalez Decl. ¶¶ 6-7; Minton Decl. ¶¶ 3-7; Mufson Decl., Ex. 47 ("Lugones Decl.") ¶ 19; Maffai Decl. ¶ 3-5; Mufson Decl., Ex. 69. Furthermore, Lugones, after accepting an offer from Howden on May 27, 2025, *see* Mufson Supplemental Decl., Ex. 23, created her "playbook" that necessarily involved input from Howden, listing Marsh employees to target, their prospective Howden titles, and pay increases that Howden would implement, *see* Mufson Decl., Ex. 69. Howden later relied on Lugones to facilitate meetings between a Marsh employee and a Marsh client with the Chairman of the Howden Board. Mufson Supplemental Decl., Exs. 1-3; Mufson Supplemental Decl. ¶ 6. Marsh has presented several documents that illustrate Howden working through and with Lugones and others at Marsh to bring over Marsh employees and clients to Howden. For example, in connection with Layton's solicitation of a Marsh employee, Howden sent an offer letter to that employee's personal email offering increased compensation to

21

persuade her to join Howden.  Mufson Decl., Ex. 52 ("Milani Decl.") ¶¶ 6-10.  Howden's

Executive Chair also sent Lugones recruitment documents and a BOR template to transfer Marsh

clients to Howden.  Mufson Supplemental Decl., Exs. 6, 7; *see also* Mufson Supplemental Decl.

¶ 11.

Howden argues that its "Guidelines for New Joiners," which stated that new hires should

comply with their prior employee contracts, disproves any claim of intentional inducement.  *See*

Howden Opp. at 21-22.  But these guidelines ring hollow given the evidence of Howden's

facilitation of breaches by the Florida Zone Leaders and Individual Defendants of their

restrictive covenants for Howden's benefit.  To be sure, the Court is not foreclosing that Howden

may ultimately show that it was not coordinating the breach of these obligations, but "[t]o

establish a likelihood of success on the merits, [Marsh] 'need not show that success is an

absolute certainty.'"  *Forge Underwriting Ltd. v. AmTrust Fin. Servs., Inc.*, No. 23-cv-06201

(JLR), 2023 WL 6890844, at *8 (S.D.N.Y. Oct. 19, 2023) (quoting *Broker Genius*, 313 F. Supp.

3d at 497).  Instead, Marsh only needs to show that there is a substantial likelihood that Howden

induced Marsh employees to breach their contracts with Marsh, and it has done so here.

Fourth, Marsh has shown that the Individual Defendants likely breached their contracts,

*see supra* at 16-20, and, as Judge Daniels found in *Parrish*, it is also likely that the Florida Zone

Leaders breached their employment contracts.  *Parrish,* 2025 WL 2676389, at *1-2.

Lastly, the harm to Marsh was likely foreseeable since the loss of workforce and clients

through improper solicitation concern precisely the legitimate employer interests that the NSA

and CA sought to protect.  *See supra* at 12-16.

Taken together, Marsh has demonstrated that it is substantially likely to succeed on the

merits of its tortious interference with contract claim against Howden.

### III.    Irreparable Harm

Next, the Court must examine whether Marsh has established that it will suffer irreparable harm absent a preliminary injunction.  "The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  *State Farm*, 120 F.4th at 80 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  To show irreparable harm, "the moving party 'must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'"  *Id.* (alteration in original) (quoting *Faiveley*, 559 F.3d at 118).  In other words, "the moving party must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.'"  *Id.* (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).  As a threshold issue, Defendants argue that Marsh cannot demonstrate irreparable harm because Marsh delayed seeking injunctive relief.  *See* Gronovius Opp. at 7-9; Individual Defendants Opp. 6-9; Howden Opp. 12-13.  The Court does not agree.

Marsh did not so delay in seeking injunctive relief that such relief should be denied.  "Delay in seeking injunctive relief 'may, standing alone, preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency' upon which the availability of the remedy is predicated."  *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, No. 21-cv-00038 (MKV), 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021) (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)).  However, "Courts may excuse delays . . . [i]f the movant can provide a credible explanation for its inactivity."  *BakeMark USA LLC v. Negron*, No. 23-cv-02360 (AT) (BCM), 2024 WL 1075280, at *22 (S.D.N.Y. Jan. 12, 2024) (alteration in original) (quoting *Gidatex*, 13 F. Supp.

23

2d at 419), *report and recommendation adopted*, 2024 WL 3385641 (S.D.N.Y. July 12, 2024). Courts have excused delays when the "delay was caused by good faith efforts to investigate the facts and law." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011).

Here, Marsh has provided a credible explanation for its delay in seeking injunctive relief against the Individual Defendants and Howden. Following the July 21, 2025 departures, Marsh immediately sought injunctive relief against the Florida Zone Leaders, Parrish, Lugones, Lynn, and Layton, *see* Mufson Reply Decl. ¶ 13, which was granted on September 18, 2025, *see Parrish,* 2025 WL 2676389, at *3. After further forensic investigation, Marsh ascertained the Individual Defendants' role in the departure of several Marsh employees and clients. Given that this was a "fluid situation, with [Marsh] losing clients day-by-day" and that Marsh diligently investigated the situation, any delay in seeking injunctive relief against the Individual Defendants does not undercut claims of irreparable harm. *See Oldenburg*, 2025 WL 3442819, at *14; Schnabolk Decl. ¶¶ 28-30 (discussing client departures after July 21, 2025).

Likewise, Marsh did not impermissibly delay in seeking relief from Howden, given that Marsh immediately sought injunctive relief against Howden in the Delaware action. *See* Mufson Reply Decl. ¶ 18. When the Delaware Court deferred resolution of that claim because New York was a more appropriate forum, *see* Lian Decl., Ex. H at 4, Marsh then brought an action in this Court and promptly sought injunctive relief against Howden and the Individual Defendants.

Turning then to Marsh's claimed irreparable harm, Marsh argues that absent a preliminary injunction restraining Defendants from soliciting Marsh employees, soliciting and servicing Marsh clients, and using or retaining Marsh's confidential information, in violation of Marsh's employment agreements, Marsh will continue to suffer irreparable harm from the loss of client relationships, loss of employees, and continuing misuse and disclosure of its confidential

24

information.  Br. at 26-27.  The Court finds that Marsh has shown that it will suffer irreparable

harm absent its requested injunctive relief.

First, Marsh has shown that it is at risk of suffering irreparable harm from the solicitation

of its employees and the solicitation and servicing of its clients.  With respect to lost clients, "[i]t

is well established in the Second Circuit that a loss of client relationships and customer goodwill

that results from the breach of a restrictive covenant generally constitutes irreparable harm."

*Osborne*, 2025 WL 304500, at *5 (collecting cases).  As the Second Circuit explained in *Ticor*

*Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999), "it would be very difficult to calculate

monetary damages that would successfully redress the loss of a relationship with a client that

would produce an indeterminate amount of business in years to come."  *Id.* at 69.  Marsh has

presented evidence that it relies on long-term, indefinite business relationships with clients to

sustain its operations, and thus lacks an adequate remedy at law for such injuries.  *See* McClellan

Decl. ¶¶ 4-8.  Likewise, the "loss of Marsh employees also constitutes irreparable harm,"

*Karasaki*, 2008 WL 4778239, at *14, because Marsh will lose its investment in training and

developing those employees, *see* Mufson Decl., Ex. 51 ¶¶ 17-19, an injury that is difficult to

quantify.  *See, e.g.*, *id.* ("The departure of Marsh employees deprives Marsh not only of its

investment in training and developing those employees, but also, for those who were brokerage

professionals, of those employees' clients who follow the employees because of the relationships

developed with them at Marsh's expense."); *Natsource LLC*, 151 F. Supp. 2d at 469 (finding that

plaintiff would be irreparably harmed by "[t]he loss of training [of the company's brokers] and

interference with already established relationships that would occur should [defendant] recruit

other employees within the year").  In fact, the NSAs expressly contemplated that equitable relief

is appropriate in the event of breach of the employee's confidentiality and non-solicitation

obligations.  *See, e.g.*, Gronovius NSA at 4; Gronovius CA at 5.  While "contractual language is

25

not dispositive . . . it serves as an additional factor in favor of concluding that [Marsh] has shown a likelihood of irreparable injury" from breaches of the contracts. *See Osborne*, 2025 WL 304500, at *5; *see also Ticor*, 173 F.3d at 69.

Defendants argue that Marsh has not met its burden for a preliminary injunction because Marsh has not shown that the loss of client relationships and employees is an ongoing risk. *See* Gronovius Opp. at 10-15; Individual Defendants Opp. 6-13; Howden Opp. 11-19. The Court does not agree. "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010). Here, Marsh has presented evidence that the risk of lost client relationships and customer goodwill remains. Both Serio and Gronovius have solicited clients as recently as October of 2025. *See* Martino Second Decl. ¶ 8; Mufson Decl., Ex. 66 (Gronovius email to Marsh client that later transferred business to Howden). And Marsh clients and employees are continuing to move to Howden, including this month. *See* Schnabolk Reply Decl. ¶ 2; McClellan Supplemental Decl. ¶ 5. Thus, there is ample evidence for this Court to conclude that there is an ongoing risk of future employee and client solicitation.

Second, Marsh has made "a strong showing of irreparable harm" as it relates to the continued retention of Marsh's confidential information by the Individual Defendants and Howden. *Daileader*, 96 F.4th at 356. Marsh has shown that Individual Defendants likely misused and took Marsh's confidential information. *See supra* at 18-20. The ongoing risk of disclosure and use of Marsh's confidential information that is impermissibly retained by the Individual Defendants while they are at Howden, a competing business, suffices to establish a risk of irreparable harm. *See, e.g., Parrish,* 2025 WL 2676389, at *3 ("Irreparable harm may be established where, as here, there is a substantial risk that the [d]efendant will use and/or disclose [p]laintiff's confidential information."); *Bijan Designer for Men, Inc. v. Katzman*, No. 96-cv-

26

07345 (BSJ), 1997 WL 65717, at *7 (S.D.N.Y. Feb. 7, 1997) ("The use and disclosure of an employer's *confidential* customer information *and* the possibility of loss of customers through such usage constitute irreparable harm." (citation omitted)).

In sum, the Court finds that Marsh has met its burden of showing the requisite irreparable harm in support of an injunction prohibiting Defendants from soliciting Marsh employees, soliciting and servicing Marsh clients, and using Marsh's confidential information in violation of Marsh employment contracts.

## IV.    Balance of Hardships and Public Interest

Finally, the Court finds that the balance of hardships and public interest favor granting Marsh a preliminary injunction, except with respect to an injunction preventing Defendants from servicing clients that have already moved to Howden.  Before issuing a preliminary injunction, "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger*, 607 F.3d at 80. Furthermore, "[i]n deciding whether to grant a preliminary injunction, a court must also 'ensure that the public interest would not be disserved by the issuance of a preliminary injunction.'" *Oldenburg*, 2025 WL 3442819, at *16 (quoting *Salinger*, 607 F.3d at 80).

Here, "Marsh has demonstrated that it will likely suffer irreparable harm, absent injunctive relief, through the loss of client relationships, employees, and disclosure of its confidential information." *Parrish,* 2025 WL 2676389, at *3.  This hardship outweighs any burden Defendants will bear from being required to comply with their employment agreements and return Marsh's confidential information.  *Id.*  Likewise, "the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements."  *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014).  An injunction would also serve the public

27

interest by "discouraging [Howden] from underwriting 'underhanded behavior in violation of contractual obligations and [other] legal requirements.'"  *See Osborne*, 2025 WL 304500, at *9 (alteration in original) (quoting *Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, C.A. No. 2019-0226-JTL, 2019 WL 2536104, at *22 (Del. Ch. June 20, 2019)).

However, the balance of hardships and public interest weigh against a preliminary injunction preventing Defendants from servicing clients that already have moved to Howden. An injunction preventing Defendants from servicing existing Howden clients would in effect deny those clients the ability to work with their chosen insurance broker, whom they have now been working with at Howden for the past several months.  Dismantling those client business arrangements and contracts is a significant burden on third parties, and that harm "must be balanced against [the injunction's] necessity."  *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 355 (S.D.N.Y. 2018); *Oldenburg*, 2025 WL 3442819, at *15-16 ("The Court is hesitant to keep non-parties from working with the insurance broker of their choosing absent a compelling legal basis.").  There is also no indication that Marsh's loss of clients and attendant goodwill would be remedied by an anti-servicing preliminary injunction on clients who have already moved to Howden, because there is no evidence that they would return to Marsh.  Thus, "it is not clear from the existing record that an injunction ordering [Defendants] to stop servicing those clients — an extraordinary remedy — would . . . ameliorate [Marsh's] harm."  *Oldenburg*, 2025 WL 3442819, at *16; *see DiGregorio*, 307 F. Supp. 3d at 355 (declining to enjoin defendants from servicing clients "who have already chosen to retain their services").

Marsh disagrees and argues that permitting Howden "to service clients obtained through misuse of confidential information perpetuates the breach and irreparable harm."  Br. at 28.  But the harm arising from misuse of confidential information will be remedied by targeted injunctive

28

relief prohibiting Defendants from using Marsh's confidential information and ordering Defendants to return any confidential information in their possession. *Cf. Buckingham Corp. v. Karp*, 762 F.2d 257, 261 (2d Cir. 1985) (vacating preliminary injunction that restricted former employee from contracting with company's suppliers because "[t]o the extent that [defendant] may be continuing to use [plaintiff's] documents or information, the proper interim remedy would be an injunction against such use"). Harm to Marsh as a result of misuse of confidential information can therefore be alleviated without an anti-servicing injunction for current Howden clients. *See City of New York v. Mickalis Pawn Shop, LLC.*, 645 F.3d 114, 144 (2d Cir. 2011) ("[A] district court has 'a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct[.]'" (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997))). There are also other avenues for ultimate relief for violations of the client non-solicitation provisions and related torts, including punitive damages. *Oldenburg*, 2025 WL 3442819, at *16 (noting that compensatory and punitive damages are available to remedy harm from violations of client-solicitation provisions and related torts in lieu of anti-servicing injunction for clients who have already moved to competitor).

Thus, the Court finds that an anti-servicing preliminary injunction for clients who have already moved their business to Howden is not warranted.

## V. Injunction

In sum, the Court finds that Marsh has met its burden for a preliminary injunction and is entitled to the relief requested, with the exception of a prohibition on Defendants servicing Marsh clients that have already moved their business to Howden.[4]

---

[4] Marsh also asks the Court to require the Individual Defendants to return all Marsh Property. Dkt. 172-1 at 7. However, Marsh does not present any evidence that the Individual Defendants are in possession of Marsh Property beyond Marsh's confidential information, so the Court will not order the return of unidentified property.

At the preliminary injunction hearing, the Court expressed its interest in ensuring the parameters of any injunction be appropriately limited, clear, and unambiguous in order to avoid disputes regarding compliance.  After extensive discussions about the parameters of various proposed restrictions, the Court invited Marsh to provide a revised proposed order to clarify the injunctive relief sought in terms of the scope of the confidential information it was seeking to restrict and the parameters of personal clients who fall outside the client non-solicitation restrictions.  Tr. at 270:3-274:8, 288:22-289:3.  The Court provided Defendants with an opportunity to respond to Marsh's proposals.  *Id.* at 289:5-24.

The Court reviewed the parties' submissions and considered all of the arguments presented.  As for restrictions regarding confidential information, the Court will track the contractual language set forth in the CA and refer to the definition of Confidential Information and Trade Secrets.  The Court will not use the more expansive or less expansive definitions proposed by the parties in their proposed orders and instead will enforce the definition and restriction that was agreed upon by the Individual Defendants in their CAs.

With respect to personal clients, the Court will track the seminal case of *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (1999) in including a carve-out from the client non-solicitation restriction for personal clients who came to Marsh solely to avail themselves of the restricted employees' services and only as a result of their own independent recruitment efforts, which Marsh neither subsidized nor otherwise financially supported as part of a program of client development.  *See id.* at 1225.

Furthermore, the Court shall impose a bond requirement of $300,000 on Marsh.  "[T]he language of . . . Rule 65(c) confers broad discretion on the trial judge to set the amount of the bond, even to dispense with the bond requirement altogether."  *Schuhriemen*, 183 F. Supp. 3d at 538 (quoting *DeWitt Stern Grp., Inc. v. Eisenberg*, No. 13-cv-03060 (RWS), 2013 WL 2420835,

at *6 (S.D.N.Y. June 4, 2013)).  In this case, Defendants will likely be harmed if no bond is posted, since if they ultimately prevail on the merits, they will have been prevented from soliciting and servicing clients with whom they are entitled to do business.  Though the NSAs contemplate Marsh's entitlement "to temporary and permanent injunctive relief (without the necessity of posting a bond)," *see, e.g.*, Gronovius NSA at 3, "this language is not binding as to the Court's authority to impose a bond requirement," *Schuhriemen*, 183 F. Supp. 3d at 538. Thus, the Court imposes a bond of $300,000 on Marsh.

## VI.    Motions to Seal

Finally, the Court addresses the three letter motions to seal at Dkts. 133, 162, and 177. "Judicial documents are subject at common law to a potent and fundamental presumptive right of public access[.]"  *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022) (quoting *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020)).  In *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), the Second Circuit articulated a three-step test for district courts to decide whether a filing can remain under seal.  *Id.* at 119.  First, the Court must "conclude that the documents at issue are indeed 'judicial documents,'" meaning that the item is "relevant to the performance of the judicial function and useful in the judicial process."  *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).  Second, the Court "determine[s] the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)). Lastly, the Court is directed to weigh the presumption of public access attached to the document against the countervailing factors.  *Id.* at 120.

In Marsh's letter motion to seal, Marsh asks to redact an individual non-party's cell phone number at Sartain Decl. ¶ 2.  *See* Dkt. 133 at 1.  Although this declaration is a judicial

document, the weight of the presumption as it relates to personal contact information is low and outweighed by the strong privacy interests that counsel against disclosure. *See, e.g.*, *Eckhart v. Fox News Network, LLC*, No. 20-cv-05593 (RA), 2024 WL 4931857, at *3 (S.D.N.Y. Dec. 2, 2024) ("[T]he personal email addresses and phone numbers of various non-parties are entitled to continued sealing," and "courts routinely permit such redactions to protect the privacy of non-parties."). Thus, the Court grants the motion to seal at Dkt. 133.

Likewise, the Court grants the motion to seal at Dkt. 162, which seeks to redact personal email addresses and phone numbers, since these items carry a low presumption of public access. The documents produced were gathered in discovery under a protective order in *Parrish*, No. 25-cv-06208, Dkt. 179 ¶ 10, *see* Mufson Supplemental Decl. ¶ 2, and the limited redactions are to protect email addresses and phone numbers, which are typically sealed. *See, e.g.*, *Eckhart*, 2024 WL 4931857, at *3. Thus, Marsh's motion to seal at Dkt 162 is granted.

Lastly, the Court grants Defendant Gronovius and non-party Lugones's ("Movants"), motion to seal at Dkt. 177, which seeks to make additional redactions to Marsh's proposed redactions of Dkt. 167-3, to protect personal medical history, other personal information, and discussions about personal business. Dkt. 177 at 1. Marsh does not oppose these additional redactions. *Id.* Although this exhibit is a judicial document with a strong presumption of public access, this presumption is outweighed by the significant countervailing privacy interests of non-parties. The Second Circuit has held that "the privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation" when determining whether to grant a motion to seal. *Amodeo*, 71 F.3d at 1050 (quoting *In re Application of Newsday, Inc.*, 895 F.2d 74, 79-80 (2d Cir. 1990)). The exhibit in question is a series of text messages between non-parties to this litigation. Furthermore, the limited proposed redactions are tailored to shield communications regarding personal medical history, other personal information, and discussions

32

around personal business, all of which carry significant privacy interests that, in this case, outweigh the presumption of public access.  *See, e.g.*, *Thor Equities, LLC v. Factory Mut. Ins. Co.*, No. 20-cv-03380 (AT), 2023 WL 6382684, at *1 (S.D.N.Y. Sept. 29, 2023) (finding the privacy interests outweighed the presumption of public access when proposed sealing sought to protect "sensitive business information" and "personal, confidential, [and] sensitive medical information" (alteration in original)); *United States v. Wey*, 256 F. Supp. 3d 355, 411 (S.D.N.Y. 2017) ("The relevant materials reflect sensitive medical, financial, educational, and other personal information pertaining to non-parties, and the Court finds that the privacy interests of those non-parties outweigh any public interest in disclosure[.]").  Thus, the motion to seal at Dkt. 177 is granted.

## CONCLUSION

For the aforementioned reasons, and as set forth more specifically in a separate Order, the Court GRANTS in part and DENIES in part Plaintiffs' Application for a Preliminary Injunction. In general terms, this injunction will prohibit (i) Gronovius, Amodeo, Serio, Wilcox, and Collins from soliciting Marsh employees, (ii) Gronovius, Serio, and Perez from soliciting and servicing Marsh clients or prospective clients, except for their personal clients and clients that already moved their business to Howden, (iii) all Individual Defendants from disclosing or using Marsh's confidential information, (iv) Howden from aiding former Marsh employees in violation of any terms of Marsh's current or former employees' contractual obligations to Marsh with respect to employee or client solicitation or disclosure of confidential information, (v) Howden from soliciting or servicing Marsh clients procured by Marsh employees in violation of their employment contracts, except for their personal clients and clients that already moved their business to Howden, (vi) Howden from soliciting Marsh employees through current or former Marsh employees in violation of their employment contracts, and (vii) Howden from disclosing

or using Marsh's confidential information. Furthermore, the Individual Defendants and Howden shall be required to timely return all of Marsh's confidential information with a sworn certification. The Application is otherwise DENIED.

Furthermore, the Court GRANTS Plaintiffs' motions to seal at Dkts. 133, 162, and 177. The Clerk of the Court is respectfully directed to close the open motions at Dkt. 133, Dkt. 162, and 177, and permit the filings at Dkt. 140, Dkt. 164, and Dkt. 165 to remain under seal. The parties are further directed to refile the documents at Dkt. 167 with redactions in accordance with the Court's ruling.

Dated: February 24, 2026
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge